UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO
Eastern Division

| | |
|---|---|
| Wesco Insurance Company, | Case Number _____ |
| Plaintiff, | |
| v. | **COMPLAINT FOR DECLARATORY JUDGMENT** |
| Yellowstone Partners, LLC; David H. Hansen; Richard K. Baird; Paul Weimer; Michael G. Dustin; KayLynn Dalebout, | |
| Defendants. | |

Plaintiff, Wesco Insurance Company, by and through its undersigned attorneys, brings this Complaint for Declaratory Judgment against the above-named Defendants regarding Wesco's obligations under an Insurance Policy issued by Wesco to Yellowstone Partners, LLC. In support of its cause of action, Wesco states as follows:

### I.   PARTIES

1.   Plaintiff Wesco Insurance Company ("Wesco") is a corporation incorporated under the laws of the State of Delaware. Wesco has its principal place of business in New York, New York, and is located at 59 Maiden Lane, 6th Floor, New York, NY 10038.

2.   Defendant Yellowstone Partners, LLC ("Yellowstone") is a limited liability company formed under the laws of the State of Idaho. Yellowstone has its principal place of business in Idaho Falls, Idaho, and is located at 3340 Merlin Drive, Idaho Falls, Idaho 83404.

3.   The sole owner and member of Yellowstone is DeGrande Management, LLC. Upon information and belief, DeGrande Management is a limited liability company formed

1

under the laws of the State of Wyoming, and has its principal place of business in Buffalo, Wyoming.

4. The sole owner and member DeGrande Management, LLC is Doyle Beck. Upon information and belief, Beck is a resident of Idaho Falls, Idaho.

5. Defendant David H. Hansen, is Yellowstone's former CEO. Upon information and belief, Hansen is a resident of the State of Arizona, residing at 22073 E. Munoz Court, Queen Creek, Arizona 85142.

6. Defendant Richard K. Baird is a former CEO and former Chief Investment Officer of Yellowstone. Upon information and belief, Baird is a resident of the State of Utah, residing at P.O. Box 788, Santa Clara, Utah 84765.

7. Defendant Paul Weimer is Yellowstone's former Chief Operating Officer. Upon information and belief, Weimer is a resident of the State of Idaho, residing at 1898 W. 4300 South, Rexburg, Idaho 83440.

8. Defendant Michael G. Dustin is Yellowstone's former Municipal Bond Manager. Upon information and belief, Dustin is a resident of the State of Idaho, residing at 1991 Bobwhite Drive, Ammon, Idaho 83401.

9. Defendant KayLynn Dalebout is Yellowstone's current Chief Financial Officer, and prior Financial Controller. Upon information and belief, Dalebout is a resident of the State of Idaho, residing at 253 Georgetown Court, Idaho Falls, Idaho 83404.

## II. JURISDICTION AND VENUE

10. This Court has the power to determine the parties' respective rights and other legal obligations as requested herein pursuant to the Federal Declaratory Judgment Act, 28

U.S.C. §§ 2201-2202.  The dispute between Wesco and Defendants, discussed below, creates an actual controversy for this Court to adjudicate.

11. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the matter is between citizens of different states.

12. Venue is proper before this Court pursuant to 28 U.S.C. § 1391(b) and Local Civil Rule 3.1, because a substantial part of the events giving rise to this suit occurred in this judicial district and division.

### III.     FACTUAL ALLEGATIONS

**A.     Yellowstone Self-Reports that it Improperly Took Customer Funds**

13. Yellowstone is an investment advisor registered with the Securities and Exchange Commission ("SEC").

14. During 2015, several clients of Yellowstone requested that Yellowstone review potential overcharging of fees from the clients' investment accounts.

15. Yellowstone reviewed these client accounts, determined that money had been improperly taken from those accounts, and returned those amounts to clients.

16. In April, 2016, Yellowstone discovered improper client account charges with respect to several additional clients.

17. In May, 2016, Yellowstone hired an accounting firm and law firm to conduct an investigation of amounts improperly taken from client accounts.

18. As a result of its investigation, Yellowstone identified additional accounts for which it had improperly obtained funds from client accounts.

19. Yellowstone began to reimburse affected clients, and ultimately returned to clients improperly obtained fees in excess of $5,000,000.00.

20. Yellowstone, through its attorneys, sent a self-report to the SEC on July 29, 2016, in which Yellowstone described the overbilling of client accounts, identified the amounts of the funds improperly taken, and stated that it had returned some of those funds to clients (the "Self-Report"). A true and correct copy of the Self-Report is attached hereto as Exhibit 1.

