

Lewis Roca Rothgerber Christie LLP
1200 Seventeenth Street
Suite 3000
Denver, CO 80202

303.623.9000 main
303.623.9222 fax
lrrc.com

Kenneth F. Rossman, IV
303.628.9584 direct
303.623.9222 fax
krossman@lrrc.com

July 29, 2016

**Via Electronic Mail: Snyderk@sec.gov**

Kristen Snyder
Office of Compliance Inspections and Examinations
San Francisco Regional Office
U.S. Securities and Exchange Commission
44 Montgomery Street, Suite 2800
San Francisco, CA 94104

RE:   Yellowstone Partners

Dear Ms. Snyder:

We represent Yellowstone Partners, LLC ("Yellowstone" or the "Firm"), an Idaho-based investment adviser registered with the Securities and Exchange Commission, and write on the Firm's behalf to report possible violations of the Investment Advisers Act of 1940 and its related rules.

Yellowstone's President and Chief Executive Officer, David H. Hansen, contacted us in late April 2016 requesting our assistance. According to Mr. Hansen, Yellowstone had discovered that it had significantly over-billed some clients and needed our help in reviewing and addressing the situation.

Over the course of the last three months, we conferred exclusively with Mr. Hansen, Chief Compliance Officer Cameron High, and other Yellowstone employees and retained professionals and have analyzed a significant volume of information provided by Yellowstone. During this same time, Yellowstone also hired Western Sage, CPAs, from Worland, Wyoming, to review and report on the potentially affected accounts. That review covered the period January 1, 2010 through the present (for two of the largest clients, the review went back to 2008).

Following the discovery of the billing issues, Yellowstone's management immediately adopted a firm commitment to take all necessary and proper steps not only to disclose and correct the errors and make its clients whole, but also to prevent a recurrence by enhancing the Firm's compliance program. Following these efforts, the Firm has asked us to submit to you the following summary of what was found, what has been done to address the issues that emerged, and what Yellowstone plans to do in the near future to further address the situation.



**STATUS**

Yellowstone was established in 2005. The Firm currently has 21 employees and 11 independent contractor investment adviser representatives ("IA reps") in eight offices in six states. Yellowstone is privately held, owned by Mr. Hansen (90%), Mr. High (5%) and Chief Investment Officer Richard Baird (5%).

As of the end of June 2016, Yellowstone had assets under management ("AUM") of approximately $862 million from 2,104 households with approximately 3,072 client accounts. The majority of the accounts are custodied at Raymond James but others are held at various broker-dealer custodians.

**HISTORY**

During the last several years, Yellowstone experienced a period of rapid growth.

- 2005—three employees in one location;

- 2009—seven employees and two outside IA reps in two locations, 761 accounts;

- 2010—seven employees and three outside IA reps in three locations, AUM of approximately $306 million in 1,013 accounts;

- 2011—eight employees and three outside IA reps in two locations, AUM of $529 million in 1,159 accounts;

- 2012—nine employees and six outside IA reps in four locations, AUM of $561 million in 1,330 accounts;

- 2013—13 employees and seven outside IA reps in six locations, AUM of $643 million in 1,440 accounts;

- 2014—16 employees and eight outside IA reps in eight locations, AUM of $732 million in 2,300 accounts;

- 2015—21 employees and 11 outside IA reps in nine locations, AUM of $784 million in 2,510 accounts; and

- 2016—21 employees and 11 outside IA reps in nine locations, AUM of $862 million in 3,072 accounts

Not surprisingly, Yellowstone's costs rose dramatically with this growth. For example, its payroll doubled over the period from the summer of 2014 to April 2016. Management issues also grew increasingly complex over this time.

Historically, Yellowstone computed advisory fees by hand. Mr. High split the fee computation duties with Mark Minarik, another member of the Yellowstone home office staff. Mr. High handled billing for the clients whose accounts were managed by home office personnel, while Mr. Minarik calculated the fees for the clients whose accounts were managed by IA reps in other



Kristen Snyder
July 29, 2016
Page 3

offices. Until very recently, both of them calculated fees using simple Excel spreadsheets[1] and processed them primarily through the Raymond James investment advisory platform used by Yellowstone. According to Mr. High, instances of errors that have led to reversals of fees in recent years have been roughly the same for the home office-managed accounts (High) and those from other offices (Minarik).