21. The Self-Report states that it is written "to report possible violations of the Investment Advisors Act of 1940 and its related rules."

22. The Self-Report states that "Yellowstone had discovered that it had significantly over-billed some clients."

23. Specifically, the Self-Report states that: "In many instances, Yellowstone billed its annual fee to various '8072' clients more than once during a 12-month billing period. A little more than one-third of all '8072' clients were charged their 1% annual fee at the beginning of their annual billing cycles and then billed again later in the same year."

24. The Self-Report further states that "as a general premise, the advances were taken to meet Firm payroll and other expenses."

25. The Self-Report states that "In early May 2016, Yellowstone undertook to reimburse the overcharges to the '8072' clients affected."

26. The Self-Report states that reimbursements to clients of improperly taken funds in the amount of $4,495,782.62 had previously been made and that $785,802.84 was to be repaid to clients in October, 2016.

    B.  **The SEC Investigation**

27. On November 21, 2016, the SEC issued a formal order of investigation into Yellowstone's billing practices and overbilling of fees to client accounts (the "SEC Order").

28. The SEC Order states that the SEC has information tending to show the following:

> In possible violation of Sections 206(1) and 206(2) of the Advisers Act, Yellowstone Partners, LLC its officers, directors, employees, partners, subsidiaries, and/or affiliates and/or other persons or entities, while acting as investment advisers, directly or indirectly, may have been or may be employing devices, schemes, or artifices to defraud any client or prospective client, or engaging in transactions, practices or courses of business which operated or operate as a fraud or deceit upon a client or prospective client.
>
> As part of these activities, such persons or entities, directly or indirectly, may have been or may be making false statements of material fact or omitting to state material facts concerning, among other things, billing practices. As part of these activities, such persons or entities, directly or indirectly, may have been or may be misappropriating or abusing client assets by, among other things, the overbilling of fees to client accounts.

29. The SEC Order directs that a private investigation be made to determine whether such violations were committed, and it designates certain officers to conduct that investigation.

30. The SEC Order was subsequently amended on December 19, 2016 to designate additional officers to assist in the investigation of "possible violations of the provisions of the federal securities laws."

31. The SEC thereafter took a series of investigative steps based upon the SEC Order (the "SEC Investigation").

32. As part of the SEC Investigation, the SEC began issuing subpoenas in December, 2016. A subpoena was issued to Yellowstone on December 20, 2016. Subpoenas were also issued to Defendants Hansen, Baird, Weimer, Dustin, and Dalebout (the "Individual Defendants").

33. Each subpoena requires the recipient to testify and/or produce documents related to the SEC Investigation.

34. The cover letter to each subpoena states that the SEC is "trying to determine whether there have been any violations of the federal securities laws."

35. The subpoenas themselves state the SEC "has issued a formal order authorizing this investigation under Section 20(a) of the Securities Act of 1933, Section 21(a) of the Securities Exchange Act of 1934, and Section 209(a) of the Investment Advisers Act of 1940."

36. Yellowstone has agreed to indemnify each of the Individual Defendants for all defense expenses and costs incurred in relation to the SEC Investigation.

### C. The Wesco Policy

37. Wesco issued a "Commercial Policy" for the policy period January 1, 2016 to January 1, 2017, a true and correct copy of which is attached as Exhibit 2 (the "Policy").

38. The Policy contains multiple coverage parts, including the "D&O Coverage Part," and the "Professional Liability Coverage Part." The Declarations identify Yellowstone Partners, LLC as the named insured. The policy year aggregate limit of liability is $2 million.

39. The D&O Coverage Part includes coverage under Insuring Agreement B ("Company Indemnification") and Insuring Agreement C.1 (Company Liability), subject to a single limit of liability of $2 million and a retention of $25,000. Subject to the other terms and conditions of the Policy, those two insuring agreements provide coverage as follows:

> **B. COMPANY INDEMNIFICATION COVERAGE** – The **Insurer** will pay on behalf of the **Company**, **Loss** resulting from any **Claim** first made during the **Policy Period** or Extended Reporting Period (if exercised) against the **Insured Persons** for which the **Company** has agreed to or is legally permitted or required by law to indemnify the **Insured Persons** for any **Wrongful Act**.
>
> **C. COMPANY LIABILITY COVERAGE** – The **Insurer** will pay on

>behalf of the **Company**:
>
>1.  **Loss** resulting from any **Claim** first made during the **Policy Period** or Extended Reporting Period (if exercised) against the **Company** for any **Wrongful Act** not covered in any other **Coverage Part** made part of this **Policy** . . . .