A subset of clients (Yellowstone refers to them by a ledger code as the "8072" clients) first came to Yellowstone early in its existence through an acquisition of accounts managed by another investment adviser. In becoming Yellowstone clients, the "8072" clients who met "qualified client" criteria agreed to pay and were subject to an annual performance fee. Over the years since, clients whose accounts are managed by home office personnel have been added to the 8072 list while others have left the Firm. Yellowstone does not now have, nor have they had in the past, performance fee arrangements with any clients other than the "8072" clients.[2]

In 2009, Yellowstone decided to eliminate the annual performance fee model for qualified "8072" clients and began charging a flat annual fee of 1%[3] instead, to be paid in full in advance at the beginning of the client's billing cycle year,[4] in addition to the annual/quarterly advisory fee of 1%. Clients who did not meet the "qualified client" criteria paid an annual fee of 2% in addition to the annual/quarterly advisory fee of 1%. Until 2013, annual fees were charged on the anniversary of the account opening date. While this transition to annual fees from performance fees was set forth in the Firm's Form ADV Part 2, was reflected on client statements, and was discussed by Yellowstone with each "8072" client, the investment advisory agreements with these "8072" clients were not amended to reflect the new fee arrangements and continued to provide for a performance fee.

In 2013, Yellowstone began charging and collecting annual fees from "8072" clients during the first quarter of every calendar year, as opposed to on their anniversary date, as had been the prior practice. Qualified "8072" clients were charged an annual fee of 1% AUM in January, while other "8072" clients were billed an annual fee of 2% AUM, 1% in January and 1% in February or March. These "annual fees" applied only to the "8072" accounts and no other clients of Yellowstone.

---

[1] As discussed in more detail below, this is changing—a few August fees will be prepared with software called Advent as a test run with full implementation projected for the fall of 2016.

[2] One of Yellowstone's advisors has a group of clients who were also charged an annual fee, but those clients were not involved in the issues we discuss here.

[3] All Yellowstone clients pay an annual advisory fee of 1% of assets under management charged quarterly in advance. The problems we discuss here concern only the additional "annual fee" charged to some of the "8072" clients. No problems were detected regarding the annual advisory fees billed quarterly in advance.

[4] In November 2009, the Staff of the SEC's Office of Compliance Inspections and Examinations conducted its most recent exam of Yellowstone. Although many points were raised in the "deficiency letter" of September 10, 2010, from John C. Chee to Yellowstone, we saw nothing in it about advisory or performance fees.

In its response to the deficiency letter, on October 6, 2010, the Firm indicated it had retained the services of an experienced outside compliance consultant (as the Staff had recommended). Yellowstone had entered into an agreement with Susan Silva to provide those services. In fact, Ms. Silva served continuously as a compliance consultant for the Firm until very recently, when she resigned for reasons not involving Yellowstone. Within the last few weeks, Yellowstone has located and retained another outside consultant, Ms. Karen Steighner, Compliance Advisers Inc., Denver, Colorado, to provide these services.



Kristen Snyder
July 29, 2016
Page 4

In 2015, one of Yellowstone's clients mentioned to management that his fee seemed high. Yellowstone reviewed the account, agreed the fees were too high, and reversed certain fee payments. Similar issues arose around this time with two other clients as well. Paul Weimer,[5] designated as the Firm's Chief Operating Officer, who worked out of Yellowstone's Salt Lake City, Utah office, learned about the situation and raised the issue with Mr. Hansen and Mr. High.[6]

In response to the situation, Mr. Hansen asked Yellowstone's bookkeeper, Matt Regen, to help the Firm assess potential billing issues. Mr. Regen provided a "template" to Mr. High for testing a sampling of accounts. Using this process, Mr. High reviewed at least two sets of 60 accounts randomly selected and did not find any other fee issues. This process and the results were reported to Mr. Hansen. This review involved sampling all Yellowstone accounts, and was not focused on the "8072" clients where the billing problems at issue here were concentrated.