40. Section IV of the D&O Coverage Part contains definitions for certain terms that appear in bold font in the Policy, including the following:

>**<u>Claim</u>** means:
>
>1.  a written demand, other than a **Shareholder Derivative Demand**, for monetary damages or non-monetary relief;
>2.  a civil proceeding commenced by the service of a complaint or similar pleading;
>3.  a criminal proceeding commenced by a filing of charges or the return of an indictment;
>4.  a formal administrative or regulatory proceeding commenced by a filing of a notice of charges, formal investigative order, service of summons, or similar document;
>5.  an arbitration, mediation or similar alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the **Insurer's** written consent, such consent not to be unreasonably withheld;
>6.  service of a subpoena on an **Insured Person** identified by name if served upon such person pursuant to a formal investigative order by the Securities and Exchange Commission;
>7.  a **Shareholder Derivative Demand** solely with respect to Insuring Agreement C.2. only; or
>8.  a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding,
>
>against an **Insured** for a **Wrongful Act**. **Claim** does not include any labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement.
>
>**<u>Insured Person</u>** means any:
>
>1.  **Executive**; or
>2.  **Employee**.
>
>**<u>Wrongful Act</u>** as used in this **Coverage Part** means any actual or alleged:
>
>1.  error, omission, misstatement, misleading statement, neglect or breach of

7

>   duty by **Insured Persons** in their capacity as such or, with respect to Insuring Agreement C., by the **Company**; or
> 2. matter claimed against the **Insured Persons** solely by reason of their serving in such capacity.

41. Section V of the D&O Coverage Part contains certain exclusions to coverage, including the following:

> **Fraud / Illegal Profit and Violation of Law** – The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to:
>
> 1. the gaining, of any profit, remuneration or pecuniary advantage to which such **Insured** is not legally entitled; or
> 2. any fraudulent or criminal **Wrongful Act** with actual knowledge of its wrongful nature or with intent to cause damage by such **Insured**,
>
> as evidenced by a final adjudication by a judge, jury or arbitrator in any proceeding.
>
> **Securities Offering** – The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to:
>
> a. the public offer, sale, solicitation or distribution of securities issued by the **Company**; or
> b. the violation of any federal, state, local or provincial statute relating to securities, including the Securities Act of 1933 and the Securities and Exchange Act of 1934, or any rules or regulations promulgated thereunder;
>
> provided, however, that this exclusion will not apply to:
>
> 1. any offer, purchase or sale of securities, whether debt or equity, in a transaction that is exempt from registration under the Securities Act of 1933 (an "Exempt Transaction"); or
> 2. to the extent that such **Claim** is made by a security holder of the **Company** for the failure of the **Company** to undertake or complete an initial public offering or sale of securities of the **Company**.
>
> If at least thirty (30) days prior to any securities offering by the **Company**, other than pursuant to an Exempt Transaction, the **Insurer** receives notice of the proposed transaction and any additional information requested by the **Insurer**, the **Company** may request a proposal for coverage subject to any additional terms and conditions, and payment of any additional premium, described in such

proposal.

42. The Professional Liability Coverage Part includes coverage under Insuring Agreement B ("Professional Services Liability"), subject to a single limit of liability of $2 million and a retention of $25,000. Subject to the other terms and conditions of the Policy, that insuring agreement provides coverage as follows:

> B. **PROFESSIONAL SERVICES LIABILITY** – The **Insurer** will pay on behalf of the **Insured**, **Loss** resulting from a **Claim** first made during the **Policy Period** or Extended Reporting Period (if exercised), by or on behalf of a customer of the **Company** for a **Wrongful Professional Services Act**.