Two events coincided in April 2016 that gave rise to Mr. Hansen contacting us for assistance. Early that month, Mr. Hansen was reviewing the performance of the account of an individual who had only become a client of his earlier that year. The return seemed to him lower than it should have been. He reviewed the fees charged and discovered that the client had been charged an annual fee even though Mr. Hansen knew Yellowstone did not have an annual fee arrangement with him. Mr. Hansen reversed the fee and asked Mr. High to reorganize the Firm's client numbering system to segregate (so as to easily identify) accounts that were to be charged an annual fee. He believed doing so would help the Firm avoid future mistakes like the one he had identified.

A short time later, Forrest Clay, among Yellowstone's largest clients and one of the qualified "8072" clients, inquired about a fee that had been billed in his accounts. Mr. Clay is wealthy and retains an attorney and an accountant to oversee his holdings. Yellowstone performed a good deal of such work for Mr. Clay in early 2016 and had charged him an extra $58,707 (0.25%) in addition to other customary fees. Mr. Clay asked about it. As a courtesy to Mr. Clay, who is a significant client, Yellowstone offered to waive these additional fees and Mr. Clay accepted. In reviewing Mr. Clay's statements, however, Yellowstone identified errors in fees charged.

At about the same time, Mr. Weimer again raised questions about fees charged to three Yellowstone "8072" clients (Clay and two related clients: Pfrangle and Weekes). He believed the fees charged to these significant Yellowstone clients were inappropriately high. As with the prior year, we do not know what circumstances gave rise to Mr. Weimer's inquiry. These events combined to cause Mr. Hansen to call us in late April 2016.

---

[5] Mr. Weimer resigned his position at Yellowstone in May 2016 and is no longer associated with or employed by Yellowstone. He was not registered or licensed in any capacity with Yellowstone during his tenure with the Firm.

[6] Yellowstone municipal bond trader and investment adviser representative Michael Dustin joined Mr. Weimer in raising the fee issues to Yellowstone management in April 2016. Mr. Dustin, also a licensed Idaho attorney, was employed by Yellowstone principally as a municipal bond trader. Yellowstone paid Mr. Dustin additional compensation so that, from time to time, he would provide legal assistance on request to the Firm on various legal issues. Given his involvement in the fee issues giving rise to this letter in his capacity as an attorney and the attendant privilege and ethical issues, Yellowstone will not disclose the specific content of any conversation between Mr. Dustin and any other person at or regarding Yellowstone. On the basis of unrelated employer-employee issues, Mr. Dustin was terminated by Yellowstone in June 2016.



## WHAT YELLOWSTONE FOUND

It is evident that the transition from performance-based fees to annual fees was not a smooth one. For four years, "8072" clients were charged as of the anniversary date as opposed to, for instance, January 1st. Different groups of "8072" clients were charged different and inconsistent fees. In entering information by hand into Excel to calculate fees, at the very same time as the demands on Mr. Hansen and Mr. High increased given the rapid growth, led to haphazard billing practices.

Based on Yellowstone's review of its records, the systemic errors detected were limited to only some of the "8072" clients and during the time period January 1, 2010 and forward. Their review extended back to 2008 for the Clay and Pfrangle accounts. The trustees for the Clay and Pfrangle accounts (one of the two trustees is the former controller for Mr. Clay's business) also reviewed the records for their accounts.

Although we identified three general categories of billing errors during the period under review, the third was by far the most prevalent and impactful.

### Multiple Qualified Client Accounts

Some qualified "8072" clients have multiple accounts under Yellowstone's management. A total of 14 qualified clients with 87 accounts were charged the 2% annual fee charged to non-qualified clients when they should only have been charged the 1% annual fee charged to qualified clients.

### Failure to Prorate

Two qualified "8072" clients with six accounts deposited substantial assets in the middle or toward the end of the billing cycle year. Rather than prorate the 1% annual fee, Yellowstone charged a full year's annual fee based on the added AUM. One client with two accounts who should have been charged a prorated annual fee was not charged any annual fee.