43. Section II of the Professional Liability Coverage Part provides definitions for certain terms that appear in bold font in the Policy. As amended by the Investment Advisor endorsement, the following definitions are relevant to this matter:

> **Claim** means:
>
> 1. a written demand for monetary damages or non-monetary relief;
> 2. a civil proceeding commenced by the service of a complaint or similar pleading;
> 3. a criminal proceeding commenced by a filing of charges or return of an indictment;
> 4. an arbitration, mediation or similar alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the **Insurer's** written consent, such consent not to be unreasonably withheld; or
> 5. a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding,
>
> against an **Insured** for a **Wrongful Act** including any appeal from such proceeding. **Claim** shall also mean a notice of investigation of violation(s) of law or regulation or disciplinary proceedings against an **Insured** by any governmental body or self-regulatory organization, but only if the investigation of violation(s) of law or regulation or disciplinary proceedings were initiated by a complaint by the Insured's customer or client or former customer or client, arising from the **Insured's** rendering or failure to render **Professional Services** for that customer or client or former customer or client.
>
> **Wrongful Professional Services Act** means any actual or alleged act, error,

9

omission, misstatement, misleading statement or breach of duty or neglect by any **Insured** in the rendering of, or failure to render **Professional Services**. **Wrongful Professional Services Act** does not include a **Wrongful Lending Act** or a **Wrongful Trust Services Act**.

**Professional Services** means services rendered for or advice given to others by an **Insured** for a fee, remuneration, **Pro Bono** or other consideration in an **Insured's** practice as a **Financial Advisor**. **Professional Services** also includes services performed in the capacity of a fiduciary pursuant to **ERISA**.

44. Section III of the Professional Liability Coverage Part contains a number of exclusions from coverage, including the following:

> **Fraud / Illegal Profit and Violation of Law** – The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to:
>
> 1. the gaining, of any profit, remuneration or pecuniary advantage to which such **Insured** is not legally entitled; or
> 2. any fraudulent or criminal **Wrongful Act** with actual knowledge of its wrongful nature or with intent to cause damage by such **Insured**,
>
> as evidenced by a final adjudication by a judge, jury or arbitrator in any proceeding.
>
> **Fee Dispute** – The **Insurer** shall not be liable under Insuring Agreements B. or C. for **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to any disputes over fees, commissions, or charges for the **Company's** services.

45. Coverage under the Policy is also subject to the General Terms and Conditions Applicable to All Coverage Parts of the Policy. Section III of the General Terms and Conditions Applicable to All Coverage Parts includes the following:

> C. **SINGLE LIMIT / RETENTION** – **Claims** based upon or arising out of the same **Wrongful Act** or **Interrelated Wrongful Acts** committed by one or more **Insureds** shall be considered a single **Claim**, and only one Retention and Limit of Liability shall apply. Each such single **Claim** shall be deemed to be first made on the date the earliest of such **Claims** was first made, regardless of whether such date is before or during the **Policy Period**.

46. Section V of the General Terms and Conditions Applicable to All Coverage Parts

10

includes the following:

    C. **INTERRELATED CLAIMS** – All **Claims** or **Potential Claims** for **Interrelated Wrongful Acts** will be considered as a single **Claim** or **Potential Claim**, whichever is applicable, for purposes of this **Policy**. All **Claims** or **Potential Claims** for **Interrelated Wrongful Acts** will be deemed to have been made at the time the first of such **Claims** or **Potential Claims** for **Interrelated Wrongful Acts was** made whether prior to or during the **Policy Period**.

47. Section VI of the General Terms and Conditions Applicable to All Coverage Parts provides as follows:

    A. **DEFENSE OF CLAIMS** – The **Insurer** does not assume any duty-to-defend and contest any **Claim** made against them, provided that:

        1. the **Insurer** will have the right to participate with the **Insured** in the investigation, defense and settlement, including the negotiation of a settlement of any **Claim** that appears reasonably likely to be covered in whole or in part by **Coverage Part** and the selection of appropriate defense counsel;

        2. the **Insurer** may establish and provide to counsel for the **Insured** guidelines for the handling of **Claims** covered under this **Policy** as a condition of the **Insurer's** obligation to pay **Defense Expenses**, counsel for the **Insured** shall adhere to the guidelines provided by the **Insurer** in the defense of such **Claims**. The **Insurer** shall not be obligated to pay **Defense Expenses** that have been incurred without observance of the guidelines, or that otherwise are unreasonable; and

        3. upon written request, the **Insurer** will advance **Defense Expenses** with respect to such **Claim**. Such advance payments by the **Insurer** will be repaid to the **Insurer** by the **Insureds** severally according to their respective interests in the event and to the extent that the **Insureds** are not entitled to payment of such **Defense Expenses**. As a condition of any payment of **Defense Expenses** under this subsection, the **Insurer** may require a written undertaking on terms and conditions satisfactory to the **Insurer** guaranteeing the repayment of any **Defense Expenses** paid to or on behalf of any **Insured** if it is finally determined that any such **Claim** or portion of such **Claim** is not covered.

. . .