### Billing Annual Fee More than Once

In many instances, Yellowstone billed its annual fee to various "8072" clients more than once during a 12-month billing period. A little more than one-third of all "8072" clients were charged their 1% annual fee at the beginning of their annual billing cycles and then billed again later in the same year. The practice of billing more than once in a year continued after the transition from anniversary date to January billing in 2013.

As a general premise, the "advances" were taken to meet Firm payroll and other expenses. When the taking of these advances began, the sense among Yellowstone management was that they were taken in anticipation of an anniversary date coming up soon, perhaps just a month or two early, based in part on the belief a fee could be taken 90 days in advance. In theory, it was contemplated that an acknowledgment would be made in the records that, on the normal due date, the advance would be credited and the annual fee would not be charged again. Things got well away from Yellowstone. By April 2016, some "8072" clients had been billed annual fees for multiple years in advance. The amounts of fees charged were all reported and described in periodic statements to "8072" clients.


Kristen Snyder
July 29, 2016
Page 6

In the following charts, we show the numbers and percentages of affected current clients and accounts within the "8072" group:[7]

| Accounts | | | Clients | |
|---|---|---|---|---|
| Affected | 162 | | Affected | 88 |
| Current | 405 | | Current | 232 |
| Percentage | 40.0% | | Percentage | 37.9% |

In the next charts, we show Yellowstone's numbers and percentages of affected current clients and accounts within the total client and account populations:

| Accounts | | | Clients | |
|---|---|---|---|---|
| Affected | 162 | | Affected | 88 |
| Current | 3072 | | Current | 2104 |
| Percentage | 5.3% | | Percentage | 4.2% |

This overcharging appears to have been the product of several problems working together. Mr. Hansen and Mr. High lacked a clear understanding of the rules applicable to the billing of fees in advance. Having client anniversary dates scattered all over the calendar as opposed to having one or two hard anniversary dates for all Firm clientele also contributed to the confusion. In some cases, more than one Yellowstone person submitted fee requests regarding the same client.

Although most examples involve excessive fees, there are also instances of under-billing. In those instances, Yellowstone has not sought to collect the under-billed fees.

**Other Unrelated Issues Discovered**

In the course of its review of its clients' accounts, Yellowstone discovered that, for some clients (not limited to "8072" clients), the Firm did not have investment advisory agreements for each account of a client. For example, Yellowstone had an agreement in place for the client as an individual and for his IRA, but did not have an agreement in place for that client's corporate account (probably opened at some point after establishing the initial client relationship).

Yellowstone could not locate any investment advisory agreement for a few clients.

In the course of our review, we also learned that Mr. Hansen had borrowed money from one client several years ago. The loan has now been repaid in full and Mr. Hansen now understands that such borrowing (or lending for that matter) is not permitted.

---

[7] This also includes clients in a related "8545" group, which was split off of "8072" during the relevant period. These numbers do not include the affected former clients. Those percentages are difficult to calculate because of client/account turnover.



Kristen Snyder
July 29, 2016
Page 7

**WHAT YELLOWSTONE HAS DONE IN RESPONSE**

**1.      Self-Report**

Early on in the process, Mr. Hansen committed to "self-report" to the SEC what happened. He also informed some clients and others of his commitment to do so.

**2.      Repayments**

In early May 2016, Yellowstone undertook to reimburse the overcharges to the "8072" clients affected. Some of the calculations were easier to compute than were others. Mr. Hansen negotiated directly with Mr. Clay, his family and his advisers as to the manner in which these largest reimbursements would be made.

Yellowstone reimbursed $3,112,912.91 to the first tranche of its clients in May 2016. The Firm reimbursed an additional second tranche of clients a total of $111,161.40 in June 2016. Yellowstone reimbursed a third tranche of clients a total of $1,210,954.32 in July 2016. Two active clients with five accounts are still due $439,730.67 (one has not been contacted yet due to a family tragedy; the other was only identified as being owed money in the last week). These last two clients will be reimbursed in October 2016.

Yellowstone still must reimburse a number of former clients. There are 113 clients with 167 such accounts. Yellowstone will be reimburse 72 of these clients with 122 of these accounts a total of $60,753.99 within the next few days. The remaining 41 clients with 45 accounts will be reimbursed $353,892.74 in October 2016. The total amount of these "closed account" reimbursements will be $414,646.73.