    **D.**     **The Parties' Coverage Dispute**

11

48. Wesco has received requests for coverage under the Policy for the SEC Investigation from all defendants.

49. In these requests, all of the Individual Defendants state that it is their position that the SEC Investigation "arises from certain alleged wrongful acts referenced in the Formal Order in connection with the possible violations of the Securities Act of 1933 and the Securities Exchange Act of 1934."

50. The request submitted by the Yellowstone entity similarly states that the SEC Investigation arises from "alleged wrongful acts in connection with the possible violations of the Investment Adviser Act of 1940, the Securities Act of 1933 and the Securities Exchange Act of 1934."

51. The Notice of Claim form submitted by the insureds states that "About 120 Clients were billed more on fees than they should have been billed. Clients have now been paid back."

52. Yellowstone and each of the Individual Defendants have asked Wesco to advance defense expenses and indemnify them for any losses "relating to and resulting from the SEC's formal investigation."

53. In response to the defendants' requests for Policy coverage for the SEC Investigation, Wesco determined that the Policy does not provide coverage for the SEC Investigation, and Wesco communicated this coverage position to the defendants by letter dated April 24, 2017. A true and correct copy of Wesco's coverage position letter is attached as Exhibit 3 (the "Coverage Position Letter").

54. Wesco denied coverage under the D&O Coverage Part on the following bases:

- The definition of "claim" provides, with respect to an SEC subpoena, that only subpoenas served "on an insured person" constitute a "claim," and therefore there

   is no coverage for Yellowstone, LLC.

- All coverage under the D&O Coverage Part is excluded by the exclusion for any claim arising from, based upon, or attributable to "the violation of any . . . statute relating to securities."

55. Wesco denied coverage under the Professional Liability Coverage Part on the following bases:

- The SEC Investigation was not "initiated by a complaint by the Insureds' customer or client" and therefore does not constitute a "claim" under this Coverage Part.

- The SEC Investigation is not one "arising from the Insureds' rendering or failure to render Professional Services for that customer or client" as required under this Coverage Part.

- The SEC Investigation is not a claim "by or on behalf of a customer of the Company."

- The SEC Investigation is not a claim "for a Wrongful Professional Services Act," because there is no allegation of any erroneous advice or improperly performed services, only the alleged improper taking of client funds.

- Coverage is excluded by the exclusion for loss in connection with any claim "arising from, based upon, or attributable to any disputes over fees, commissions, or charges for the Company's services."

56. Wesco also determined and communicated to the defendants, in the Coverage Position Letter, that the SEC Investigation is excluded under both coverage parts, because, if it is a "claim" under the Policy, then it is a claim "made against any insured arising from, based upon, or attributable to . . . the gaining of any profit, remuneration or pecuniary advantage to which such Insured is not legally entitled."

57. This declaratory judgment action is a "proceeding" in which the improper financial gain exclusion can be adjudicated.

58. Wesco also reserved its rights based upon the Policy's exceptions to the definition of "loss," general provisions regarding non-admission of liability, the prior knowledge exclusion,

prior notice exclusion, the fraud exclusion, and other insurance provisions. Wesco also generally reserved all its rights under the Policy and at law.

59. Without waiving its coverage denial, Wesco determined that it would advance defense expenses for the Defendants, on an interim basis, subject to the specific reservations of rights identified in the Coverage Position Letter and general reservation of rights, the Policy's $25,000 retention and $2 million limit of liability, and subject to Wesco's right to obtain a refund of all such defense expenses advanced through this declaratory judgment action.

60. Pursuant to the above reservations, Wesco has advanced payments for the defense of each Defendant named in this Complaint. As of November 3, 2017, the total amount of defense expenses advanced by Wesco on behalf of the Defendants was $407,150.96.

61. As a condition for receiving such payments, each Defendant has signed a written undertaking, stating that the signatory "hereby guarantees the repayment of any Defense Expenses paid to or on behalf of such Signatory if it is finally determined that the SEC Investigation or any portion of such SEC Investigation is not covered."

62. True and correct copies of the guarantees signed by Defendants Yellowstone, Hansen, Baird, Dalebout, Dustin, and Weimer are attached hereto as Exhibit 4.

63. Wesco now seeks a declaration that loss incurred by the Defendants in connection with the SEC Investigation is not covered, and that Wesco is entitled to repayment of the defense expenses advanced.

## COUNT I – DECLARATORY JUDGMENT
**(No Coverage under the Policy)**

64. Wesco hereby incorporates by reference the allegations contained in paragraphs 1-63 of this Complaint, as if set forth fully herein.