Summing up, reimbursements of $4,495,782.62 have been made with $785,802.84 to be repaid in October 2016.

**3.      Communication**

Yellowstone has contacted virtually every affected client to explain generally what occurred and to describe the refund(s) that had or soon would be made to the client's account(s).[8] Notwithstanding Yellowstone's communicating with all of the current clients holding affected accounts, not one client has terminated his, her or its relationship with the Firm. In fact, Mr. Clay, the client with the most AUM at Yellowstone, added over $400,000 to his accounts after the disclosure and reimbursements were made.

**4.      New Compliance Consultant**

Yellowstone has retained the services of a seasoned compliance consultant, Karen Steighner for a period of at least two years. She is the President and CEO of a regulatory compliance consulting firm and has worked in the securities industry for more than 30 years, 24 years of which have been devoted to compliance.

---

[8] Three households have yet to be notified as of the date of this letter. They were identified for the first time as accounts with overcharges in the Western Sage report received by Yellowstone in the last few days.

2010565246_1



### 5.  New Financial Controller

The Firm hired KayLynn Dalebout as its new Financial Controller. Ms. Dalebout's responsibility is to manage Yellowstone's fiscal operations. She will monitor and control cash flow, develop and maintain the Firm's financial policies and procedures, create and complete financial reporting systems, select and maintain financial software, oversee payroll and accounts receivable and payable, complete audits, oversee financial compliance activities, monitor debt/credit, oversee payroll and benefits, and manage any outsourced financial activities. She has been in the accounting industry for 20 years. She worked as a tax examiner for the IRS, in bookkeeping for a manufacturing company and as controller for both an advertising agency and a software company. She is a licensed CPA and holds a Masters Degree in Accounting.

### 6.  Conversion to *Advent* Billing

Yellowstone is in the process of converting all billing data to Advent. A test run will be made in August for a few accounts. The Firm anticipates full conversion sometime in the fall of 2016. This conversion will eliminate the *ad hoc*, Excel spreadsheet process that appears to have contributed to the problems described. Ms. Steighner will be reviewing the conversion to assure its accuracy.

### 7.  New Fee Structure

Yellowstone has abandoned the "annual fee" concept. As of January 1, 2017, the Firm will switch to a straight, conventional base 2% of AUM per annum paid quarterly in advance (subject to negotiation in particular circumstances). The Firm is also considering converting from fees paid in advance to arrears for all clients.

### 8.  New Investment Advisory Agreements

The Firm has adopted new investment advisory agreements that will be deployed before the end of the calendar year in which the new fee structure described herein will be disclosed. All clients, including those with current agreements in place and those for whom agreements cannot be located, either have already been or soon will be asked to sign new agreements.

### 9.  Review of Policies and Procedures

In consultation with Ms. Steighner, a comprehensive review of policies and procedures has been undertaken, in general to assure they are comprehensive and up to date and more specifically to enhance the Firm's internal controls and address the particular problems identified.

### 10.  Review of and Changes to Website

In consultation with Ms. Steighner, a comprehensive review of the Firm's website has been undertaken, in general to assure it is comprehensive and up to date.

2010565246_1



Kristen Snyder
July 29, 2016
Page 9

### 11.  Form ADV Parts 1and 2

In consultation with Ms. Steighner, Form ADV Parts 1 and 2 have been amended and filed electronically on IARD.

### 12.  Other Communication

Yellowstone plans to prepare a letter to be sent to all clients in which, generally, the issues discussed herein will be described, as well as the steps that have been and will be taken, the advent of the new fee arrangement, and new advisory agreements. A similar communication is planned to be sent to all Yellowstone personnel.

### 13.  Repayment of Loan Commemorated

Mr. Hansen commemorated in writing with the one client from whom he had borrowed money that the loan has been repaid in full.

If you have any questions or would like to discuss any of the about, please feel free to give us a call.

Respectfully,

Philip A. Feigin
Lewis Roca Rothgerber Christie LLP

Kenneth F. Rossman IV
Lewis Roca Rothgerber Christie LLP