A. *The Improper Financial Gain Exclusion Bars Coverage for the SEC Investigation*

65. The Self-Report admits that Yellowstone wrongfully took client funds.

66. The Self-Report is an admission that Yellowstone gained profit, remuneration, or pecuniary advantage to which it was not legally entitled.

67. The Policy's improper financial gain exclusion applies to the SEC Investigation, and therefore excludes all coverage under the Policy for the SEC Investigation.

B. *There is No Coverage for the SEC Investigation Under the D&O Coverage Part*

68. The definition of "claim" under the D&O Coverage Part does not include the SEC Investigation into Yellowstone.

69. The SEC Investigation is not covered by the Policy because it is a claim arising from, based upon, or attributable to "the violation of any….statute relating to securities."

C. *There is No Coverage for the SEC Investigation under the Professional Liability Coverage Part*

70. The SEC Investigation was not "initiated by a complaint by the Insureds' customer or client" and therefore does not constitute a defined "claim" under this Coverage Part.

71. The SEC Investigation is not one "arising from the Insureds' rendering or failure to render Professional Services for that customer or client," as required by this Coverage Part.

72. The SEC Investigation is not a claim "by or on behalf of a customer of the Company," as required by this Coverage Part.

73. The SEC Investigation is not a claim "for a Wrongful Professional Services Act" under this Coverage Part, because there is no allegation of any erroneous advice or improperly performed services, only alleged improper taking of client funds.

74. Coverage is excluded by the exclusion in this Coverage Part for loss in connection with any claim "arising from, based upon, or attributable to any disputes over fees, commissions, or charges for the Company's services."

75. Wesco is entitled to a declaration that it is not obligated to pay any loss, including defense expenses or indemnification, to any of the Defendants related to the SEC Investigation.

## COUNT II – DECLARATORY JUDGMENT
### (Refund of Defense Expenses Advanced)

76. Wesco hereby incorporates by reference the allegations contained in paragraphs 1-75 of this Complaint, as if set forth fully herein.

77. The Policy provides that **defense expenses** advanced by Wesco "will be repaid to the **Insurer** by the **Insureds** severally according to their respective interests in the event and to the extent that the **Insureds** are not entitled to payment of such **defense expenses**."

78. Each of the Defendants has guaranteed to Wesco "the repayment of any **Defense Expenses** paid to or on behalf of any **insured** if it is finally determined that any such **Claim** or portion of such **Claim** is not covered."

79. For the reasons described in Count I above, the SEC Investigation is not covered under the Policy.

80. Wesco is entitled to repayment from the defendants of all amounts paid by Wesco for defense expenses related to the SEC Investigation.

81. Pursuant to 28 U.S.C. § 2202, Wesco is also entitled to further necessary and proper relief in the aid of this declaration, including but not limited to a monetary judgment in favor of Wesco and against Defendants for such advanced defense expenses.

**WHEREFORE**, Wesco respectfully requests the following relief:

1. An Order declaring that Wesco has no obligation, under the Policy or otherwise, to pay any loss incurred by any of the defendants, including defense expenses, in connection with the SEC Investigation;

2. An Order declaring that Wesco is entitled to repayment from the defendants of the amounts advanced to or on behalf of the defendants related to the SEC Investigation;

3. An Order granting further necessary and proper relief in aid of the declaration requested in paragraph 3 above, including but not limited to a monetary judgment in favor of Wesco and against the defendants, according to their respective interests.

4. An Order awarding Wesco its costs and disbursements incurred herein; and

5. Such further relief as the Court deems just and proper.

        Respectfully submitted,

        MERRILL & MERRILL

Dated: December 1, 2017    By: /s/ Kent L. Hawkins
        Kent L. Hawkins, Esq.
        109 North Arthur Ave., 5th Floor
        Pocatello, ID 83204
        Phone: (208) 232-2286
        Fax: (208) 232-2499
        khawk@merrillandmerrill.com

        and

        GREGERSON, ROSOW, JOHNSON & NILAN, LTD.
        Joseph A. Nilan, Esq.
        Daniel A. Ellerbrock, Esq.
        100 Washington Square, Suite 1550
        Minneapolis, MN 55401
        Phone: (612) 338-0755
        Fax: (612) 349-6718
        jnilan@grjn.com
        dellerbrock@grjn.com
        (to be admitted pro hac vice)

*Attorneys for Wesco Insurance Company*