# COMMERCIAL POLICY



877-528-7878

**800 SUPERIOR AVENUE EAST, 21ST FLOOR**

**CLEVELAND, OH 44114**

# Wesco Insurance Company

INSURANCE IS PROVIDED BY
THE COMPANY DESIGNATED ON THE
DECLARATIONS PAGE
(A Stock Insurance Company)

THIS POLICY CONSISTS OF:
   -- DECLARATIONS
   -- COMMON POLICY CONDITIONS
   -- ONE OR MORE COVERAGE PARTS, and
   -- APPLICABLE FORMS AND ENDORSEMENTS

IL-PJ-WIC 0414

This page intentionally left blank

## Read Your Policy Carefully

This policy is a legal contract between you and us.  The information on this page is not the insurance contract and only the actual policy provisions will control.  The policy sets forth in detail the rights and obligations of both you and us.  **It is therefore important that you read your policy carefully.**

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of the policy.

This policy is signed by the President and Secretary of the insurance company and, if required by State law, this policy shall not be valid unless countersigned on the Declaration page by its authorized representative.

President                              Secretary

ILSIGDEC-A 0414

This page intentionally left blank

# AMTRUST  *FI Advantage*

## Wesco Insurance Company
(A Stock Insurance Company, herein called the **Insurer**)

## DECLARATIONS PAGE

**This is a claims-made policy. Defense Expenses are included within the Limit of Liability. Amounts incurred as Defense Expenses will reduce the Limit of Liability available to pay judgments or settlements. Please read this Policy carefully!**

**Item 1:**  (a)  Yellowstone Partners, LLC
3340 Merlin Drive
Suite 100
Idaho Falls, ID  83404

(b)  **Subsidiaries:**  See Schedule of Subsidiaries

**Item 2:**  **Policy Period:**    From: 1/1/2016   To: 1/1/2017
12:01 A.M. local time at the principal address stated in Item 1 above.

**Item 3:**  **Policy Year Aggregate Limit of Liability:**  $2,000,000

**Item 4:**  **Coverage Elections, Limit of Liability, Retentions, and Premium:**
***Only those Coverage Parts and Insuring Agreements designated with an "X" below are covered under this Policy.***

| Coverage Part/Insuring Agreement | "X" | (a) Sublimit of Liability | (b) Separate Limit of Liability | (c) Single Limit of Liability | (d) Retention | (e) Annual Premium |
|---|---|---|---|---|---|---|
| **Directors & Officers Liability** | | | | | | |
| A.   Insured Persons Liability | X | N/A | N/A | | 0 | |
| B.   Company Indemnification | X | N/A | N/A | | $25,000 | |
| C.1.  Company Liability | X | N/A | N/A | | $25,000 | |
|      2.  Investigation  Expense | N/A | N/A | N/A | $2,000,000 | 0 | $3,991 |
| **Professional Liability** | | | | | | |
| A.   Lender Liability | N/A | N/A | N/A | | 0 | |
| B.   Professional Services | X | N/A | N/A | | $25,000 | |
|      IRA/Keogh & HSA  Wrongful Acts | N/A | N/A | N/A | | 0 | |
| C.   Trust Services | N/A | N/A | N/A | $2,000,000 | 0 | $9,362 |

PL-FI-DEC 0414

This page intentionally left blank

**Item 4: (con't)**

| Coverage Part | "X" | (a) Sublimit of Liability | (b) Separate Limit of Liability | (c) Single Limit of Liability | (d) Retention | (e) Annual Premium |
|---|---|---|---|---|---|---|
| **Employment Practices Liability** | | | | | | |
| A.  Employment Practices Liability | N/A | N/A | N/A | | 0 | |
| B.  Third Party Liability | N/A | N/A | N/A | | 0 | |
| **Fiduciary Liability** | | | | | | |
| A.  Fiduciary Liability | N/A | N/A | N/A | | 0 | |
| B.  Voluntary Settlement Program | N/A | N/A | N/A | | 0 | |
| C.  HIPAA Civil Money Penalties | N/A | N/A | N/A | | 0 | |
| **Network Security and Privacy Liability** | | | | | | |
| A.  Network Security and Privacy Liability | N/A | N/A | N/A | | 0 | |
| B.  Media Communications Liability | N/A | N/A | N/A | | 0 | |
| C.  Regulatory Defense and Penalties | N/A | N/A | N/A | | 0 | |
| II.A.  Crisis Mitigation Expense | N/A | N/A | N/A | | 0 | |
| II.B.  Cyber Extortion Threat | N/A | N/A | N/A | | 0 | |
| II.C.  Business Interruption | N/A | N/A | N/A | | 0 | |

\*___0___ hour K UJ hb[ `DYf]cX for Business Interruption for Insuring Agreement II.C.*"

5 bbi U Premium: $ 13,353

Taxes ⁄ Si fW Uf[ Yg.  0

HcHU `5 a ci bh8 i Y. ˜ SSSSSSSSSSSSSS

**Item 5:    Prior and Pending Litigation and Retroactive Date(s):**

| Coverage Part | (a) Pending and Prior Litigation Date | (b) Retroactive Coverage Date |
|---|---|---|
| **Directors and Officers Liability** | | |
| A.  Insured Persons Liability | 1/9/1900 | N/A |
| B.  Company Indemnification | 1/9/1900 | N/A |
| C. 1.  Company Liability | 1/9/1900 | N/A |
| C. 2.  Investigation Expense | N/A | N/A |
| **Professional Liability** | | |
| A.  Lender Liability | N/A | N/A |
| B.  Professional Services | 1/9/1900 | 1/9/1900 |
| C.  Trust Services | N/A | N/A |
| **Employment Practices Liability** | | |
| A.  Employment Practices Liability | N/A | N/A |
| B.  Third Party Liability | N/A | N/A |

2

This page intentionally left blank

| Fiduciary Liability | | |
|---|---|---|
| A.   Fiduciary Liability | N/A | N/A |
| **Network Security and Privacy Liability** | | |
| A.   Network Security and Privacy Liability | N/A | N/A |
| B.   Media Communications Liability | N/A | N/A |
| C.   Regulatory Defense and Penalties | N/A | N/A |

**Item 6:**   **Extended Reporting Period (ERP):**

(a)  Percentage of Annual Premium:      125 %
(b)  ERP Term:                                        365 days

Applicable only if exercised in accordance with Section IX of the General Terms & Conditions Applicable to All Coverage Parts, entitled Extended Reporting Period.

**Item 7:**   **Endorsements attached at issuance:**    Refer to attached Endorsement Schedule

The **Parent Company**, by the acceptance of this **Policy**, gives notice to the **Insurer** cancelling any prior **Policy** issued, and such cancellation shall be effective as of the time this **Policy** becomes effective.

**Item 8:**        All notices required to be given to the **Insurer** shall be sent by registered mail, email or fax to:

AmTrust Claims Director
AmTrust Financial Group
135 S. LaSalle Street; Suite 1925
Chicago, IL 60603
Email:   anaclaimsreporting@amtrustgroup.com
Fax:      312-781-0423

In witness whereof, this Declarations Page is to be signed by a duly authorized representative of the **Insurer**.

**Date:** 1/1/2016                **Signature:**

Authorized Representative

This page intentionally left blank

This endorsement is attached to and forms a part of Policy No. WDO1429740 00 effective 1/1/2016.

## ENDORSEMENT SCHEDULE

| | |
|---|---|
| PL9901580414 | FINANCIAL INSTITUTION GENERAL TERMS AND CONDITIONS |
| PL9901590414 | FINANCIAL INSTITUTION DIRECTORS & OFFICERS LIABILITY COVERAGE PART |
| PL9901630414 | FINANCIAL INSTITUTION PROFESSIONAL LIABILITY COVERAGE PART |
| PL990170ID0414 | IDAHO AMENDATORY ENDORSEMENT |
| PL990185ID0414 | GENERAL TERMS AND CONDITIONS MODIFICATION NON-CANCELLATION ENDORSEMENT |
| PL9901980414 | DIRECTORS AND OFFICERS LIABILITY COVERAGE PART MODIFICATION PRIVACY LIABILITY COVERAGE |
| PL9902360414 | POLICY CHANGE ENDORSEMENT |
| PL9902580414 | PROFESSIONAL SERVICES BY SPECIFIC ENTITY EXCLUSION |
| PL9902711014 | EXCLUSION OF CERTIFIED ACTS OF TERRORISM |

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the **Policy** other than as above stated.

This page intentionally left blank

**AmTrust Bank Insurance – Claims Service**

AmTrust's professional claims processing staff has an average of 20+ years of experience and maintains low workloads, enabling the effective management of claims.  Benefits for our customers include a 24/7 centralized call center staffed by special claims operators; prompt payout to injured employees, medical providers and others; and return-to-work options initiated through a joint effort.

**Information Required for All Claims Reported**

- Description of accident or incident
- Name, phone and /or email of person making the report

**Additional Information Required for Specific Claim Types**

- **For Workers' Compensation**

  o MUST have the injured employee's social security number as it is required by law
  o Description of Injury

- **For Property Claims**

  o Physical address of the loss
  o If more than one building on property, must have specific building(s) involved
  o Type of loss, i.e., fire, theft, etc.
  o Description of loss or damage

- **For Motor Vehicle (Auto) Claims**

  o Name, address and contact information of ALL parties involved
  o Make, model and VIN of the insured vehicle
  o Make, Model of all other vehicles involved
  o Current location of all vehicles
  o Name and contact information for each driver and all passengers
  o Name and contact information for any known witnesses

- **For General Liability Claims**

  o Physical address of where the loss occurred
  o Name, address and contact information for all persons claiming injury or damage
  o Name and contact information for any known witnesses

**For ALL States**
First Report of Claim:
Phone: 866.272.9267
Fax: 877.669.9140
Email: amtrustclaims@qrm-inc.com
Claim Status: 888.239.3909

**For Florida Worker's Comp Only**
First Report of Claim:
Phone: 888.225.2442
Fax: 561.241.3257
Email: flclaims@amtrustgroup.com
Claims Status: 888.239.3909

**For Property**
Joe Bonanno, Claims Manager
Phone: 214.360.8683
Email Joe.Bonanno@amtrustgroup.com

**Professional Liability**
**Financial Institution Bonds**
Jay Fenton, Claims Manager
AmTrust North America
Professional Lines Claim Dept.
135 S LaSalle St., Suite 1925
Chicago, IL 60603
Phone: 312.803.6083
Email: Jay.Fenton@amtrustgroup.com

**Auto/General Liability**
Tim McElroy, Claims Manager
Phone: 214.360.2441
Email: Tim.McElroy@amtrustgroup .com

This page intentionally left blank

This endorsement is attached to and forms a part of Policy No. WDO1429740 00 effective 1/1/2016           .

**THIS NOTICE IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS NOTICE DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

**TERRORISM RISK INSURANCE ACT DISCLOSURE NOTICE**

**SCHEDULE**

| | |
|---|---|
| **Terrorism Premium (Certified Acts)** | **$  -0-** |
| **This premium is the total Certified Acts premium attributable to your policy.** | |

**A.    Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in the above Schedule.  Such premium is included in the policy premium quoted.

**B.    Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 85% of that portion of the amount of such insured losses that exceeds the applicable insurer retention.  However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31), the Treasury shall not make any payment for any portion of the amount of such losses that exceed $100 billion.

**C.    Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of Treasury.

This page intentionally left blank



# AMTRUST FI ADVANTAGE
## KEEP THIS NOTICE WITH YOUR INSURANCE PAPERS

## AmTrust Underwriting Service

In the event you need to contact someone about this insurance for any reason, please contact your agent. If no agent was involved in the sale of this insurance, or if you have additional questions, you may contact AmTrust North America's Financial Institution Division at:

## Complaint Information

If you have been unable to contact or obtain satisfaction from the insurance company or your agent, you may contact the Office of the Attorney General.

**AMTRUST NORTH AMERICA**
**Attention: Financial Institution Division**
800 Superior Ave • 21st Floor • Cleveland, OH, 44114
Telephone: 866.327.6904 • Fax: 216.328.6251
Website: www.amtrustnorthamerica/financial-institutions.com

**OFFICE OF THE ATTORNEY GENERAL**
Consumer Protection Division
954 W. Jefferson, 2nd Floor
PO Box 83720
Boise ID 83720-0010
1-800-432-3545 or 208-334-2424

---

Written correspondence is preferable so that a record of your inquiry is maintained. When contacting your agent, insurance company or the Attorney General, have your policy number available.

---

## AmTrust Claims Service

AmTrust's claims staff has an average of 20+ years of experience and provides effective management of claims. Benefits for our customers include a 24/7 centralized call center staffed by special claims operators; prompt payout to injured employees, medical providers and others, return-to-work options initiated through a joint effort, adjusters specialized by claim types, field adjusters to provide direct assistance at loss locations and a highly qualified panel of defense attorneys.

**Information Required for All Claims Reported**
- Description of accident or incident
- Name, phone and/or email of person making the report

**Additional Information Required for Specific Claim Types**
- **For Workers' Compensation**
  o MUST have the injured employee's social security number as it is required by law
  o Description of injury
- **For Property Claims**
  o Physical address of the loss
  o If more than one building on property, must have specific building(s) involved
  o Type of loss, i.e., fire, theft, etc.
  o Description of loss or damage

- **For Motor Vehicle (Auto) Claims**
  o Name, address and contact information of ALL parties involved
  o Make, model and VIN of the insured vehicle
  o Make, model of all other vehicles involved
  o Current location of all vehicles
  o Name and contact information for each driver and all passengers
  o Name and contact information for any known witnesses

- **For General Liability Claims**
  o Physical address of where the loss occurred
  o Name, address and contact information for all persons claiming injury or damage
  o Name, contact information for any known witnesses

---

| Professional Liability Lines | | Financial Institution Bond |
|---|---|---|
| Jay Fenton, Claims Manager | Paul Poppish, Vice President – Claims | Jay Fenton, Claims Manager |
| 312.803.6083 | 312.803.4630 | 312.803.6083 |
| jay.fenton@amtrustgroup.com | paul.poppish@amtrustgroup.com | jay.fenton@amtrustgroup.com |

---

**Workers' Compensation (All States Except Florida), Property, Auto, Inland Marine, General Liability and Umbrella (ALL STATES)**
First Report of Claim:
Phone: 866.272.9267
Fax: 877.669.9140
Email: amtrustclaims@qrm-inc.com
Claims Status: 888.239.3909

**Florida Workers' Comp Only**
First Report of Claim:
Phone: 888.225.2442
Fax: 561.241.3257
Email: flclaims@amtrustgroup.com
Claims Status: 888.239.3909

Website: https://amtrustgroup.com/small-business-insurance/claims/claim-center/report-claim

This page intentionally left blank

AGENCY CUSTOMER ID: _____

 **ACORD®**

# INSURANCE SUPPLEMENT

| AGENCY | CARRIER | NAIC CODE |
|---|---|---|
| Arthur J. Gallagher & Co. - Irvine | Wesco Insurance Company | 25011 |
| **POLICY NUMBER** | **APPLICANT / NAMED INSURED** | |
| WDO1429740 00 | Yellowstone Partners, LLC | |

## POLICYHOLDER DISCLOSURE
## NOTICE OF TERRORISM INSURANCE COVERAGE

You are hereby notified that under the Terrorism Risk Insurance Act, as amended, you have a right to purchase insurance coverage for losses resulting from acts of terrorism. As defined in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury—in consultation with the Secretary of Homeland Security, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

YOU SHOULD KNOW THAT WHERE COVERAGE IS PROVIDED BY THIS POLICY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THE FORMULA, THE UNITED STATES GOVERNMENT GENERALLY REIMBURSES 85% THROUGH 2015; 84% BEGINNING ON JANUARY 1, 2016; 83% BEGINNING ON JANUARY 1, 2017; 82% BEGINNING ON JANUARY 1, 2018; 81% BEGINNING ON JANUARY 1, 2019 and 80% BEGINNING ON JANUARY 1, 2020, OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. THE PREMIUM CHARGED FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS THAT MAY BE COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.

**Acceptance or Rejection of Terrorism Insurance Coverage**

☐ I hereby elect to purchase terrorism coverage for a prospective premium of $ 2% of the premium _____.

☐ I hereby decline to purchase terrorism coverage for certified acts of terrorism. I understand that I will have no coverage for losses resulting from certified acts of terrorism.

| | | |
|---|---|---|
| _____ | _____ | _____ |
| **Policyholder / Applicant's Signature** | **Print Name** | **Date** |
| _____ | _____ | _____ |
| **Policyholder / Applicant's Signature** | **Print Name** | **Date** |
| _____ | _____ | _____ |
| **Policyholder / Applicant's Signature** | **Print Name** | **Date** |

1/1/2016
**Effective Date**

**Includes copyrighted material of the National Association of Insurance Commissioners, with its permission.**

© 2003-2015 ACORD CORPORATION.  All rights reserved.

The ACORD name and logo are registered marks of ACORD

This page intentionally left blank

**AMTRUST** *FI Advantage*

Policy No. WDO1429740 00

### Wesco Insurance Company
(A Stock Insurance Company, herein called the **Insurer**)

### FINANCIAL INSTITUTION
### GENERAL TERMS AND CONDITIONS APPLICABLE TO ALL COVERAGE PARTS

**This is a claims-made policy. Defense Expenses are included within the Limit of Liability. Amounts incurred as Defense Expenses will reduce the Limit of Liability available to pay judgments or settlements. Please read this Policy carefully!**

In consideration of the premium paid and in reliance upon all statements made and information contained in the Declarations Page and **Application**, the **Insurer** and the **Insureds** agree that coverage will be provided subject to all of the terms, conditions and limitations of this **Policy**, as follows:

### SECTION I – GENERAL INFORMATION

These General Terms and Conditions apply to all **Coverage Parts** made a part of this **Policy**. Unless otherwise stated to the contrary, the terms and conditions of each **Coverage Part** apply only to that particular **Coverage Part**. If any provision in these General Terms and Conditions is inconsistent or in conflict with the terms and conditions of any particular **Coverage Part**, the terms, conditions, and limitations for that particular **Coverage Part** shall apply.

### SECTION II – DEFINITIONS

Whenever appearing in this **Policy**, the following words and phrases appearing in bold type will have the meanings set forth below.

**<u>Application</u>** means:

1.      the application signed for the procurement of this **Policy** and any materials submitted to the **Insurer** in support of the procurement of this **Policy** or any **Policy** for which this **Policy** is a direct or indirect renewal or replacement;

2.      any publicly available information published or filed by or with a recognized source, agency or  institution regarding the **Insured** in the three (3) years preceding the **Policy's** inception, and any amendments thereto, whether or not submitted with any signed application; and

3.      if applicable, any representation provided to the **Insurer** within the past three (3) years in connection with any **Policy** for which this **Policy** is a direct or indirect renewal or replacement.

The **Application** is deemed to be attached to and incorporated into this **Policy**, as if physically attached.

**<u>Change of Control</u>** means:

1.      the acquisition of the **Parent Company**, or of all or substantially all of its assets, by another entity, or the merger or consolidation of the **Parent Company** into or with another entity such that the **Parent Company** is not the surviving entity; or

2.      the obtaining by any person, entity or affiliated group of persons or entities the right to elect, appoint or designate more than fifty percent (50%) of the board of directors, board of trustees, board of managers,

or functional equivalent thereof or to exercise a majority control of the board of directors, board of trustees, board of managers, or a functional equivalent thereof of the **Parent Company**.

**Claim** has the meaning set forth in the applicable **Coverage Part.**

**COBRA** means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

**Company** means the **Parent Company** and any **Subsidiary**.

**Coverage Part** means only those coverage parts designated in Item 4. of the Declarations Page.

**Defense Expenses** means reasonable and necessary legal fees and expenses incurred by the **Insurer** or the **Insured**, with the **Insurer's** consent, in the investigation, defense, settlement and appeal of a **Claim**, including but not limited to, cost of expert consultants and witnesses, premiums for appeal, injunction, attachment or supersedeas bonds (without the obligation to furnish such bonds) regarding such **Claim**. **Defense Expenses** will not include the salaries, wages, benefits or overhead of, or paid to, any **Insured** or any **Employee** of such **Insured**.

**Domestic Partner** means any natural person qualifying as such under the provisions of any federal, state or local law or under the provisions of any formal, written program established by the **Company**.

**Employee** has the meaning set forth in the applicable **Coverage Part**.

**ERISA** means the Employee Retirement Income Security Act of 1974, including amendments thereto and regulations promulgated thereunder or any similar common or statutory law.

**Executive** has the meaning set forth in the applicable **Coverage Part**.

**Financial Insolvency** means, with respect to the **Company**, the appointment of a receiver, conservator, liquidator, trustee or similar official; **Regulatory Agency**; or the inability of the **Company** financially to indemnify the **Insured Persons**.

**Independent Contractor** means any natural person working for the **Company** in the capacity of an **Independent Contractor** pursuant to an express contract or agreement with the **Company** governing the nature of such person's engagement.  The status of an individual as an **Independent Contractor** will be determined as of the date of the alleged **Wrongful Act**.

**Insured** has the meaning set forth in the applicable **Coverage Part**.

**Insured Person** has the meaning set forth in the applicable **Coverage Part**.

**Interrelated Wrongful Acts** means **Wrongful Acts** which have as a common nexus any fact, circumstance, situation, event, transaction or series of related facts, circumstances, situations, events or transactions.

**Loss** has the meaning set forth in the applicable **Coverage Part**.

**Loss Information** means information on open, closed and potential **Claims**, including date, description, and payment amounts, if any.

**Parent Company** means the entity named in Item 1.(a) of the Declarations Page.

**Policy** means, collectively, the Declarations Page, the **Application**, the General Terms and Conditions Applicable to All Coverage Parts, each **Coverage Part** purchased, and any Endorsements attached thereto.

**Policy Period** means the period from the effective date of this **Policy** to either the **Policy** expiration date, as shown in Item 2. of the Declarations Page or the date on which the **Policy** is effectively terminated, whichever is sooner, but shall not include the Extended Reporting Period.

**Policy Year** means the period of one (1) year following the effective date and hour of this **Policy** as shown in Item 2. of the Declarations Page or any anniversary thereof; or if the time between the effective date and the termination of the **Policy** is less than one (1) year, such lesser period. Notwithstanding the above, if the expiration is extended for any reason, the Limit of Liability provided during the extension period shall be considered part of, and not in addition to, the Limit of Liability provided during the last **Policy Year.**

**Pollutants** means any solid, liquid, gaseous or thermal organism, irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, hazardous substances, nuclear materials, and waste.  Waste includes materials to be recycled, reconditioned or reclaimed.

**Potential Claim** means any **Wrongful Act** that may subsequently give rise to a **Claim**.

**Regulatory Agency** means any federal, state, local or foreign law enforcement or governmental authority including, the U.S. Department of Justice, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, the Federal Reserve, the National Credit Union Administration, the Federal Home Loan Bank Board, the Office of the Comptroller of the Currency, the U.S. Securities and Exchange Commission and any attorney general or the enforcement unit of any securities exchange or similar self-regulatory body.

**Subsidiary** means:

1.  any entity in which the **Company** owns, directly or through one or more subsidiaries, more than fifty percent (50%) of the outstanding securities representing the present right to vote for, elect, appoint or exercise a majority control over such entity's board of directors, board of trustees, board of managers, natural person partners or functional equivalent;

2.  any limited liability company in which the **Company**, or one or more of its subsidiaries, has the right to appoint or designate fifty percent (50%) or more of such limited liability company's managers; or

3.  any joint venture in which the **Company**, or one or more of its subsidiaries, has the right to elect, appoint or designate more than fifty percent (50%) of such entity's directors, trustees or other equivalent executives;

provided that such entities, limited liability companies or joint ventures are named in the **Application** for coverage.

**Wrongful Act** has the meaning set forth in the applicable **Coverage Part**.

## SECTION III - LIMIT OF LIABILITY AND RETENTION

A.   **LIMIT OF LIABILITY**

1.  The amount set forth in Item 3. of the Declarations Page is the maximum **Policy Year** Aggregate Limit of Liability of the **Insurer** for all **Loss** from all **Claims** under all purchased **Coverage Parts**, regardless of the number of **Insureds**, **Claims** made, or persons or entities bringing such **Claims**.  The Single Limit of Liability and the Separate Limit of Liability on the Declarations Page are sub-limits of the **Policy Year** Aggregate Limit of Liability which further limits and does not increase the **Insurer's** limit of liability.

2.  The **Coverage Parts** of this **Policy** are offered with either a Single Limit of Liability applicable in the aggregate to all Insuring Agreements or a Separate Limit of Liability for each Insuring Agreement as set forth in Item 4. of the Declarations Page.

    a.  Each Single Limit of Liability designated in Item 4.(c) of the Declarations Page shall be the maximum per **Policy Year** limit of liability of the **Insurer** for all **Loss** under the respective **Coverage Part** regardless of the number of **Insureds**, **Claims** made, or persons or entities bringing such **Claims**.  Each such Single Limit of Liability is a sublimit of and erodes the **Policy Year** Aggregate Limit of Liability set forth in Item 3. of the Declarations Page.

    b.  Each Separate Limit of Liability designated in Item 4.(b) of the Declarations Page shall apply as separate Limit of Liability for each indicated Insuring Agreement and shall be the maximum per **Policy Year** limit of liability of the **Insurer** for all **Loss** under the respective Insuring Agreement regardless of the number of **Insureds**, **Claims** made, or persons or entities bringing such **Claims**. Each such Separate Limit of Liability is a sublimit of and erodes the **Policy Year** Aggregate Limit of Liability set forth in Item 3. of the Declarations Page.

3.  Subject always to the applicable Limit of Liability, should two or more **Coverage Parts** apply to the same **Claim**; the **Insurer** will not pay more than the actual **Loss** incurred by the **Insureds**.

4.  **Defense Expenses** shall be part of, and not in addition to, each applicable Limit of Liability. Payment of **Defense Expenses** by the **Insurer** shall reduce each applicable Limit of Liability.

5.  The **Insurer's** obligations for all **Claims** shall cease upon exhaustion of the **Policy Year** Aggregate Limit of Liability set forth in Item 3. on the Declarations Page and, to the extent any Single Limit of Liability or Separate Limit of Liability is exhausted, the **Insurer's** obligations for all **Claims** under that particular **Coverage Part** or Insuring Agreement shall cease.

B.  **RETENTION**

1.  The applicable Retention(s) for each purchased **Coverage Part** are set forth in Item. 4.(d) of the Declarations Page. The **Insurer** has no obligation to pay **Loss**, including **Defense Expenses**, until the Retention has been paid by the **Insured**. Except for the payment of **Defense Expenses**, the **Insurer** shall pay or reimburse one hundred percent (100%) of covered **Loss**, in excess of the applicable Retention, upon final disposition of the **Claim**.

2.  Each Retention shall be borne by the **Insured** and shall remain uninsured.

3.  If a **Claim** is subject to more than one Retention, the applicable Retention shall apply separately to such **Claim**, provided that the total Retention for such **Claim** shall not exceed the largest applicable Retention.

C.  **SINGLE LIMIT/RETENTION** - **Claims** based upon or arising out of the same **Wrongful Act** or **Interrelated Wrongful Acts** committed by one or more **Insureds** shall be considered a single **Claim**, and only one Retention and Limit of Liability shall apply. Each such single **Claim** shall be deemed to be first made on the date the earliest of such **Claims** was first made, regardless of whether such date is before or during the **Policy Period**.

## SECTION IV – SUPPLEMENTAL COVERAGES

A.  **SPOUSAL LIABILITY COVERAGE** - This **Policy** will, subject to all of its terms, conditions, and limitations, be extended to apply to **Loss** resulting from a **Claim** made against a person who, at the time the **Claim** is made, is a lawful spouse or **Domestic Partner** of an **Insured Person**, but only if and so long as:

1.  the **Claim** against such spouse or **Domestic Partner** results from a **Wrongful Act** actually or allegedly committed by the **Insured Person**, to whom the spouse is married, or who is joined with the **Domestic Partner**; and

2.  such **Insured Person** and his or her spouse or **Domestic Partner** are represented by the same counsel in connection with such **Claim**.

B.  **ESTATES, HEIRS AND LEGAL REPRESENTATIVES** - In the event of the death, incapacity or bankruptcy of an **Insured Person**, any **Claim** against the estate, heirs, legal representatives or assigns (including **Domestic Partners**) of such **Insured Person** for a **Wrongful Act** of such **Insured Person** will be deemed to be a **Claim** against such **Insured Person**.

No spouse or **Domestic Partner** of an **Insured Person** will, by reason of this subsection have any greater right to coverage under this **Policy** than the **Insured Person** to whom such spouse is married, or to whom such **Domestic Partner** is joined.

The **Insurer** has no obligation to make any payment for **Loss** in connection with any **Claim** against a spouse or **Domestic Partner** of an **Insured Person** for any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by such spouse or **Domestic Partner**.

## SECTION V - NOTICE OF CLAIMS AND POTENTIAL CLAIMS

A.  **NOTICE OF CLAIMS** - The **Insured** shall, as a condition precedent to their rights under this **Policy**, give the **Insurer** written notice as soon as practicable, of any **Claim** made and brought to the attention of an **Executive**, but in no event later than ninety (90) days after the expiration of the **Policy Year** in which the **Claim** was first made or the expiration of the **Policy Period**.

B.  **NOTICE OF POTENTIAL CLAIMS** - If during the **Policy Period** the **Insured**, through an **Executive**, first becomes aware of facts or circumstances which may reasonably give rise to a **Potential Claim** and gives written notice to the **Insurer** of the reasons for anticipating such **Potential Claim**, then any **Claim** subsequently made shall be deemed to have been first made during the **Policy Year** in which notice was first given to the **Insurer**.

   As a condition precedent to any coverage hereunder for such **Potential Claims**, such notice must be specific and contain full particulars as to the names, dates, and persons involved in the underlying facts potentially giving rise to the **Potential Claim**, as well as the identity of the potential plaintiffs and the causes of action to be asserted.

C.  **INTERRELATED CLAIMS -** All **Claims** or **Potential Claims** for **Interrelated Wrongful Acts** will be considered as a single **Claim** or **Potential Claim**, whichever is applicable, for purposes of this **Policy**. All **Claims** or **Potential Claims** for **Interrelated Wrongful Acts** will be deemed to have been made at the time the first of such **Claims** or **Potential Claims** for **Interrelated Wrongful Acts** was made whether prior to or during the **Policy Period**.

D.  **NOTICE REQUIREMENTS** - Notice of **Claims** and **Potential Claims** shall be effective on the date of receipt by the **Insurer**. All notices under this subsection must be sent in writing to the address set forth in Item 8. of the Declarations Page and will be effective upon receipt.

E.  **CROSS COVERAGE NOTICE** - It is agreed that notice provided to the **Insurer** of any **Claim**, **Potential Claim** or circumstances which may give rise to a **Claim** under any **Coverage Part** shall be deemed to have been provided under the **Policy** in its entirety.

## SECTION VI – DEFENSE OF CLAIMS, INSURED'S DUTIES AND RESPONSIBILITIES, ALLOCATION, AND ARBITRATION

A.  **DEFENSE OF CLAIMS** – The **Insurer** does not assume any duty-to-defend a **Claim**.  The **Insured** shall defend and contest any **Claim** made against them, provided that:

   1.  the **Insurer** will have the right to participate with the **Insured** in the investigation, defense and settlement, including the negotiation of a settlement of any **Claim** that appears reasonably likely to be covered in whole or in part by such **Coverage Part** and the selection of appropriate defense counsel;

   2.  the **Insurer** may establish and provide to counsel for the **Insured** guidelines for the handling of **Claims** covered under this **Policy**. As a condition of the **Insurer's** obligation to pay **Defense Expenses**, counsel for the **Insured** shall adhere to the guidelines provided by the **Insurer** in the defense of such **Claims**. The **Insurer** shall not be obligated to pay **Defense Expenses** that have been incurred without observance of the guidelines, or that otherwise are unreasonable; and

   3.  upon written request, the **Insurer** will advance **Defense Expenses** with respect to such **Claim**. Such advanced payments by the **Insurer** will be repaid to the **Insurer** by the **Insureds** severally according to their respective interests in the event and to the extent that the **Insureds** are not entitled to payment of such **Defense Expenses**. As a condition of any payment of **Defense Expenses** under this subsection, the **Insurer** may require a written undertaking on terms and conditions satisfactory to the **Insurer** guaranteeing the repayment of any **Defense**

**Expenses** paid to or on behalf of any **Insured** if it is finally determined that any such **Claim** or portion of such **Claim** is not covered.

B.  **INSURED'S DUTIES AND RESPONSIBILITIES** – It shall be the duty and responsibility of the **Insured**, as a condition precedent to any coverage under this **Policy**:

1.  to grant to the **Insurer** the right to associate itself in defense and settlement of any **Claim** that appears reasonably likely to involve the **Insurer**;

2.  not to, except at personal cost, make any payment, admit any liability, settle any **Claims**, assume any obligation, or incur any expense without the **Insurer's** written consent, which consent shall not be unreasonably withheld;

3.  to assert all appropriate defenses and to take all steps in defense of any **Claim** made, including but not limited to, releasing to the **Insurer** all copies of reports, investigations, pleadings and other papers as soon as reasonably possible and to provide the **Insurer** with such information, assistance and cooperation as the **Insurer** may reasonably request to determine the existence or extent of the **Insurer's** obligation; and

4.  to conduct all matters relative to any **Claim** or **Potential Claim** as if coverage under this **Policy** were not otherwise afforded, including but not limited to not admitting any liability for, settling any **Claim,** or incurring any **Defense Expenses** without the prior written consent of the **Insurer**, which consent shall not be unreasonably withheld.

D.  **ALLOCATION** – If there is a **Claim** under any **Coverage Part** in which the **Insured** incurs an amount consisting of both covered **Loss** and uncovered loss because such **Claim** includes both covered and uncovered matters or covered and uncovered parties, the **Insured** and the **Insurer** agree to use their best efforts to determine a fair and proper allocation of all such amounts.   In making such a determination, the parties will take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and settlement of the **Claim** by the **Insured Persons**, the **Company**, and others not insured under the applicable **Coverage Part**.   In the event that an allocation cannot be agreed to, then the **Insurer** will be obligated to make an interim payment of the amount of **Loss** which the parties agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of the applicable **Coverage Part** and applicable law.

D.  **ARBITRATION** – If the **Insured** and the **Insurer** cannot agree on an allocation of **Defense Expenses**, if requested by the **Insured**, the **Insurer** shall submit the allocation dispute to binding arbitration.  In such case:

1.  no presumption as to allocation shall exist in any arbitration, suit or other proceeding; and

2.  the **Insurer** shall advance on a current basis **Defense Expenses** which the **Insurer** believes to be covered under this **Policy** until a different allocation is negotiated, arbitrated or judicially determined.

The rules of the American Arbitration Association shall apply except with respect to the selection of the arbitration panel. The arbitration panel shall consist of one arbitrator selected by the **Insured**, one arbitrator selected by the **Insurer**, and a third independent arbitrator selected by the first two arbitrators. In any such arbitration, each party will bear its own legal fees and expenses. Any negotiated, arbitrated or judicially determined allocation of **Defense Expenses** will be applied retroactively to all **Defense Expenses**, notwithstanding any prior advancement to the contrary. Any allocation or advancement of **Defense Expenses** shall not apply to or create any presumption with respect to the allocation of other **Loss** arising from such **Claim** or any other **Claim**.

## SECTION VII – ACQUISITIONS, CREATIONS AND ASSET PURCHASES/ASSUMPTIONS

A.  **NOTICE/COVERAGE REQUIREMENTS** - If, during the **Policy Period**, the **Company**:

1.  acquires or forms a **Subsidiary**;

2.      acquires any entity by such entity's merger into, or consolidation with, the **Company** such that the **Company** is the surviving entity; or

3.      purchases assets or assumes liabilities of another entity, without acquiring such entity,

then coverage will be provided for such acquired or formed entity and its **Insured Persons**, or for such purchased assets or assumed liabilities for ninety (90) days, subject to all other terms and conditions of this **Policy**, provided that the:

a.      **Company** provides written notice to the **Insurer** and any requested information regarding the transaction within such ninety (90) day period;

b.      **Company** accepts any special terms, conditions and/or Exclusions and pays any additional premium required by the **Insurer**; and

c.      **Insurer**, at its sole discretion, agrees in writing to provide such coverage.

B.    **AUTOMATIC COVERAGE EXTENSION** - The ninety (90) day limitation of coverage and ninety (90) day notice requirement referenced in A. above shall not apply, if during the **Policy Period** the **Company**:

1.      creates or acquires a **Subsidiary** or purchases or assumes assets or liabilities totaling less than thirty percent (30%) of the total assets of the **Company** (as reflected in the **Company's** most recent fiscal year-end financial statement at time of the transaction); or

2.      the purchase of assets or assumption of liabilities occurs less than ninety (90) days prior to the end of the **Policy Year**.

C.    **MERGED/ACQUIRED ENTITIES** - Any coverage afforded under this section will be subject to all other terms and conditions of this **Policy** and will only extend to **Claims** made for **Wrongful Acts** relating to, or in connection with, such acquisition, formation, purchased assets, or assumed liabilities committed after such acquisition, formation, purchase of assets, or assumption of liabilities, unless the **Insurer** agrees in writing to provide for **Wrongful Acts** committed before such acquisition, creation, purchase of assets, or assumption of liabilities.

## SECTION VIII–CANCELLATION, NON-RENEWAL AND CONVERSION

A.    **CANCELLATION**

1.      This **Policy** may be cancelled at any time by the **Parent Company** for itself and as agent for all other **Insureds**, by providing written notice to the **Insurer**. If this **Policy** is canceled by the **Parent Company**, the **Insurer** shall retain the customary short rate portion of the premium. If this **Policy** is canceled by the **Insurer**, the **Insurer** shall retain the pro-rata portion of the premium. Payment or tender of any unearned premium by the **Insurer** to the **Parent Company** shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.

2.      The **Insurer** may cancel this **Policy** by mailing or delivering to the **Parent Company** written notice of cancellation stating when, not less than sixty (60) days thereafter, such cancellation shall be effective. The **Insurer** may cancel this **Policy** for nonpayment of premium, in which case ten (10) days written notice shall be given to the **Parent Company.** If the **Insurer** cancels the **Policy** for nonpayment of premium, the **Policy** may, at the **Insurer's** option, be deemed void from its inception.

B.    **NON-RENEWAL -** If the **Insurer** elects not to renew this **Policy**, the **Insurer** shall provide the **Parent Company** for itself and as agent for all **Insureds**, with no less than sixty (60) days advance written notice of when the non-renewal shall become effective and the reason(s) for such action.

C.    **CONVERSION** - Upon the occurrence of any of the following events, this **Policy** shall continue in full force and effect with respect to **Claims** for **Wrongful Acts** committed or allegedly committed before such event, but coverage shall cease with respect to **Claims** for such **Wrongful Acts** committed or allegedly committed after such event (herein called the Conversion Period):

1. **Financial Insolvency** of the **Company** or any **Subsidiary** comprising more than fifty percent (50%) of the **Company's** total assets;

2. **Change of Control**; or

3. the **Company** or any **Subsidiary** ceasing to engage actively in its primary business.

Pursuant to this Conversion Period, this **Policy** may not be cancelled and the entire premium shall be deemed fully earned. If the Extended Reporting Period is elected, it will run concurrently with the Conversion Period.

In the event of **Financial Insolvency** or sale of a **Subsidiary** comprising less than fifty percent (50%) of the **Parent Company's** total assets, this Conversion Period provision shall apply only to the **Subsidiary** and its **Insured Persons** and the **Policy** shall continue in full force with respect to all other **Insureds**.

D. **NOTICES -** The **Insurer** will mail any cancellation or non-renewal notice to the mailing address shown in Item 1.(a) of the Declarations Page. If notice is mailed, proof of mailing will be sufficient proof of notice. If the period of limitation relating to the giving of notice is prohibited or made void by any law, such period shall be amended so as to be equal to the minimum period of limitation permitted by such law.

## SECTION IX - EXTENDED REPORTING PERIOD (ERP)

A. **ERP AVAILABILITY -** If the **Company** or the **Insurer** cancels or nonrenews this **Policy**, or if the **Policy** converts subject to Section VIII C.2., the **Insured** shall have the right to purchase the Extended Reporting Period. At any time prior to or within sixty (60) days after the effective date of cancellation, non-renewal or conversion, the **Insured** may give the **Insurer** written notice that it desires to purchase the Extended Reporting Period. It is understood and agreed that the Extended Reporting Period shall not be made available if:

1. the **Insurer** cancels this **Policy** due to nonpayment of premium; or

2. there is an offer by the **Insurer** to renew this **Policy** under terms, conditions, Limits of Liability, Retentions or premiums different from those applicable to the expiring **Policy** as such offer of coverage shall not constitute a refusal to renew.

B. **ERP TERMS AND CONDITIONS** – The Extended Reporting Period shall be subject to the following terms and conditions:

1. The coverage term for the Extended Reporting Period shall be the period set forth in Item 6. of the Declarations Page. The premium due will be calculated by multiplying the fully annualized premium for such coverage by the percentage reflected in Item 6.(a) of the Declarations Page and the entire premium will be deemed to have been fully earned at the commencement of such Extended Reporting Period.

2. There is no separate or additional Limit of Liability for the Extended Reporting Period. The **Insurer's** maximum Limit of Liability for all **Claims** made during such Extended Reporting Period will be the remaining portion of the applicable Limit of Liability set forth in the Declarations Page for the **Policy Year** immediately preceding the effective date of the Extended Reporting Period.

3. The Extended Reporting Period is not an extension of coverage, but rather an extended period to report **Claims** first made during the Extended Reporting Period resulting from **Wrongful Acts** that occurred prior to the effective date of cancellation, nonrenewal or conversion and otherwise covered under this **Policy**. Notice of facts and circumstances that may give rise to a **Claim**, pursuant to Section V.B., must be given during the **Policy Period** and shall not be effective if given during the Extended Reporting Period.

## SECTION X– REPRESENTATIONS AND SEVERABILITY

A.  **REPRESENTATIONS** - It is agreed and represented that the particulars and statements contained in the **Application** are the basis of this **Policy** and are to be considered as incorporated into and constituting a part of this **Policy**. By acceptance of this **Policy**, the **Insured** agrees that:

1.  each **Application** shall be construed as a separate **Application** for coverage by each **Insured Person**;

2.  this **Policy** shall not be deemed to be a series of individual insurance contracts with the **Company** and each of the **Insured Persons**; and

3.  the statements in the **Application** are their representations, and that this **Policy** is issued in reliance upon the truth of such representations. No misrepresentation by the **Insured** shall be deemed material unless knowledge by the **Insurer** of the facts misrepresented would have led to the refusal by the **Insurer** to issue or renew the **Policy** for the premium charged and with the same terms and conditions as offered based on the **Insurer's** uniformly applied underwriting guidelines.

B.  **SEVERABILITY** - The **Insureds** agree that in the event the **Application** contains material misrepresentations made with the actual intent to deceive, no coverage will be provided under this **Policy** with respect to:

1.  any **Insured Person** who knew of any fact, circumstance or situation that was not truthfully disclosed in the **Application**;

2.  the **Company**, to the extent the **Company** indemnifies the **Insured Person** reflected in Item 1 above; or

3.  the **Company**, to the extent coverage is granted to the **Company** by any Insuring Agreement made a part of this **Policy**, if any past, present, or future chief financial officer, in-house counsel, chief executive officer, President or Chairman of the Board of the **Company**, or any person holding any equivalent position within the **Company** (regardless of title), knew of any fact, circumstance or situation that was not truthfully disclosed in the **Application**.

The foregoing conditions shall apply whether or not the **Insured Person** actually knew that the misrepresentation or untruthful disclosure was made in the **Application** for coverage.

C.  **SEVERABILITY OF EXCLUSIONS** - With respect to the Exclusions contained in each **Coverage Part**, in order to determine if coverage is available:

1.  no **Wrongful Act**, fact pertaining to, or knowledge possessed by any **Insured Person** will be imputed to any other **Insured Person**; and

2.  all facts pertaining to and knowledge possessed by any past, present, or future chief financial officer, in-house counsel, chief executive officer, President or Chairman of the Board of the **Company**, or any person holding any equivalent position within the **Company** (regardless of title), shall be imputed to the **Company** with respect to the Fraud/Illegal Profit and Violation of Law Exclusion.

## SECTION XI - OTHER TERMS AND CONDITIONS

A.  **ACTION AGAINST THE INSURER** - No action shall be taken against the **Insurer** unless, as a condition precedent, there shall have been full compliance with all of the terms of this **Policy**, and until the **Insured's** obligation to pay shall have been finally determined either by adjudication or by written agreement of the **Insureds**, the claimant and the **Insurer**.

No person or organization shall have any right under this **Policy** to join the **Insurer** as a party to any action against any **Insured** nor shall the **Insurer** be impleaded by the **Insureds** or their legal representatives.

B.  **ASSIGNMENT AND ACCEPTANCE** - By acceptance of this **Policy**, the **Insured** and the **Insurer** agree that this **Policy**, the **Application**, and any written endorsements attached thereto constitute the entire

agreement between the parties. Assignment of interest under this **Policy** shall not bind the **Insurer** until its consent is endorsed hereon.

C.   **AUTHORIZATION CLAUSE** - By acceptance of this **Policy**, the **Insureds** agree that the **Parent Company** will act on behalf of all **Insureds** for all purposes under this **Policy** including, but not limited to, giving and receiving of all notices and correspondence, cancellation, nonrenewal or termination of this **Policy**, payment of premiums, the negotiation and acceptance of endorsements, and receipt of any return premiums that may be due under this **Policy**.

D.   **CHANGES** - Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the **Insurer** shall not effect a waiver or a change in any part of this **Policy** or estop the **Insurer** from asserting any right under the terms of this **Policy**, nor shall the terms, conditions and limitations of this **Policy** be waived or changed, except by written Endorsement issued to form a part of this **Policy**.

E.   **CONFORMITY TO STATUTE** - The terms of this **Policy** that are in conflict with the terms of any applicable laws construing this **Policy** are hereby amended to conform to such laws.

F.   **COVERAGE PART COORDINATION** – Subject always to the applicable Limit of Liability, should two or more **Coverage Parts** apply to the same **Claim**, the **Insurer** will not pay more than the actual **Loss** incurred by the **Insureds**.

G.   **COVERAGE TERRITORY -** Coverage under this **Policy** shall extend to **Wrongful Acts** taking place or **Claims** made anywhere in the world.

H.   **INSOLVENCY/BANKRUPTCY** - The **Financial Insolvency** of the **Insured** or of the estate of such **Insured** shall not release the **Insurer** from its obligations nor deprive the **Insurer** of its rights under this **Policy**.

I.   **LIBERALIZATION** – If during the **Policy Period**, the **Insurer** is required, by law or by insurance supervisory authorities of  the state in which this **Policy** was issued, to make any changes in the form of this **Policy**, by which the insurance afforded by this **Policy** could be extended or broadened without increased premium charge by endorsement or substitution of form, then such extended or broadened insurance will inure to the benefit of the **Insured** as of the date the revision or change is approved for general use by the applicable department of insurance.

J.   **STATE AMENDATORY DISCREPANCY PROVISION** - In the event that there is a discrepancy between a state amendatory endorsement attached to this **Policy** and any term or condition of this **Policy**, then it is understood and agreed that, where permitted by law, the **Insurer** shall apply the most favorable terms in the contract to the **Insured**, whether those terms and conditions are in either the amendatory or the **Policy**.

K.   **LOSS INFORMATION** - The **Insurer** will provide **Loss Information** to the **Company** within ten (10) days of the **Company's** request or, if required by statute, at the same time as any notice of cancellation or nonrenewal of this **Policy**.

L.   **SUBROGATION** - In the event of payment under this **Policy**, the **Insurer** is subrogated to all of the **Insured's** rights of recovery against any person or organization to the extent of such payment and the **Insured** agrees to execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The **Insured** will do nothing to prejudice such rights.

M.   **TITLES OF PARAGRAPHS** - The descriptions in the headings and sub-headings of this **Policy** are inserted solely for convenience or reference and form no part of the terms and conditions of coverage.

**AMTRUST**  *FI Advantage*

### Wesco Insurance Company
(A Stock Insurance Company, herein called the **Insurer**)

### FINANCIAL INSTITUTION
### DIRECTORS & OFFICERS (D&O) LIABILITY COVERAGE PART

**This is a claims-made policy. Defense Expenses are included within the Limit of Liability. Amounts incurred as Defense Expenses will reduce the Limit of Liability available to pay judgments or settlements. Please read this Policy carefully!**

In consideration of the premium paid and in reliance upon all statements made and information contained in the Declarations Page and **Application**, the **Insurer** and the **Insureds** agree that coverage will be provided subject to all of the terms, conditions and limitations of this **Policy**, as follows:

### SECTION I - INSURING AGREEMENTS

A.     <u>**INSURED PERSONS LIABILITY COVERAGE**</u> - The **Insurer** will pay on behalf of the **Insured Persons**, **Loss** resulting from any **Claim** first made during the **Policy Period** or Extended Reporting Period (if exercised) against the **Insured Persons** for any **Wrongful Act**, except for **Loss** the **Company** pays as indemnification.

B.     <u>**COMPANY INDEMNIFICATION COVERAGE**</u> - The **Insurer** will pay on behalf of the **Company**, **Loss** resulting from any **Claim** first made during the **Policy Period** or Extended Reporting Period (if exercised) against the **Insured Persons** for which the **Company** has agreed to or is legally permitted or required by law to indemnify the **Insured Persons** for any **Wrongful Act**.

C.     <u>**COMPANY LIABILITY COVERAGE**</u> - The **Insurer** will pay on behalf of the **Company**:

    1.     **Loss** resulting from any **Claim** first made during the **Policy Period** or Extended Reporting Period (if exercised) against the **Company** for any **Wrongful Act** not covered in any other **Coverage Part** made part of this **Policy**; and

    2.     **Investigation Expense** for any **Shareholder Derivative Demand** first made during the **Policy Period** or Extended Reporting Period (if exercised) against the **Company** for any **Wrongful Act**. The **Insurer's** maximum sublimit of liability for all **Investigation Expenses** will be the Investigation Expense Sublimit of Liability set forth in Item 4. of the Declarations Page.

### SECTION II – SUPPLEMENTAL LIMIT OF LIABILITY FOR NON-INDEMNIFIABLE LOSS

The **Insurer** will provide the **Insured Persons** with a supplemental Limit of Liability, which shall not exceed $1,000,000 per **Policy Year** for **Loss** resulting from **Claims** against the **Insured Persons** to which Section I.A. of this **Coverage Part** is applicable. This supplemental Limit of Liability is available only after the Insuring Agreement I.A. Limit of Liability as set forth in the Declarations has been exhausted.

## SECTION III – NOT-FOR-PROFIT DIRECTORSHIP LIABILITY COVERAGE

Subject to the provisions applicable to this **Coverage Part**, coverage is afforded for **Loss** resulting from any **Claim** for a **Wrongful Act** committed by **Insured Persons** in an **Outside Capacity**.  Such coverage shall be specifically excess of any indemnity and insurance available from or provided by the **Outside Organization**.

If any **Claim** against the **Insured** gives rise to an obligation both under this **Coverage Part** and under any other coverage or policy of insurance issued by the **Insurer** or any of its affiliates to any **Outside Organization**, the **Insurer's** maximum Aggregate Limit of Liability under all such policies for all **Loss**, including **Defense Expenses**, for such **Claim** will not exceed the largest single available Limit of Liability under any such coverage.

## SECTION IV - DEFINITIONS

In addition to the Definitions set forth in General Terms and Conditions Applicable to All Coverage Parts, the following Definitions shall apply to all Insuring Agreements contained herein.

**Claim** means:

1.     a written demand, other than a **Shareholder Derivative Demand**, for monetary damages or non-monetary relief;

2.     a civil proceeding commenced by the service of a complaint or similar pleading;

3.     a criminal proceeding commenced by a filing of charges or the return of an indictment;

4.     a formal administrative or regulatory proceeding commenced by a filing of a notice of charges, formal investigative order, service of summons, or similar document;

5.     an arbitration, mediation or similar alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the **Insurer's** written consent, such consent not to be unreasonably withheld;

6.     service of a subpoena on an **Insured Person** identified by name if served upon such person pursuant to a formal investigative order by the Securities and Exchange Commission;

7.     a **Shareholder Derivative Demand** solely with respect to Insuring Agreement C.2. only; or

8.     a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding,

against an **Insured** for a **Wrongful Act**.  **Claim** does not include any labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement.

**Employee** means any natural person whose labor or service was, is or shall be engaged and directed by the **Company** including full-time, part-time, seasonal, leased and temporary employees as well as volunteers. **Employee** shall not include any **Independent Contractor**.

**Executive** means any natural person who was, is or shall be a duly elected or appointed:

1.     director, officer, or member of the board of managers or management committee of the **Company**;

2.     in-house general counsel or risk manager of the **Company**; or

3.     manager of a **Company** organized outside the United States of America, if such position is equivalent to those specified in 1. or 2. above.

**Insured** means the **Insured Persons** and the **Company**.

**Insured Person** means any:

1.     **Executive**; or

2.      **Employee**.

**Investigation Expense** means the reasonable and necessary fees, costs and expenses incurred by the **Company**, including its board of directors, board of managers or any duly constituted committee thereof, in connection with any investigation or evaluation by the **Company** of any **Shareholder Derivative Demand**.

**Loss** means **Defense Expenses** and any amount the **Insured** is legally obligated to pay resulting from a **Claim**, including damages, judgments, settlements, punitive or exemplary damages or the multiple portion of any multiplied damage award (if insurable under the applicable law most favorable to the insurability of punitive, exemplary, or multiplied damages), prejudgment and post judgment interest, and legal fees and expenses awarded pursuant to a court order or judgment.  **Loss** shall not include:

1.      payroll or other taxes;

2.      criminal or civil fines or penalties imposed by law;

3.   any unpaid, unrecoverable or outstanding amounts resulting from a loan, lease or extension of credit to any borrower, including unpaid, unrecoverable or outstanding amounts resulting from a loan, lease or extension of credit which has been sold as a participation to other financial institutions;

4.      any increased amount in the price or consideration paid, or proposed to be paid, for any actual or attempted acquisition of all or substantially all of the ownership interest in, or assets of, an entity, or merger with any entity;

5.      any restitution, disgorgement, or payment of similar payments including but not limited to the return of fees, commissions or charges for the **Company's** services;

6.   costs to comply with any non-monetary or injunctive relief of any kind or any agreement to provide such relief, including but not limited to any damages, costs or expenses incurred in making an accommodation for any disabled person pursuant to the Americans with Disabilities Act or any similar federal, state or local laws, or in complying with any other federal, state or local laws of any kind; or

7.      any matters which are uninsurable under the law pursuant to which this **Policy** shall be construed.

Where the **Company** reasonably determines that punitive, exemplary or multiple damages are insurable under the applicable law, the **Insurer** shall not challenge that interpretation of insurability.

**Outside Organization** means any:

1.      not-for-profit corporation, community chest, fund or foundation that is exempt from federal income tax as an organization described in Section 501(c)(3), 501(c)(4), or 501(c)(10) of the Internal Revenue Code of 1986, as amended; or

2.      organization established for a religious or charitable purpose under any non-for-profit statute.

**Outside Capacity** means service by an **Insured Person** on the board of directors, board of trustees, board of managers, or functional equivalent thereof, in any **Outside Organization**, provided and so long as such service is at the specific request, consent or direction of the **Company**.

**Shareholder Derivative Demand** means any written demand on behalf of the **Company** brought and maintained by any securities holder of the **Company** and made upon the board of directors or board of managers of the **Company**, or any functional equivalent board, to bring a civil proceeding in a court of law against any **Insured Person** for a **Wrongful Act**, but only if such demand is brought and maintained without the active solicitation, assistance, or participation of any **Insured**.

**Whistleblower Activity** means activity protected under:

1.      18 U.S.C. 1514A(a) (whistleblower protection pursuant to section 806 of the Sarbanes-Oxley Act of 2002, as amended), other than the activity of "filing or the causing to be filed" any proceeding as specified under section 1514A(a)(2) and any other activity specified in section 1514A(a)(2) that is engaged in on a voluntary basis; or

2.    any similar whistleblower protection provision of any applicable federal, state, local, or foreign securities law or regulation that affords protection to a natural person, other than the filing, causing to be filed, or any other activity similar to the type specified in section 18 U.S.C. 1514A(a)(2) that is engaged in on a voluntary basis.

An **Insured Person's Whistleblower Activity** alone will not be considered the active solicitation, assistance, or participation of an **Insured**.

**Wrongful Act** as used in this **Coverage Part** means any actual or alleged:

1.    error, omission, misstatement, misleading statement, neglect or breach of duty by **Insured Persons** in their capacity as such or, with respect to Insuring Agreement C., by the **Company**; or

2.    matter claimed against the **Insured Persons** solely by reason of their serving in such capacity.

## SECTION V – EXCLUSIONS

A.        **EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS**

**Bodily & Personal Injury/Property Damage -** The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** for bodily injury, personal injury, emotional distress, mental anguish, humiliation, sickness, disease or death of any person, injury resulting from libel, slander, defamation or disparagement, violation of a person's right of privacy, or damage to, loss or use or destruction of any tangible property.

**Bonding/Insurance Company -** The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** brought directly or indirectly by or for the benefit of any insurance carrier or bond carrier of the **Company**, or any affiliate of the **Company**, regardless in whose name such **Claim** is actually made.

**Contractual Liability -** The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured**:

1.    arising from, based upon, or attributable to the assumption of any liability to defend, indemnify, or hold harmless any person or entity, other than an **Insured Person**, under any written contract or agreement, unless such liability would be imposed regardless of the existence of such contract or agreement; or

2.    for the intentional breach, in fact, of any express written or oral contract or amounts the **Company** is obligated to pay pursuant to any express written or oral contract.  If it is established in fact that such **Claim** involves intentional breach of contract, the **Insured** agrees to reimburse **Defense Expenses**.

**Discrimination or Harassment/Fair Labor Standards Act -** The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** by any third party or **Independent Contractor** for any actual or alleged:

1.    discrimination or harassment including but not limited to violation of any federal, state or local laws (whether common-law or statutory) concerning discrimination including the Americans with Disabilities Act of 1992, the Civil Rights Act of 1991, the Age Discrimination in Employment Act of 1967, Title VII of the Civil Rights Act of 1964 and the Civil Rights Act of 1866; or

2.    violations of the Fair Labor Standards Act as amended, or any federal, state, or local statutory law or common law anywhere in the world governing wage, hour and payroll policies.

**Employment-Related Wrongful Acts -** The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to any employment-related **Wrongful Act**.

**ERISA -** The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** for any actual or alleged violation of the responsibilities, obligations or duties imposed upon fiduciaries by **ERISA** or any similar law.

**Fraud/Illegal Profit and Violation of Law** - The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to:

1.  the gaining of any profit, remuneration or pecuniary advantage to which such **Insured** is not legally entitled; or

2.  any fraudulent or criminal **Wrongful Act** with actual knowledge of its wrongful nature or with intent to cause damage by such **Insured**,

as evidenced by a final adjudication by a judge, jury or arbitrator in any proceeding.

**Insured vs. Insured** - The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** by, on behalf of, or at the behest of any **Insured** in any capacity; provided, however, that this exclusion will not apply to:

1.  any **Claim** brought or maintained by a securities holder of the **Company** as a derivative action on behalf of the **Company**; provided such **Claim** is brought independently of, and totally without the solicitation, assistance, participation, or intervention of any **Insured Person** unless such participation arises solely out of an **Insured Person's Whistleblower Activity**;

2.  any **Claim** that is in the form of a cross claim, third party claim or other claim for contribution or indemnity which is part of and results directly from a **Claim** which is not otherwise excluded by the terms of the **Policy**;

3.  any **Claim** brought or maintained by a former **Executive** who has not served as an **Executive** for at least four (4) years preceding the date the **Claim** is first made; provided such **Claim** is brought independently of, and totally without the solicitation, assistance, participation, or intervention of any **Insured Person**;

4.  any **Claim** brought or maintained by an **Insured Person** solely as a customer of the **Company**; provided such **Claim** is brought independently of, and totally without the solicitation, assistance, participation, or intervention of any other **Insured**;

5.  any **Claim** brought or maintained by any bankruptcy or insolvency trustee, examiner, receiver, any assignee of such trustee, examiner or receiver, any conservator, liquidator, rehabilitator or similar official appointed by the court to take control of, supervise, manage or liquidate the **Company**; or

6.  any **Claim** brought by or maintained by any **Regulatory Agency**; provided such **Claim** is brought independently of, and totally without the solicitation, assistance, participation, or intervention of any other **Insured**.

**Mutual Conversion** - The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to the **Company** converting from a mutual company to a stock company or the offering or sale of common stock or other securities in connection therewith.

If at least thirty (30) days prior to such transaction, the **Insurer** receives notice of the proposed transaction and any additional information requested by the **Insurer**, the **Company** may request a proposal for coverage subject to any additional terms and conditions, and payment of any additional premium, described in such proposal.

**Non-Subsidiary Wrongful Acts** - The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to any **Wrongful Act** by any entity that is, or was, a **Subsidiary**, or by any **Insured Person** of such entity, occurring at any time during which such entity was not a **Subsidiary**.

**Not For Profit Outside Organization vs. Insured Persons** - The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** by or on behalf of, or in the name or right of, any **Outside Organization** against an **Insured Person** for a **Wrongful Act** in his or her **Outside Capacity** with respect to such **Outside Organization**; provided, however, that this exclusion will not apply to any **Claim** brought derivatively by a security holder of such **Outside Organization** in his or her capacity as such.

**Outside Capacity Exclusion** - The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** involving any **Insured Person** in their capacity as an employee, director, officer, trustee, governor, member of the board of managers, or any equivalent position, of any entity other than the **Company** or an

**Outside Organization.**

**Past Acts** - The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to any actual or alleged **Wrongful Acts** committed on or before the Retroactive Date set forth in Item 5.(b) of the Declarations Page or any **Wrongful Acts** occurring prior to such date which together with **Wrongful Acts** occurring on or after such date would constitute **Interrelated Wrongful Acts.**

**Pollution** - The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to:

1.    the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of any **Pollutant**; or

2.    any request, demand, order, or statutory or regulatory requirement that any **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, any **Pollutant**;

provided, however, that this exclusion shall not apply to **Loss** covered under Insuring Agreement A. or any **Shareholder Derivative Demand** covered under Insuring Agreement C.2.

**Prior Knowledge/Litigation** - The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to:

1.    any fact, circumstance, situation, or event that is or reasonably would be regarded as the basis for a **Potential Claim** about which any **Executive** had knowledge prior to the date of the initial **Application** for coverage; or

2.    any prior or pending civil, criminal, administrative or regulatory proceeding initiated against any **Insured** prior to the applicable Prior and Pending Litigation Date(s) set forth in Item 5. (a) of the Declarations Page, or arising out of or in any way involving the same or substantially the same fact, circumstance, situation or **Wrongful Act** underlying or alleged in such prior or pending civil, criminal, administrative or regulatory proceeding.

**Prior Notice** - The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to any **Wrongful Act** or any **Wrongful Act** which is part of any **Interrelated Wrongful Acts**, or any fact, circumstance or situation, which has been the subject of any notice given to any carrier other than the **Insurer** under any similar insurance policy providing protection for any **Insured**.

**Professional Services** - The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to those services performed by or on behalf of the **Insured** for a customer or borrower of the **Company**.

**Securities Offering** - The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to:

a.    the public offer, sale, solicitation or distribution of securities issued by the **Company**; or

b.    the violation of any federal, state, local or provincial statute relating to securities, including the Securities Act of 1933 and the Securities and Exchange Act of 1934, or any rules or regulations promulgated thereunder;

provided, however, that this exclusion will not apply to:

1.    any offer, purchase or sale of securities, whether debt or equity, in a transaction that is exempt from registration under the Securities Act of 1933 (an "Exempt Transaction"); or

2.    to the extent that such **Claim** is made by a security holder of the **Company** for the failure of the **Company** to undertake or complete an initial public offering or sale of securities of the **Company**.

If at least thirty (30) days prior to any securities offering by the **Company**, other than pursuant to an Exempt Transaction, the **Insurer** receives notice of the proposed transaction and any additional information requested by

the **Insurer**, the **Company** may request a proposal for coverage subject to any additional terms and conditions, and payment of any additional premium, described in such proposal.

**Short-Swing Profit** - The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to an accounting of profits made from the purchase and sale or sale and purchase of **Company** securities by the **Insured Persons** within the meaning of Section 16(b) of the Securities Exchange Act of 1934, as amended, or similar provisions of any state statutory law or common law.

B.   **EXCLUSIONS APPLICABLE TO INSURING AGREEMENT C.**

**Intellectual Property/Infringement Exclusion** - The **Insurer** shall not be liable under Insuring Agreement C. to pay any **Loss** in connection with any **Claim** made against the **Company** arising from, based upon or attributable to any actual or alleged infringement or violation of any intellectual property right or law, including copyright, title, slogan, patent, service mark, service name, trade dress, trade name, trade secret, or trademark.

**Mechanical Malfunction** - The **Insurer** shall not be liable under Insuring Agreement C. to pay any **Loss** in connection with any **Claim** made against the **Company** arising from, based upon, or attributable to the mechanical or electronic failure, breakdown or malfunction of any machine or system of machines.

**Plagiarism/Patent/Trademark/Product Defect** - The **Insurer** shall not be liable under Insuring Agreement C. to pay any **Loss** in connection with any **Claim** made against the **Company** arising from, based upon, or attributable to:

1.   any plagiarism;

2.   any misappropriation, infringement or violation of copyright, patent, trademark, service mark, trade name, trade secret or any other intellectual property rights; or

3.   any malfunction of any product or failure of any product to perform in any manner as a result of any defect, deficiency, inadequacy or dangerous condition in such product or in its design or manufacture.

**Safe Deposit Box** - The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to any safe deposit box operations of the **Company**.

**Unfair Trade Practices** - The **Insurer** shall not be liable under Insuring Agreement C. to pay any **Loss** in connection with any **Claim** made against the **Company** arising from, based upon, or attributable to:

1.   charges of price fixing, restraint of trade, monopolization or unfair trade practice; or

2.   any actual or alleged violation of:

   a.   the Federal Trade Commission Act, the Sherman Act, the Clayton Act, or any federal statutory provision regarding anti-trust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade.

## SECTION VI – OTHER TERMS AND CONDITIONS

This Section will supplement and not replace, Section XI., entitled "Other Terms And Conditions" contained in the General Terms and Conditions Applicable to All Coverage Parts.

A.   **ORDER OF PAYMENTS –** If **Loss** for any **Claim** exceeds, or may exceed, the remaining applicable Limit of Liability as set forth in Item 4. of the Declarations Page:

   1.   the **Insurer** will first pay **Loss** for such **Claim** to which Insuring Agreement A. of this **Coverage Part** applies; then

   2.   to the extent that any amount of the applicable Limit of Liability will remain available, the **Insurer** will pay **Loss** for such **Claim** to which such other Insuring Agreements of this **Coverage Part** may apply.

Upon written request by the **Executive** of the **Company**, the **Insurer** will either pay or withhold payment of **Loss** under the other applicable Insuring Agreements of this **Coverage Part**. In the event of a written request to withhold payment, the **Insurer** will make any future payment only for **Loss** to which Insuring Agreement A. of this **Coverage Part** applies, unless otherwise so instructed upon written request by and through an **Executive** of the **Company.**

B.   <u>**OTHER INSURANCE**</u> –This **Coverage Part** shall not be subject to the terms of any other insurance. All **Loss**, including **Defense Expenses**, payable under this **Policy** shall be excess to:

1.   any other valid and collectible insurance available to any **Insured**, including any insurance under which there is a duty-to-defend, unless such insurance is written specifically excess of this **Coverage Part** by reference in such other policy to the Policy Number assigned to this **Policy**; or

2.   indemnification to which an **Insured Person** is entitled from any entity other than the **Company**.

C.   <u>**RETENTION**</u> - This Section will supplement, and not replace, Section III.B., entitled "Retention" contained in the General Terms and Conditions Applicable to All Coverage Parts.

1.   No Retention will apply to **Defense Expenses** resulting from any **Claim** brought by any securities holder of the **Company** and the **Insurer** will reimburse the **Company** for any such Retention paid by the **Company** in connection with any such **Claim**, if:

a.   there is a final adjudication of no liability obtained prior to or during trial, in favor of all **Insureds**, by reason of a motion to dismiss or a motion for summary judgment or any similar motion or process, after exhaustion of all appeals, or a final judgment of no liability obtained after trial, in favor of all **Insureds**, after exhaustion of all appeals; or

b.   the **Claim** is dismissed or there is a stipulation to dismiss such **Claim** with prejudice and without the payment of any monetary consideration by the **Insureds**.

2.   No Retention will apply to an **Insured Person** if indemnification by the **Company** is not permitted by law or if the **Company** is unable to make such indemnification solely by reason of its **Financial Insolvency**. The **Company** will be conclusively deemed to have indemnified all **Insured Persons** to the extent that the **Company** is permitted or required to indemnify them pursuant to law, common or statutory, or contract, or the charter or by-laws of the **Company**.

In no event will a settlement of a **Claim** be considered a final adjudication of no liability for purposes of this subsection.

As a condition of any reimbursement of the Retention as set forth above, the **Insurer** may require a written undertaking on terms and conditions satisfactory to the **Insurer** guaranteeing the repayment of such amounts in the event that such **Claim** is reinstituted after payment by the **Insured**.

**AMTRUST** *FI Advantage*

**POLICY NO.**WDO1429740 00

Wesco Insurance Company
(A Stock Insurance Company, herein called the **Insurer**)

### FINANCIAL INSTITUTION
### PROFESSIONAL LIABILITY COVERAGE PART

**This is a claims-made policy. Defense Expenses are included within the Limit of Liability. Amounts incurred as Defense Expenses will reduce the Limit of Liability available to pay judgments or settlements. Please read this Policy carefully!**

In consideration of the premium paid and in reliance upon all statements made and information contained in the Declarations Page and **Application**, the **Insurer** and the **Insured** agree that coverage will be provided subject to all of the terms, conditions and limitations of this **Policy**, as follows:

## SECTION I-INSURING AGREEMENTS

A. **LENDER LIABILITY** - The **Insurer** will pay on behalf of the **Insured**, **Loss** resulting from any **Claim** first made during the **Policy Period** or Extended Reporting Period (if exercised), by or on behalf of a **Borrower** for a **Wrongful Lending Act.**

B. **PROFESSIONAL SERVICES LIABILITY** - The **Insurer** will pay on behalf of the **Insured**, **Loss** resulting from a **Claim** first made during the **Policy Period** or Extended Reporting Period (if exercised), by or on behalf of a customer of the **Company** for a **Wrongful Professional Services Act**.

C. **TRUST SERVICES LIABILITY** - The **Insurer** will pay on behalf of the **Insured**, **Loss** resulting from a **Claim** first made during the **Policy Period** or the Extended Reporting Period (if exercised), for a **Wrongful Trust Services Act**.

## SECTION II – DEFINITIONS

In addition to the Definitions set forth in General Terms and Conditions Applicable to All Insuring Agreements, the following Definitions apply to all Insuring Agreements contained herein.

**Borrower** means any individual or entity to which the **Company** extends, agrees to extend, or refuses to extend, a loan, lease or extension of credit; or any individual or entity that is a guarantor of any such loan, lease or extension of credit.

**Claim** means:

1. a written demand for monetary damages or non-monetary relief;

2. a civil proceeding commenced by the service of a complaint or similar pleading;

3. a criminal proceeding commenced by a filing of charges or return of an indictment;

4. a formal administrative or regulatory proceeding commenced by a filing of charges, formal investigative order, service of summons, or similar document;

5. an arbitration, mediation or similar alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the **Insurer's** written consent, such consent not to be unreasonably withheld; or

6.    a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding,

against an **Insured** for a **Wrongful Act** including any appeal from such proceeding.

**Depositor Services** means only those services an **Insured** performs or is required to perform for a customer of the **Company** in connection with establishing, maintaining, administering or servicing any FDIC or NCUA insured deposit account or processing any transaction related to such account.

**Employee** means any natural person whose labor or service was, is or shall be engaged and directed by the **Company** including full-time, part-time, seasonal, leased and temporary employees as well as volunteers. **Employee** shall not include any **Independent Contractor**.

**Executive** means any natural person who was, is or shall be a duly elected or appointed:

1.    director, officer, or member of the board of managers or management committee of the **Company**;

2.    head of any **Trust Department** or **Trust Company**;

3.    branch manager of the **Company**; or

4.    manager of a **Company** organized outside the United States of America if such position is equivalent to those specified in 1. or 2. above.

**Incidental Insurance Services** means the sale of credit life or disability insurance incidental to the issuance of a loan.

**Insured** means the **Insured Persons** and the **Company**.

**Insured Person** means any:

1.    **Executive**; or

2.    **Employee**.

**Lending Services** means:

1.    an agreement or refusal to grant or extend any  loan, lease or extension of credit;

2.    the granting or extending of any  loan, lease or extension of credit;

3.    **Loan Servicing**, but only for any  loan, lease or extension of credit in which the **Company** has an ownership interest;

4.    the restructure, termination, transfer, repossession, or foreclosure of any loan, lease or extension of credit; or

5.    the rendering or failure to render **Incidental Insurance Services**.

**Loan Servicing** means the administrative servicing of a loan, lease or extension of credit (not including financing for investment banking, or leveraged or management buy-outs), including the following administrative servicing activities: record keeping, billing and disbursements of principal or interest, receipt or payment of insurance premiums and taxes, credit reporting or statements of a customer's creditworthiness, and determination of the depreciation amount of property (but not projections of, or an appraisal for, residual or future value of property).

**Loan Servicing** shall not include the purchase, acquisition or sale of any loan, lease or extension of credit, the restructuring, termination, transfer, repossession, or foreclosure of any such loan, lease or extension of credit, or any act based upon or arising out of the operation or control of any entity or property that the **Company** acquired as security or collateral for any loan, lease or extension of credit.

**Loss** means **Defense Expenses** and any amount the **Insured** is legally obligated to pay resulting from a **Claim**, including damages, judgments, settlements, punitive or exemplary damages or the multiple portion of any multiplied damage award (if insurable under the applicable law most favorable to the insurability of punitive, exemplary, or multiplied damages), prejudgment and post judgment interest, and legal fees and expenses incurred pursuant to a court order or judgment. **Loss** shall not include:

1.  payroll or other taxes;

2.  criminal or civil fines or penalties imposed by law;

3.  any unpaid, unrecoverable or outstanding amounts resulting from a loan, lease or extension of credit to any **Borrower**, including unpaid, unrecoverable or outstanding amounts resulting from a loan, lease or extension of credit which has been sold as a participation to other financial institutions;

4.  costs to comply with any non-monetary or injunctive relief of any kind or any agreement to provide such relief, including but not limited to any damages, costs or expenses incurred in making an accommodation for any disabled person pursuant to the Americans with Disabilities Act or any similar federal, state or local laws, or in complying with any other federal, state or local laws of any kind;

5.  the depreciation (or failure to appreciate) in value of any investment product, including but not limited to securities, commodities, currencies, options or futures due to market fluctuation unrelated to any **Wrongful Act**;

6.  any restitution, disgorgement, or payment of similar payments including, but not limited to the return of fees, commissions or charges for the **Company's** services; or

7.  any matters which are uninsurable under the law pursuant to which this **Policy** shall be construed.

Where the **Company** reasonably determines that punitive, exemplary or multiple damages are insurable under the applicable law, the **Insurer** shall not challenge that interpretation of insurability.

**Professional Services** means services performed by the **Insured** for or on behalf of a customer of the **Company** pursuant to a written agreement between such customer and the **Company** or, with respect to **Loan Servicing**, pursuant to a written agreement between a third party and the **Company**:

1.  for a fee, commission or other monetary compensation;

2.  for no fee, commission or other monetary compensation, if a fee, commission, or other monetary compensation would usually be received by the **Company** for such services, but for business or other reasons is waived or not charged by the **Company**; or

3.  for other remuneration which inures to the benefit of the **Company**,

including **Depositor Services**, services performed outside of a **Trust Department** or a **Trust Company** by any **Insured** in the capacity as a trustee, custodian or administrator of any individual retirement account (IRA) or H.R. 10 Plan (Keogh Plan), or **Loan Servicing** that the **Insured** performs or is required to perform for a customer of the **Company** on behalf of a third party.

**Trust Company** means any **Company** specifically formed for the purpose of performing wealth management and fiduciary services, including agency services and acting as a trustee of, or administering, a trust or settling estates.

**Trust Department** means a distinct unit or division of the **Company** specifically formed for the purpose of performing wealth management and fiduciary services, including agency services and acting as a trustee of, or administering, a trust or settling estates.

**Trust Services** means any of the following services performed by the **Insured** through a **Trust Company**, **Trust Department** or Trust **Subsidiary** of the **Company**:

1.  administrator, custodian or trustee under any individual retirement account (IRA) or H.R. 10 Plan (Keogh Plan);

2.  executor, administrator or personal representative of estates, administrator of guardianships, trustee under personal or corporate trust agreements, or conservator of any person;

3.  trustee under a pension, profit sharing, health and welfare or any other employee benefit plan or trust, other than an employee benefit plan or trust sponsored or established by the **Company** for its own **Employees**;

4.  custodian, depository or managing agent for securities or real property, manager of any personal property owned by others, attorney-in-fact, interest or dividend disbursing agent, transfer or paying

agent, redemption or subscriptions agent, fiscal agent, tax withholding agent, registrar of securities, agent for voting securities, sinking fund agent, escrow agent or trustee under a corporate bond indenture; or

5.      trustee exercising any other trust or fiduciary powers permitted by law.

**Wrongful Act** means:

1.      solely with respect to Insuring Agreement A., any actual or alleged **Wrongful Lending Act**;

2.      solely with respect to Insuring Agreement B., any actual or alleged **Wrongful Professional Services Act**; or

3.      solely with respect to Insuring Agreement C., any actual or alleged **Wrongful Trust Services Act**.

**Wrongful Lending Act** means any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty or neglect by any **Insured** in rendering or failing to render **Lending Services**. **Wrongful Lending Act** does not include a **Wrongful Professional Services Act** or a **Wrongful Trust Services Act**.

**Wrongful Professional Services Act** means any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty or neglect by any **Insured** in the rendering of, or failure to render **Professional Services**.  **Wrongful Professional Services Act** does not include a **Wrongful Lending Act** or a **Wrongful Trust Services Act**.

**Wrongful Trust Services Act** means any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty or neglect by the **Insured** in the rendering of, or failure to render, **Trust Services** by a **Trust Department** or a **Trust Company** pursuant to a written agreement:

1.      for a fee, commission or other monetary compensation;

2.      for no fee, commission or other monetary compensation if a fee, commission, or other monetary compensation would usually be received by the **Company** for such services, but for business or other reasons is waived or not charged by the **Company**; or

3.      for other remuneration which inures to the benefit of the **Company**.

**Wrongful Trust Services Act** does not include **Wrongful Professional Services Act** or **Wrongful Lending Act**.

## SECTION III – EXCLUSIONS

A.      **EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS**

**Bodily & Personal Injury/Property Damage** - The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** for bodily injury, sickness, disease or death of any person, or damage to, loss of use or destruction of any tangible property; provided, however, that this exclusion shall not apply to **Claim** for emotional distress, mental anguish or humiliation under Insuring Agreement A. Lender Liability.

**Cyber Liability** - The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to:

1.      the inability of an authorized user to gain access to a network;

2.      electronic information damage or theft to a network;

3.      the suspension or interruption of any network;

4.      electronic infection of any network;

5.      an attack executed over one or more networks or the Internet that disrupts the operation of a network or renders a network inaccessible to authorized users; or

6.      the unauthorized access to any electronic data processing system of the **Company**.

**Bonding/Insurance Company** - The **Insurer** shall not be liable to pay any **Loss** in connection with any

**Claim** made against any **Insured** brought directly or indirectly by or for the benefit of any insurance carrier or bond carrier of the **Company**, or any affiliate of the **Company**, regardless in whose name such **Claim** is actually made.

**Fraud/Illegal Profit and Violation of Law** - The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to:

1.  the gaining, of any profit, remuneration or pecuniary advantage to which such **Insured** is not legally entitled; or

2.  any fraudulent or criminal **Wrongful Act** with actual knowledge of its wrongful nature or with intent to cause damage by such **Insured**,

as evidenced by a final adjudication by a judge, jury or arbitrator in any proceeding.

**Insured vs. Insured** - The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** by, on behalf of, or at the behest of any **Insured** in any capacity; provided, however, that this exclusion will not apply to:

1.  any **Claim** that is in the form of a cross claim, third party claim or other claim for contribution or indemnity which is part of, or results directly from a **Claim** which is not otherwise excluded by the terms of this **Coverage Part**; or

2.  any **Claim** brought or maintained by an **Insured Person** solely as a customer of the **Company**; provided such **Claim** is brought independently of, and totally without the solicitation, assistance, participation, or intervention of any other **Insured**.

**Non-Subsidiary Wrongful Acts** - The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to any **Wrongful Act** by any entity that is, or was, a **Subsidiary**, or by any **Insured Person** of such entity, occurring at any time during which such entity was not a **Subsidiary**.

**Outside Capacity Exclusion** - The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** involving any **Insured Person** in their capacity as an employee, director, officer, trustee, governor, member of the board of managers, or any equivalent position, of any entity other than the **Company**, even if such service is with the knowledge and consent of, at the direction or request of, or part of the duties regularly assigned to the **Insured Person** by the **Company**.

**Past Acts** - The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to any actual or alleged **Wrongful Acts** committed on or before the Retroactive Date set forth in Item 5. (b) of the Declarations Page or any **Wrongful Acts** occurring prior to such date which together with **Wrongful Acts** occurring on or after such date would constitute **Interrelated Wrongful Acts.**

**Pollution** - The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to:

1.  the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of any **Pollutant**; or

2.  any request, demand, order, or statutory or regulatory requirement that any **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, any **Pollutant**;

provided, however, that this exclusion shall not apply to the portion of any **Claim** based upon, arising out of, or in consequence of the diminution in value of any securities in connection with an **Insured's** investment on behalf of a customer in any organization, other than the **Company**, if such diminution in value is allegedly as a result of a **Pollutant**.

**Prior Knowledge/Litigation** - The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to:

1.  any fact, circumstance, situation, or event that is or reasonably would be regarded as the basis for a **Potential Claim** about which any **Executive Officer** had knowledge prior to the date of the initial

**Application** for coverage; or

2.  any prior or pending civil, criminal, administrative or regulatory proceeding initiated against any **Insured** prior to the applicable Prior and Pending Litigation Date(s) set forth in Item 5.(a) of the Declarations Page, or arising out of or in any way involving the same or substantially the same fact, circumstance, situation or **Wrongful Act** underlying or alleged in such prior or pending civil, criminal, administrative or regulatory proceeding.

**Prior Notice** - The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to any **Wrongful Act** or any **Wrongful Act** which is part of any **Interrelated Wrongful Acts**, or any fact, circumstance or situation, which has been the subject of any notice given to any carrier other than the **Insurer** under any similar insurance policy providing protection for any **Insured**.

**Safe Deposit Box** - The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to any safe deposit box operations of the **Company**.

**Violation of Lending Law** - The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to any intentional violation of federal or state laws or regulations relating to extensions or denials of credit, including the Truth-in-Lending Act, Equal Credit Opportunity Act, Fair Credit Reporting Act, Fair Debt Collection Practices Act, the Home Owners Equity Protection Act of 1994, Fair Credit Billing Act, and usury laws or regulations, as amended.

B.  **EXCLUSIONS APPLICABLE TO LENDER LIABILITY COVERAGE**

**Financial Insolvency** - The **Insurer** shall not be liable under Insuring Agreement A. to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to **Financial Insolvency**.

**Foreclosed Property** - The **Insurer** shall not be liable under Insuring Agreement A. to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to any error, misstatement, misleading statement, act, omission, neglect or breach of duty arising out of the operation or control of any entity or property that the **Company** acquired as security or collateral for any loan, lease or extension of credit; provided, however, that this exclusion shall not apply to **Claims** resulting from **Wrongful Acts** in connection with the foreclosure process or the ownership, operation management or control of any one (1) to four (4) family residential property.

**Legal Lending Limit Violation** - The **Insurer** shall not be liable under Insuring Agreement A. to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to any **Wrongful Lending Act** in connection with a loan, lease or extension of credit that was, at the time of its making, in excess of the legal lending limit of the **Company**.

**Lending/Advisory Services** - The **Insurer** shall not be liable under Insuring Agreement A. to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to any lending or advisory services where such services are not reasonably regarded as part of the process of extending a loan, lease or extension of credit to a **Borrower**.

C.  **EXCLUSIONS APPLICABLE TO PROFESSIONAL SERVICES LIABILITY AND TRUST SERVICES LIABILITY COVERAGES**

**Contractual Liability** - The **Insurer** shall not be liable under Insuring Agreements B. or C. for **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to any liability under any contract or agreement; provided, however, that this exclusion shall not apply to:

1.  the extent that the **Company** would have been liable in the absence of the contract or agreement;

2.  **Defense Expenses** to the extent that such **Claim** alleges a breach of contractual obligations because of a **Wrongful Professional Services Act** or a **Wrongful Trust Services Act**; or

3.  the extent that the **Company** has agreed to indemnify an **Employee** whose services have been leased to the **Company**.

**ERISA** - The **Insurer** shall not be liable under Insuring Agreements B. or C. for **Loss** in connection with any **Claim** made against any **Insured** for any actual or alleged violation of the responsibilities, obligations or duties imposed upon fiduciaries by **ERISA** or any similar law.

**Failure to Maintain Insurance** - The **Insurer** shall not be liable under Insuring Agreements B. or C. for **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to any failure of the **Insureds** to effect or maintain adequate insurance.

**Fee Dispute** - The **Insurer** shall not be liable under Insuring Agreements B. or C. for **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to any disputes over fees, commissions, or charges for the **Company's** services.

**Forgery** - The **Insurer** shall not be liable under Insuring Agreements B. or C. for **Loss** in connection with any **Claim** made against any **Insured** for:

1.  accepting, paying or cashing any instrument which bears a forged, altered or      unauthorized  signature or endorsement;

2.  acquiring, selling, transferring, paying or delivering any funds or property, extending any credit or giving any value, on the faith of any instruction or advice which:

    a.  bears a forged signature; or

    b.  has been altered without the knowledge and consent of the person or entity who signed or endorsed the instruction or advice; or

3.  guaranteeing in writing or witnessing any handwritten signature, which:

    a.  is on a transfer, assignment, bill of sale, power of attorney, evidence of debt, guarantee, endorsement or similar written document; and

    b.  is forged or altered.

**Guarantees** - The **Insurer** shall not be liable under Insuring Agreements B. or C. for **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to the **Insured's** actual or written representations, promises or guarantees regarding the past performance or future value of any investment product.

**Investment Performance** - The **Insurer** shall not be liable under Insuring Agreements B. or C. for **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon or attributable to the depreciation, or failure to appreciate, in value of any investments, including securities, commodities, currencies, options or futures; provided, however, that this exclusion will not apply to any such depreciation, or failure to appreciate, resulting from negligence on the part of any **Insured** in failing to effect a specific investment transaction in accordance with the specific prior instructions of a customer of the **Company**.

**Investment Banking/Securities Underwriting** - The **Insurer** shall not be liable under Insuring Agreements B. or C. for **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to:

1.  underwriting, syndicating or promoting any security (except loan syndications or equity or debt securities issued by the **Company**);

2.  rendering of advice or recommendations regarding any actual or attempted or threatened merger, acquisition, divestiture, tender offer, proxy contest, leveraged buy-out, going private transaction, bankruptcy, reorganization, restructuring, recapitalization, spin-off, offering of securities, dissolution or sale of all or substantially all of the assets or stock of an entity;

3.  rendering of any fairness opinion;

4.  proprietary trading;

5.  any acquisition or sale of securities of the **Company** for its own account; or

6.  any other investment banking activity,

including any disclosure requirements in connection with any of the foregoing.

**Lost Property** - The **Insurer** shall not be liable under Insuring Agreements B. or C. for **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to the actual physical loss of, or damage to, money, securities, property or other items of value in the care, custody or control of the **Company**, its correspondent bank or other authorized representative, including money, securities, property or other Items of value stored in a safe deposit box at, or in transit while in the care, custody or control of, the **Company**, its correspondent bank or other authorized representative.

**Mechanical Malfunction** - The **Insurer** shall not be liable under Insuring Agreements B. or C. for **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to the mechanical or electronic failure, breakdown or malfunction of any machine or system of machines.

**Notary Services** - The **Insurer** shall not be liable under Insuring Agreements B. or C. for **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to the notarization or certification of a signature of a person unless that person, or someone claiming to be that person, physically appeared before the **Insured** at the time of such notarization or certification.

**Other Services** - The **Insurer** shall not be liable under Insuring Agreements B. or C. for **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to:

1.   **Lending Services**;

2.   services performed by any entity which the **Company** has acquired or is in control of, as security or collateral for an extension of credit;

3.   the practice of law or the rendering of legal services;

4.   architectural or construction management services; or

5.   services provided to customers as an enrolled actuary as that term is used in or in connection with **ERISA**.

**Receiver/Trustee in Bankruptcy** - The **Insurer** shall not be liable under Insuring Agreements B. or C. for **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to the **Company** serving as a receiver, trustee in bankruptcy, conservator or assignee for the benefit of creditors.

**Stop Payment Liability** - The **Insurer** shall not be liable under Insuring Agreements B. or C. for **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to the failure to comply with any notice of any customer of the **Company**, or any authorized representative of such customer, to stop payment on any check or draft made or drawn by such customer, or the wrongful dishonor of, or wrongful failure to certify, any check or draft made or drawn by any customer of the **Company** or any authorized representative of such customer.

**Insolvency** - The **Insurer** shall not be liable under Insuring Agreements B. or C. for **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to the insolvency, conservatorship, receivership, bankruptcy, or liquidation of, or financial inability to pay or suspension of payment by, any bank or banking firm, investment company, investment bank, broker or dealer in securities or commodities, insurance or reinsurance entity, or any other organization of a similar nature (other than the **Company**); provided, however, that this exclusion will not apply to the extent such **Claim** alleges a covered **Wrongful Professional Services Act** or **Wrongful Trust Services Act** solely in connection with an **Insured's** investment on behalf of a customer in the stock of any of the foregoing entities.

## SECTION IV - OTHER TERMS AND CONDITIONS

This Section will supplement and not replace, Section XI., entitled "Other Terms And Conditions" contained in the General Terms and Conditions Applicable to All Coverage Parts.

A.    **ADDITION OF A NEW PROFESSIONAL SERVICE** - If, during the **Policy Period**, the **Insured** begins to offer a new **Professional Service**, coverage will be provided for such new **Professional Service** provided written notice has been given to the **Insurer**, together with such documentation and information as the **Insurer** may request, within ninety (90) days after the **Insured** begins to offer such new **Professional Service**. Coverage will not be afforded after ninety (90) days unless the **Insurer** has agreed to provide such coverage, subject to any additional terms and conditions, and payment of any additional premium, as may be required by the **Insurer**. The ninety (90) day notice

requirement and the ninety (90) day limitation of coverage will not apply, provided that:

1.   the total projected annual fee income or gross revenue to the **Company** from such new **Professional Service** does not exceed ten (10%) of the annual fee income or gross revenue to the **Company** for all **Professional Services**, as reflected in the **Company's** most recent financial statements as of the inception date of the **Policy Period**; or

2.   the **Company** begins to offer such **Professional Service** less than ninety (90) days prior to the end of the **Policy Period**.

Notwithstanding the foregoing, no coverage will be afforded under this section with respect to any new **Professional Service** specifically excluded from the definition of **Professional Services**.

B.   **OTHER INSURANCE** - This **Coverage Part** shall not be subject to the terms of any other insurance. All **Loss**, including **Defense Expenses**, payable under this **Policy** shall be excess to any other valid and collectible insurance available to any **Insured**, including any insurance under which there is a duty to defend, unless such insurance is written specifically excess of this **Coverage Part** by reference in such other policy to the Policy Number assigned to this **Policy**.

This page intentionally left blank

This endorsement is attached and forms a part of Policy No. WDO1429740 00 effective  1/1/2016  .

## IDAHO AMENDATORY ENDORSEMENT

In consideration of the premium paid for this **Policy**, the **Insurer** and the **Insureds** agree that this endorsement amends the General Terms and Conditions Applicable to All Coverage Parts:

1. Section VIII. – CANCELLATION, NONRENEWAL AND CONVERSION, Subsections A.1. and A.2. are deleted and replaced as follows:

   A.1.   The **Parent Company** shown in the Declarations may cancel this **Policy** by mailing or delivering to the **Insurer** advance written notice of cancellation.  Cancellation will be effective on the later of the date requested by the **Parent Company** or the date the **Insurer** receives the request.  Payment or tender of the unearned premium by the **Insurer** to the **Parent Company** shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be returned within thirty (30) days of the date the **Insurer** was notified or decided to cancel the **Policy** and issue the cancellation notice.

   A.2.   a.   If this **Policy** has been in effect for less than sixty (60) days and is not a renewal of a **Policy** the **Insurer** issued, the **Insurer** may cancel this **Policy** by mailing to the **Parent Company** written notice stating when, not less than sixty (60) days thereafter, such cancellation shall become effective and the reason(s) therefore.  The **Insurer** may cancel this **Policy** for nonpayment of premium, in which case fifteen (15) days written notice shall be given to the **Parent Company**.

   b.   If this **Policy** has been in effect for more than sixty (60) days or if this **Policy** is a renewal of a **Policy** the **Insurer** issued, the **Insurer** may cancel this **Policy** by mailing to the **Parent Company** written notice stating when such cancellation shall become effective and the reason(s) therefore.  The **Insurer** shall provide not less than:

   (i)   fifteen (15) days notice of its intent to cancel for nonpayment of premium; or

   (ii)   sixty (60) days notice of its intent to cancel for any of the following reasons:

   (1)   fraud or material misrepresentation made by or with the knowledge of any **Insured** in obtaining the **Policy**, continuing the **Policy** or in presenting a **Claim** under the **Policy**;

   (2)   activities or omissions on the part of an **Insured** which increase any hazard insured against, including a failure to comply with loss control recommendations;

   (3)   change in the risk which materially increases the risk of **Loss** after coverage has been issued or renewed including, but not limited to, an increase in exposure due to regulation, legislation or court decision;

   (4)   loss or decrease of the **Insurer's** reinsurance covering all or part of the risk exposure by the Policy;

   (5)   determination by the Director that the continuation of the Policy would jeopardize the **Insurer's** solvency or would place the **Insurer** in violation of the insurance laws of this state or any other state; or

   (6)   violation or breach by the **Insured** of any **Policy** terms or conditions other than nonpayment of premium.

This page intentionally left blank

2.  Section VIII. - CANCELLATION, NONRENEWAL AND CONVERSION, Subsection B. is deleted and replaced as follows:

B.1.   Non-Renewal Requirements

a.   If the **Insurer** elects not to renew this **Policy**, the **Insurer** will mail or deliver to the **Parent Company** a written notice of intention not to renew at least sixty (60) days prior to the expiration or anniversary date of the **Policy**.

b.   If notice is not mailed or delivered at least sixty (60) days before the expiration or anniversary date of this **Policy**, this **Policy** will remain in effect until sixty (60) days after the notice is mailed or delivered.  Earned premium for the extended period of coverage will be calculated pro rata at the rates applicable to the expiring policy.

c.   Changes in deductibles, premium, or a reduction in limits or coverage shall not be deemed to be a refusal to renew.  The **Insurer** need not mail or deliver this notice if:

(i)   the **Insurer** has offered to renew this **Policy**;

(ii)   the **Parent Company** has obtained replacement coverage; or

(iii)   the **Parent Company** has agreed in writing to obtain replacement coverage.

B.2.   Premium or Coverage Changes at Renewal

a.   If the **Insurer** elects to renew this **Policy**, the **Insurer** will mail or deliver written notice of any total premium increase greater than ten percent (10%) which is the result of a comparable increase in premium rates, change in deductible, reduction in limits or reduction in coverage to the **Parent Company** at the last mailing address known to the **Insurer**.  Any such notice will be mailed or delivered at least thirty (30) days before the expiration or anniversary date of the **Policy**.

b.   If notice is not mailed or delivered at least thirty (30) days before the expiration or anniversary date of the **Policy**, the premium, retention, limits and coverage in effect prior to the changes will remain in effect until the earlier of the following:

(i)   thirty (30) days after notice is given; or

(ii)   the effective date of replacement coverage obtained by the **Parent Company**.

c.   If the **Parent Company** accepts the renewal, the premium increase, if any, and other changes will be effective on and after the first day of the renewal term.

d.   If the **Parent Company** elects not to renew, any earned premium for the resulting extended period of coverage will be calculated pro rata at the lower of the new rates or rates applicable to the expiring **Policy**.

3.  Section XI. – OTHER TERMS AND CONDITIONS, is amended to add the following:

Idaho Department of Insurance
Consumer Affairs
700 W. State Street, 3rd Floor
P.O. Box 83720
Boise, ID  83720-0043

Toll-Free Number:  1-800-721-3272
Local Number:  208-334-4250
Website Address:  www.DOI.Idaho.gov

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the **Policy** other than as above stated.

This page intentionally left blank

This endorsement is attached to and forms a part of Policy No. WDO1429740 00          effective.  1/1/2016

## GENERAL TERMS AND CONDITIONS MODIFICATION
## NON-CANCELLATION ENDORSEMENT

In consideration of the premium paid for this **Policy**, the **Insurer** and the **Insureds** agree that this endorsement amends the General Terms and Conditions Applicable to All Coverage Parts:

1.      Section VIII. – CANCELLATION, NON-RENEWAL AND CONVERSION, Subsection A.2. is  deleted and replaced as follows:

      A.      <u>**CANCELLATION**</u>

          2.      The **Insurer** may not cancel this **Policy** from <u>1/1/2016</u> to <u>1/1/2017</u> except for nonpayment of premium, in which case the **Insurer** will provide written notice of cancellation to the **Parent Company** at least ten (15) days before the effective date of cancellation.


Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the **Policy** other than as above stated.

This page intentionally left blank

This endorsement is attached to and forms a part of Policy No. WDO1429740 00 effective 1/1/2016

### DIRECTORS AND OFFICERS LIABILITY COVERAGE PART MODIFICATION
### PRIVACY LIABILITY COVERAGE

In consideration of the premium paid for this **Policy**, the **Insurer** and the **Insureds** agree that this endorsement amends the Directors & Officers Liability **Coverage Part**:

1.      Section I. - INSURING AGREEMENTS is amended to add the following:

      **PRIVACY LIABILITY COVERAGE -** The **Insurer** will pay on behalf of the **Insured**, **Loss** resulting from any **Claim** first made during the **Policy Period** or Extended Reporting Period (if exercised) against the **Insured** for any **Wrongful Privacy Act**.

      **CUSTOMER PRIVACY EXPENSE COVERAGE -** The **Insurer** will pay on behalf of the **Insured**, **Customer Privacy Expense** the **Company** has incurred as a result of a **Wrongful Privacy Act** which occurred during the **Policy Period**.

2.      Section IV. – DEFINITIONS is amended to add the following:

      **Confidential Customer Information** means information about a customer obtained by the **Company** including name, address, telephone number, date of birth, social security number, driver's license number or other personal identification number, financial account number (including a bank account number, retirement account number, or healthcare spending account number), credit, debit or other payment card number, any individually identifiable health information pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), or information concerning the individual that constitutes "non-public personal information" as defined in the Gramm-Leach Bliley Act of 1999, as amended, held by the **Company**.

      **Confidential Customer Information Breach** means any federal, state or local statutory or common law that requires notice to persons whose **Personal Information** was accessed or may reasonably have been accessed by an unauthorized person.

      **Customer Privacy Expense** means actual, necessary and reasonable expenses incurred as a result of unauthorized access to **Confidential Customer Information** including costs to notify customers, change account numbers and provide one year of basic credit monitoring services to affected customers.

      **Privacy Policy** means the internal or publicly accessible written documents that set forth the **Company's** policies, standards and procedures for collection, use, disclosure, sharing, dissemination and correction or supplementation of, and access to, **Confidential Customer Information**.

      **Wrongful Privacy Act** means:

      1.     theft of **Confidential Customer Information** that is in the care, custody or control of the **Company**, or an independent contractor that is holding or processing such information on behalf of the **Company**;

      2.     the failure of the **Company** to timely disclose an incident or event triggering a violation of an **Confidential Customer Information Breach**;

      3.     failure by the **Insureds** to comply with that part of the **Privacy Policy** that specifically:

           (a)     prohibits or restricts the disclosure, sharing or selling of **Confidential Customer**

**Information**;

(b)    requires the **Company** to provide access to **Confidential Customer Information** or to correct incomplete or inaccurate **Confidential Customer Information** after a request is made by a customer of the **Company**; or

(c)    mandates procedures and requirements to prevent the loss of **Confidential Customer Information**.

3.    The definition of **Wrongful Act** in Section IV. – DEFINITIONS is amended to add the following:

**Wrongful Act** shall also mean a **Wrongful Privacy Act**.

4.    Section V. – EXCLUSIONS, Subsection A. is amended to add the following:

<u>**Unauthorized Access to Confidential Customer Information**</u>

arising from, based upon, or attributable to:

1.    the unauthorized access to **Confidential Customer Information** where such **Confidential Customer Information** was obtained from the customer, regardless of whether this information was obtained through trick, artifice, fraud or false pretenses; or

2.    the unauthorized access to **Confidential Customer Information** where the **Confidential Customer Information** was obtained through the fraudulent use of debit, credit or ATM cards.

5.    The **Bodily & Personal Injury/Property Damage** exclusion in Section V. – Exclusions, Subsection A. is deleted and replaced as follows:

<u>**Bodily & Personal Injury/Property Damage**</u> - The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** for bodily injury, personal injury, emotional distress, mental anguish, humiliation, sickness, disease or death of any person, injury resulting from libel, slander, defamation or disparagement, violation of a person's right of privacy, or damage to, loss or use or destruction of any tangible property; provided, however, that this exclusion shall not apply to any otherwise covered **Claim** under the PRIVACY LIABILITY COVERAGE insuring agreement.

6.    The Maximum Limit of Liability for PRIVACY LIABILITY COVERAGE afforded under this endorsement shall be  $50,000

The Retention for PRIVACY LIABILITY COVERAGE afforded under this endorsement shall be  $5,000

7.    The Maximum Limit of Liability for CUSTOMER PRIVACY EXPENSE COVERAGE afforded under this endorsement shall be  $50,000

The Retention for CUSTOMER PRIVACY EXPENSE COVERAGE afforded under this endorsement shall be  $5,000

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the policy other than as above stated.

This page intentionally left blank

This endorsement is attached to and forms a part of Policy No. WDO1429740 00 effective 1/1/2016.

## POLICY CHANGE ENDORSEMENT
## (INVESTMENT ADVISOR)

In consideration of the premium paid for this **Policy**, the **Insurer** and the **Insureds** agree that this endorsement amends the following **Coverage Parts**:

<Professional Liability Coverage Part>

It is agreed that each **Coverage Part** shown above is amended as follows:

A.  The definition of **Claim** in **SECTION II. DEFINITIONS** is deleted and replaced as follows:

**Claim** means:

1.  a written demand for monetary damages or non-monetary relief;

2.  a civil proceeding commenced by the service of a complaint or similar pleading;

3.  a criminal proceeding commenced by a filing of charges or return of an indictment;

4.  an arbitration, mediation or similar alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the **Insurer's** written consent, such consent not to be unreasonably withheld; or

5.  a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding,

against an **Insured** for a **Wrongful Act** including any appeal from such proceeding.  **Claim** shall also mean a notice of investigation of violation(s) of law or regulation or disciplinary proceedings against an **Insured** by any governmental body or self-regulatory organization, but only if the investigation of violation(s) of law or regulation or disciplinary proceedings were initiated by a complaint by the **Insured's** customer or client or former customer or client, arising from the **Insured's** rendering or failure to render **Professional Services** for that customer or client or former customer or client;

B.  The definition of **Insured** in **SECTION II. DEFINITIONS** is amended to add the following:

**Insured** shall also mean the following:

1.  any **Predecessor In Interest**; and

2.  if the **Parent Company** is a limited liability company, any past or current manager thereof, but only for **Professional Services** rendered on the **Company's** behalf or on behalf of **Company's Predecessor In Interest** and within the scope of their duties as manager of such limited liability company and any past or current member thereof, but only for **Professional Services** rendered on the **Company's** behalf or on behalf of **Company's Predecessor In Interest** and within the scope of their duties as a member of such limited liability company.

C.  The definition of **Insured Person** in **SECTION II. DEFINITIONS** is amended to add the following:

**Insured person** shall also mean the following:

1.  any person who is, was, or after the inception of the **Policy Period** becomes partner or principal, but only for **Professional Services** rendered on the **Company's** behalf or on behalf of **Company's Predecessor In Interest**, during such time such person is a partner or principal, of the **Company** or **Company's Predecessor In Interest**;

2. any person who is, was, or after the inception of the **Policy Period** becomes the appointed Chief Compliance Officer pursuant to Rule 206(4)-7 of the Investment Advisers Act of 1940 solely while acting in that capacity for **Company** or **Company's Predecessor In Interest**; and

3. Any individual, professional or professional organization while rendering **Professional Services** on behalf of or under contract with the **Company**, but only if specifically endorsed by name onto this insurance.

D. The definition of **Professional Services** in **SECTION II. DEFINITIONS** is deleted and replaced as follows:

**Professional Services** means services rendered for or advice given to others by an **Insured** for a fee, remuneration, **Pro Bono** or other consideration in an **Insured's** practice as a **Financial Advisor**. **Professional Services** also includes services performed in the capacity of a fiduciary pursuant to **ERISA.**

**Professional Services** shall not include:

1. any services rendered during the period of any suspension or revocation of an **Insured's** certification, licensure, accreditation, appointment or other right to practice as a **Financial Planner**, **Registered Representative**, **Registered Investment Advisor** or **Life Insurance Agent**; or

2. activities as a partner, principal, officer, director, manager, member, employee, independent contractor or administrative staff of any organization or public office other than the **Company** or an organization specifically endorsed by name onto this insurance.

E. **SECTION II. DEFINITIONS** is amended to add the following definitions:

**Broker** shall have the meaning assigned to that term by the Securities Exchange Act of 1934, as amended; but **Broker** does not include a person who is a **Registered Representative**.

**Dealer** shall have the meaning assigned to that term by the Securities Exchange Act of 1934, as amended, but **Dealer** does not mean a person who is a **Registered Representative**.

**Financial Advisor** means an individual who is in the business of providing **Financial Planning Services** as a **Financial Planner** or **Investment Management Services** as a **Registered Investment Advisor** or providing general financial education courses and seminars including, but not limited to, courses in support of Section 404(c) of **ERISA**.

**Financial Plan** means a written plan identifying a client's assets, liabilities, financial objectives and risk appetite and which recommends a course of activities or specific actions consistent with the client's risk tolerance to achieve the client's goals and objectives.

**Financial Planner** means an individual in the business of providing **Financial Planning Services** to others. It includes a **Registered Representative**, **Registered Investment Advisor** or **Life Insurance Agent** while they are providing **Financial Planning Services** as part of a **Financial Plan** or an **Investment Management Contract**.

**Financial Planning Services** means financial or investment advice given to individuals or their owned business organizations as part of a **Financial Plan**, comprehensive or modular, including advice with respect to personal risk management, investments, estate planning, retirement planning, college planning and taxes; or **Investment Management Services** provided pursuant to an **Investment Management Contract** as well as the implementation of the **Financial Plan** or the **Investment Management Contract** through the purchase or sale of **Securities** or life insurance products or other appropriate implementation strategies.

**Investment Management Contract** means a written agreement wherein a client agrees to goals and strategies for the investment of the client's money, assisted by the **Registered Investment Advisor**, following a process which specifies investment goals, risk tolerance, asset allocation and guidelines for the selection and oversight of other registered investment advisors.

**Investment Management Services** means providing financial advice, advising and/or supervising the purchase or sale of **Securities** for a client by a **Registered Investment Advisor** pursuant to an **Investment Management Contract**.

**Life Insurance Agent** means an individual licensed, as required by any applicable Federal law and the law of the state where any part of the transaction occurs, to sell life, health, disability, long term care or accidental death and dismemberment insurance including activities as a licensed life insurance consultant. It does not include anyone while acting as a general agent or in any similar capacity for a life insurance company.

**Non-traditional Life Insurance Products** means viatical agreements, private placement life insurance products, life settlements, life settlement-backed securities (death bonds), senior settlements and any product originally issued in relation to a structured settlement, including but not limited to structured settlement factoring transactions as defined in the Internal Revenue Code.

**Predecessor In Interest** means any organization, some or all of whose shareholders, members or partners have joined the **Parent Company**, but only if the prior organization is listed on the application for this insurance, and is specifically endorsed hereon by name.

**Pro Bono** means **Professional Services** done for the public good and benefit, voluntarily and without payment.

**Registered Investment Advisor** means an **Insured** who:

1.  meets the definition of investment adviser as defined in the Investment Advisers Act of 1940, as amended; and

2.  is registered as required by law with either the Securities Exchange Commission (SEC) or the appropriate state authority.

**Registered Representative** means a person who:

1.  is registered with the Financial Industry Regulatory Authority (FINRA) or its successor as a **Registered Representative** of a **Broker** or **Dealer** pursuant to the provisions of the Securities Exchange Act of 1934; and

2.  is in the business of buying and selling **Securities** for the account of others, including but not limited to, direct participation products such as limited partnerships, shares in mutual funds, unit investment trusts and variable annuities.

**Registered representative** does not include any person while acting in the capacity of a principal of a **Broker** or **Dealer**, including but not limited to a General Securities Principal or Limited Principal General Securities Sales Supervisor.

**Security** in singular or plural shall have the meaning assigned to that term by the following:

1.  the Securities Exchange Act of 1934;

2.  the Securities Act of 1933;

3.  the Investment Advisers Act of 1940 as amended; and/or

4.  any rules issued by the Securities Exchange Commission pursuant to any of these acts.

F.  The **Other Services** exclusion in **SECTION III — EXCLUSIONS**, Subsection C. is deleted and replaced as follows:

**Other Services** - The **Insurer** shall not be liable under Insuring Agreements B. or C. for **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to the **Insured's** activities in any profession other than **Financial Advisor**, including but not limited to, **Broker**, **Dealer**, accountant, actuary, enrolled agent, tax preparer, lawyer, mortgage broker, property or casualty insurance agent, real estate agent or broker, securities analyst, or third party administrator.

G. **SECTION III. EXCLUSIONS**, Subsection A., is amended to add the following exclusions:

**Confidential Information** - **The Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to the use of non-public or confidential information in a manner prohibited by applicable law, rule, or regulation.

**Conflict of Interest** - **The Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to **Professional Services** rendered to or on behalf of, or any recommendation to invest in any organization including the subsidiaries in which any **Insured Person**, the **Company**, spouse or **Domestic Partner** is a partner, principal, trustee, officer, director, manager, employee or a more than five percent (5%) shareholder or ownership interest in the organization at the time the **Wrongful Act** giving rise to said **Claim** took place.

**Copyright** - **The Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to any misappropriation, infringement or violation of copyright, patent, trademark, service mark, trade name, trade secret or any other intellectual property rights.

**Disallowed Tax Deduction** - **The Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to any disallowed deduction(s), credit(s) or other item(s) on a tax return; or for taxes which would be owed in any case by a customer or client.

**Discrimination** - **The Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to unlawful discrimination committed by an **Insured** or at an **Insured's** direction.

**Other Investment Products** - **The Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to the purchase, sale, servicing, or recommendation to purchase, sell, or hold, any of the following:

1. unregistered Securities and private placements;

2. **Non-traditional Life Insurance Products**;

3. any **Security** that derives its value by combining a derivative or financial instrument with another financial instrument. Such structured financial products include, but are not limited to, exchange-traded notes, asset backed securities, mortgage backed securities, credit default swaps, and collateralized or securitized debt obligations;

4. promissory notes, real property, tangible property or tangible personal property;

5. any pooled investment vehicle not registered with the Securities Exchange Commission, including but not limited to any hedge fund (registered or not), private equity fund, venture capital fund or mezzanine fund;

6. any **Security** or contract whose value is linked to or derived from the value of an underlying asset such as commodities or other financial instruments including bonds, or market benchmarks such as interest rates or indexes. Such derivatives include, but are not limited to, future contracts, warrants, forward contracts, options, swaps, and exchange-traded funds.

However, this exclusion shall not apply to mutual funds, publicly traded real estate investment trusts, publicly traded master limited partnerships, publicly traded limited partnerships, non-leveraged exchange traded funds or FDIC Company structured CD products.

**Other Investment-Related Entity** - **The Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to the ownership, formation, capitalization, syndication, operation, management or administration of a general or limited partnership, an investment related Limited Liability Company, real estate syndicate, joint venture or any other type of venture or syndicate, or any type of charitable enterprise or entity.

**Predecessor In Interest** - **The Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** by, on behalf of, or at the behest of any **Predecessor In Interest**, parent organization or any subsidiary, division or affiliated organization.

**Securities** - **The Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to any of the following:

1. trading or failure to trade in any **Securities** traded exclusively outside the United States of America, its territories, possessions, Puerto Rico or Canada;

2. any function of an **Insured** as a specialist or market maker for any **Securities**;

3. failure to make a market for any **Securities**;

4. any action brought against any **Insured** by or on behalf of any clearing agency or arising out of any function of any **Insured** as a clearing agency.

**Unauthorized Securities** - **The Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to any **Claim** against a **Registered Representative** based upon, arising from, or in any way involving **Securities**, investment products or any services not approved or authorized by the **Broker** or **Dealer** with which the **Registered Representative** is affiliated at the time the **Wrongful Act** giving rise to the **Claim** took place.

H.   **SECTION IV – OTHER TERMS AND CONDITIONS** is amended to add the following:

**ADDITIONAL PAYMENT FOR LOSS CONTROL AND INVESTIGATIVE EXPENSES** - If, during the **Policy Period** or Extended Reporting Period (if exercised), the **Insured** gives the **Insurer** written notice of a **Wrongful Act** or incident that is reasonably expected to result in a **Claim** but as to which no **Claim** has yet been made, the **Insurer** may, at **Insurer's** sole option, choose to investigate the **Wrongful Act** or incident. Such an investigation will be at **Insurer's** expense and will not reduce the Limits Of Liability or be subject to the Retention provisions of this insurance until one of the following occurs:

1. a **Claim** results from the **Wrongful Act** or incident under investigation; or

2. **Insurer** incurs $5,000 in expenses arising from the investigation.

If a **Claim** is made and reported to **Insurer**, or once **Insurer** incurs $5,000 in investigative expense, any further payment will be considered **Defense Expenses** and will reduce the applicable Limits of Liability and be subject to the Retention provisions of this insurance.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the **Policy** other than as above stated.

This endorsement is attached to and forms a part of Policy No. WDO1429740 00 effective 1/1/2016.

## POLICY CHANGE ENDORSEMENT
## (CORRECTION EVENT)

In consideration of the premium paid for this **Policy**, the **Insurer** and the **Insureds** agree that this endorsement amends the following **Coverage Parts**:

<Professional Liability Coverage Part>

It is agreed that each **Coverage Part** shown above is amended as follows:

A. The definition of <u>**Claim**</u> in **Section II – DEFINITIONS** is amended to add the following:

   **Claim** also means a **Correction Event Claim.**

B. **Section II – DEFINITIONS** is amended to add the following:

   <u>**Correction Costs**</u> means reasonable and necessary costs and expenses resulting solely from a **Correction Event Claim**.

   <u>**Correction Event Claim**</u> means a **Wrongful Act** by an **Insured** in the rendering of or failure to render **Investment Management Services** provided that:

   1. such **Wrongful Act** arose in the ordinary course of an **Insured's** operations and, if not corrected, would directly result in damage to a customer or client of the **Insured**; and

   2. in the absence of any correction, a **Claim** alleging such **Wrongful Act** would have constituted a covered **Claim** under this **Policy**.

   <u>**Investment Management Services**</u> means providing financial advice, advising and/or supervising the purchase or sale of **Securities** for a client by a **Registered Investment Advisor** pursuant to an **Investment Management Contract**.

   <u>**Investment Management Contract**</u> means a written agreement wherein a client agrees to goals and strategies for the investment of the client's money, assisted by the **Registered Investment Advisor**, following a process which specifies investment goals, risk tolerance, asset allocation and guidelines for the selection and oversight of other registered investment advisors.

   <u>**Registered Investment Advisor**</u> means an **Insured** who:

   1. meets the definition of investment adviser as defined in the Investment Advisers Act of 1940, as amended; and

   2. is registered as required by law with either the Securities Exchange Commission (SEC) or the appropriate state authority.

   <u>**Security**</u> in singular or plural shall have the meaning assigned to that term by the following:

   1. the Securities Exchange Act of 1934;

   2. the Securities Act of 1933;

   3. the Investment Advisers Act of 1940 as amended; and/or

   4. any rules issued by the Securities Exchange Commission pursuant to any of these acts.

C. The definition of **Loss** in **Section II – DEFINITIONS** is amended to add the following:

   Notwithstanding any of the foregoing, **Loss** shall include **Correction Costs.**

D.  Solely with respect to the coverage provided by this endorsement, **SECTION III - EXCLUSIONS** is amended to add the following subsection:

**EXCLUSIONS APPLICABLE TO CORRECTION EVENT COVERAGE**

**Contractual Obligation Guarantee** - **The Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to any contractual obligation to a customer or client of an **Insured,** guaranteeing any rate of return or the fulfillment of any minimum performance standards.

**Diminution** - **The Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to any diminution in value of money, **Securities**, property, or any other item of value, unless caused by a **Wrongful Act** of any **Insured** under this **Policy** in the execution or implementation of **Investment Management Services**.

**Exculpatory Provision** - **The Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to any **Wrongful Act** for which an **Insured** would not be liable pursuant to any contractual provision defining the scope of such **Insured's** liability or providing protection for liability including, without limitation, any applicable exculpatory provision.

**Loss of Property** - **The Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to any loss of money, **Securities**, or other property in the custody or control of an **Insured**.

**Transfer of Funds** - **The Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to any wire or electronic transfer of funds initiated at any location not owned or operated by the **Insured**.

E.  **SECTION III – LIMIT OF LIABILITY AND RETENTION** in the General Terms and Conditions is amended to add the following:

$1,000,000 shall be the maximum **Policy Year** Aggregate Limit of Liability of the **Insurer** for all **Loss** under this **Policy** in connection with any **Correction Event Claim**, regardless of the number of such **Correction Event Claims** made against the **Insureds**. The limit described herein is a sublimit, included within, and not in addition to, the applicable Limit of Liability set forth in Item 4. of the Declarations Page.

Notwithstanding any applicable Retention specified in the Declarations Page, the amount of $100,000 shall be the Retention applicable to all **Loss** in connection with each **Correction Event Claim**. The applicable Retention specified in the Declarations Page shall continue to apply with respect to each **Claim** other than a **Correction Event Claim**.  In the event more than one Retention applies to any **Claim**, the maximum total Retention applicable to such **Claim** shall be the highest of such applicable Retentions.

F.  **SECTION V – NOTICE OF CLAIMS AND POTENTIAL CLAIMS** in the General Terms and Conditions is amended to add the following:

**NOTICE/PROOF OF LOSS APPLICABLE TO CORRECTION EVENT –** As a condition precedent to the coverage provided under the Correction Event Endorsement, the **Insured** shall: (a) as soon as practicable, but no later than three (3) business days after an **Insured** first becomes aware of a **Correction Event** provide a notice of potential claim. This notice will set forth all circumstances of the loss and explain why the **Insured** believes it is entitled to coverage for the applicable loss.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the **Policy** other than as above stated.

This endorsement is attached to and forms a part of Policy No. WDO1429740 00 effective 1/1/2016

## PROFESSIONAL SERVICES BY SPECIFIC ENTITY EXCLUSION

In consideration of the premium paid for this **Policy**, the **Insurer** and the **Insureds** agree that this endorsement amends the Professional Liability **Coverage Part**:

1.     Section III. – EXCLUSIONS, Subsection A. is amended to add the following:

**Professional Services by Specific Entity** - The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to **Professional Services** performed by or on behalf of the entity or entities shown below:

Entity

 Riskx Investments

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the **Policy** other than as above stated.

This page intentionally left blank

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

    Directors & Officers Liability Coverage Part

**A.** The following exclusion is added:

    **Terrorism** – The **Insurer** shall not be liable to pay **Any Injury or Damage** arising directly or indirectly, out of a **Certified Act of Terrorism.**

**B.** The following definitions are added:

    **1.** For the purposes of this endorsement, **Any Injury or Damage** means any injury or damage covered under any Coverage Part to which this endorsement is applicable to **Loss** as it is defined in any applicable Coverage Part.

    **2.** **Certified Act of Terrorism** means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a **Certified Act of Terrorism** include the following:

        **a.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

        **b.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

This page intentionally left blank



Brokerage Firm: _____

Submitting Broker Name: _____

Broker Address (Optional): _____

City: _____ State: _____

Broker Email: _____

Risk Manager Email (Optional): _____

Broker Phone No.: _____ Broker Fax No: _____

Please select the form you would like to fill out:

Application    ○ Mainform    ⦿ Renewal

## Instructions for Using the Editable Adobe Application form:

1. Save the document to your local computer. You will need Adobe Reader 7.0.5 or greater to use this application

2. Complete the application by clicking in the areas provided; you may use your mouse or the tab key to advance to the next fields. If an attachment is required for completion of a field use the paper clip icon on the left sidebar of the Adobe Acrobat application. The size limit of the email including the completed Adobe application cannot exceed **10 MB**. If an attachment will cause that limit to be exceeded, please send a follow up email with additional attachments.

3. If there is not enough room for a complete answer for a question please include the full response in an additional attachment as you would with a paper-based application.

4. When the application is completed, please verify the accuracy and completeness of all answers before signing the application and forwarding to your broker. Please do not forward completed applications to AIG Property Casualty Inc. unless you are an agent or broker.

5. If you choose to use a wet signature, please print the entire application, including all attachments, after reviewing for accuracy and completeness, sign in ink, and send the entire packet to your agent or broker.

6. You now have the option to sign this form electronically. If you choose to use Electronic Signature please make sure you read the disclaimer and the instructions on the creation and use of Electronic Signature found on the last page of the application. Do not apply your Electronic Signature until you have reviewed the application for accuracy and completeness. Applying your Electronic Signature will prevent you from further editing the application. If you need to change the application, you need to remove all applicable Electronic Signatures on the last page of the application. Please re-apply your Electronic Signature after ensuring all updates have been made.

If you experience any technical difficulties while using the document, please contact Broker Services at (877) 867-3783 or at **toserve@aig.com**. For all other inquiries please contact your agent or broker. If you are an agent or broker, please contact your local AIG Property Casualty Inc. underwriter for assistance. This document is provided for licensed insurance agents and brokers and their clients only.

## By accessing this document in any format you agree to the following:

- AIG Property Casualty Inc. does not warrant that the document will be free from viruses. You assume the entire cost of any necessary service, repair, or correction.

- The privacy of communication over the Internet cannot be guaranteed as the Internet is not a secure medium. AIG Property Casualty Inc. does not as assume any responsibility for any harm, loss, or damage you may experience or incur by the sending of personal or confidential information over the Internet.

- AIG Property Casualty Inc. is not responsible for any versions of the document that have been manipulated, altered, or revised from the version of the document that appears on www.aig.com. Do not post the document on the Internet.

- To the fullest extent permissible under applicable law, AIG Property Casualty Inc. makes no warranties or representations as to the accuracy of the content of these documents and under no circumstances, including, but not limited to, negligence, shall AIG Property Casualty Inc. or any affiliated party be liable to you for any damages that result from the use of, or the inability to use, these materials, even if AIG Property Casualty Inc. or a AIG Property Casualty Inc. authorized representative has been advised of the possibility of such damages.

© AIG Property Casualty Inc. All rights reserved.



Name of Insurance Company to which Application is made (herein called the "Insurer")

# INVESTMENT MANAGEMENT INSURANCE EDGE<sup>SM</sup> APPLICATION

## Professional and Management Liability Insurance

### NOTICES:

In underwriting your submission for coverage, the Insurer will rely upon the accuracy and completeness of the statements, warranties and representations contained in this form and any materials submitted with this form and on certain information contained in your public filings with the Securities and Exchange Commission, if any. Such statements, warranties, representations and filings will be a basis for any policy that results and deemed incorporated into that resulting policy. If a policy results, it will provide claims-made coverage. Also, amounts incurred for legal defense will reduce the limit of liability available to pay judgments or settlements, and shall be applied against the retention amount. Please consider this application carefully and review it with your insurance agent or broker.

---

### SECTION I. GENERAL INFORMATION

Full (Legal) Name of Applicant: Yellowstone Partners LLC

Applicant Address: 3340 Merlin Dr Suite 100

Year Established: 1972   Web Site Address: www.yellowstonepartners.com

---

### SECTION II. INVESTMENT ADVISER PROFESSIONAL LIABILITY COVERAGE

1. Attach copies of the following:
   - ☐ Most recent SEC or other regulatory inspection report and management's response
   - ☒ Completed ADV report Part II (as filed with the SEC)
   - ☐ Six (6) year performance history (annual) compared to benchmark for each composite
   - ☐ Twelve (12) month performance history (monthly) compared to benchmark for each composite
   - ☒ Copy of sample discretionary contract and non-discretionary contract offered to clients
   - ☐ Any general communications or publications made to account holders over the past year

2. Is the Applicant registered with the SEC as an investment adviser?   ☒ Yes  ☐ No

3. Please list all subsidiaries and other entities proposed for coverage. If there are additional subsidiaries or entities to be added to this schedule, please do so by attachment to this Application.

| Name of Subsidiary | Location | Nature of Operation | Registered Investment Adviser | % Owned | Date Created or Acquired |
|---|---|---|---|---|---|
|  |  |  | ☐ Yes  ☐ No | % |  |
|  |  |  | ☐ Yes  ☐ No | % |  |
|  |  |  | ☐ Yes  ☐ No | % |  |
|  |  |  | ☐ Yes  ☐ No | % |  |
|  |  |  | ☐ Yes  ☐ No | % |  |
|  |  |  | ☐ Yes  ☐ No | % |  |

   © AIG Property Casualty Inc. All rights reserved.



4. Is the Applicant or any entity listed in 3. above registered with the Commodity Futures Trading Commission?  ☐ Yes  ☒ No

5. Does the Applicant or any entity listed in 3. above have physical custody of any client assets?  ☐ Yes  ☒ No

6. May clients select their own brokers for execution?  ☐ Yes  ☒ No

7. Are any client transactions executed by an "in-house" or affiliated broker-dealer?  ☐ Yes  ☒ No

8. Does the Applicant or any entity listed in 3. above offer any of the following services?

   Mortgage Broking  ☐ Yes  ☒ No

   Insurance or Annuity Planning or Sales  ☐ Yes  ☒ No

   Real Estate Management  ☐ Yes  ☒ No

   Tax Planning or Tax Return Preparation  ☐ Yes  ☒ No

   Non-Discretionary Investment Consulting  ☐ Yes  ☒ No

   If "Yes," approximately what percentage of annual revenue is derived from non-discretionary investment management services?  ☐ %

9. Please provide the following information regarding assets under management:

|  | Current Year | Prior Year |
|---|---|---|
|  | As of Date: 11/6/2015 | As of Date: 11/4/2014 |
| Total Assets Under Management ($) | $863,532,000 | $763,312,000 |
| Total Number (#) of Accounts | 1,654 | 1,206 |

10. Please provide the following information regarding types of clients:

| | Asset Market Value | Number of Accounts |
|---|---|---|
| Individuals | $838,027,760 | 1,648 |
| Pension or Benefit Plans (Not Plan Participants) | $25,504,240 | 6 |
| Mutual Funds | | |
| ETFs | | |
| Hedge Funds | | |
| REITS | | |
| CLOs/CDOs (Collateral Management) | | |
| All Other Accounts | | |
| Total | $863,532,000 | 1,654 |

11. Minimum investment for new client accounts:  $50,000

12. Please state the percentage of investments in the following specialty areas:

| | | | | |
|---|---|---|---|---|
| Commodity Derivatives | 0 % | Currency Derivatives | 0 % |
| Equity Derivatives | 0 % | Credit Default Swaps | 0 % |
| OTC Securities | 0 % | Foreign Securities | 0 % |
| Oil and Gas Ventures | 0 % | Litigation Buyouts | 0 % |
| Life Settlements & Annuities | 0 % | Direct Real Estate | 0 % |
| Non-Investment Grade Bonds | 0 % | Hedge Funds | 0 % |
| Private Equity/Venture Capital Funds | 0 % See Attached | Mortgage-Backed Securities | 0 % |

© AIG Property Casualty Inc. All rights reserved.

Yellowstone Partners has entered into a Sub-advisor Agreement with various funds managed by the Bridge Investment Group Partners. Under this agreement Mark Johnson, at his discretion, may refer clients who are qualified investors to invest in various funds managed by this group. Mark or Yellowstone Partners are solely responsible for the relationship with the client, and will not be involved in investment management relating to client assets managed by Bridge. Yellowstone Partners will receive half of the management fee (between 1.5% and 2% of funds) for maintaining the client relationship. Yellowstone or Mark Johnson will not receive any performance fees relating to the investment.



13. Does the Applicant or any entity listed in 3. above manage assets of related and/or affiliated companies?   ☐ Yes   ☒ No

    If "Yes," please attach details.

14. Does the Applicant or any entity listed in 3. above manage any pooled investment vehicles not proposed for coverage in Section III of this Application?   ☐ Yes   ☒ No

    If "Yes," please attach details.

15. Please list all regulatory or administrative examinations, inspections, investigations, or inquiries in the past three years:

| Regulatory Body | Date |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |

## SECTION III. FUND COVERAGE

1.  Attach copies of the following:

    ☐ Each fund's most recent prospectus, private placement memorandum, or other offering documents

    ☐ Six (6) year performance history (annual) compared to benchmark for each fund

    ☐ Twelve (12) month performance history (monthly) compared to benchmark for each fund

    ☐ Any letters to investors for each fund over the past eighteen (18) months

2.  Please provide a list of all funds proposed for coverage.  If there are additional funds to be added to this schedule, please do so by attachment to this Application.

| Name of Fund | Date Established | Registered Pursuant to the Investment Company Act | Maximum Leverage (Assets/Net Assets) | Redemptions in Last 12 Months | Current Net Assets |
|---|---|---|---|---|---|
|  |  | ☐ Yes   ☐ No |  |  |  |
|  |  | ☐ Yes   ☐ No |  |  |  |
|  |  | ☐ Yes   ☐ No |  |  |  |
|  |  | ☐ Yes   ☐ No |  |  |  |
|  |  | ☐ Yes   ☐ No |  |  |  |
|  |  | ☐ Yes   ☐ No |  |  |  |

© AIG Property Casualty Inc. All rights reserved.



3. Do all funds proposed for coverage that are investment companies share the same board? ☐ Yes ☐ No

   If "No," attach answers to this question, including the parts below, for each board.

   Total number of directors or trustees: [_____]

   Total number of directors or trustees who are not "Interested Persons": [_____]

   Is the chairman or lead trustee an "Interested Person"? ☐ Yes ☐ No

   Have there been any changes in the composition of the board in the past year? ☐ Yes ☐ No

4. Please provide the following information regarding each service provider, if applicable:

| Service Provider | Name | Affiliated with the Applicant? |
|---|---|---|
| Investment Adviser | | ☐ Yes ☐ No |
| Administrator | | ☐ Yes ☐ No |
| Transfer Agent | | ☐ Yes ☐ No |
| General Distributor | | ☐ Yes ☐ No |
| Custodian | | ☐ Yes ☐ No |
| Auditor | | ☐ Yes ☐ No |

5. Have any of the service providers listed above changed within the past year? ☐ Yes ☐ No

   If "Yes," please attach details.

6. Have there been any changes or modifications in the investment restrictions or liquidity provisions of any fund during the past year? ☐ Yes ☐ No

   If "Yes," please attach details.

7. Are any funds proposed for coverage being wound down or liquidated? ☐ Yes ☐ No

   If "Yes," please attach details.

---

SECTION IV.  INVESTMENT ADVISER MANAGEMENT LIABILITY COVERAGE

1. Attach copies of the following:
   ☒ Most recent audited annual financial statements

2. Are shares of the Applicant or any subsidiary publicly traded? ☐ Yes ☒ No

   If "Yes," ticker symbol: [_____]

3. Are debt securities of the Applicant or any subsidiary publicly traded? ☐ Yes ☒ No

   If "Yes," please attach details.

4. What is the equity ownership of the Applicant by its directors and employees? [ *100* ] %

   Dave Hansen   90%
   Cameron High   5%
   Rich Baird   5%



5. Please list all subsidiaries and other entities proposed for coverage.  If there are additional subsidiaries or entities to be added to this schedule, please do so by attachment to this Application.

| Name | % Owned |
|---|---|
| | % |
| | % |
| | % |
| | % |
| | % |
| | % |

6. Does the Applicant or any other entity proposed for coverage anticipate an offering of public or private securities or a merger, acquisition, or consolidation within the next 12 months?   ☐ Yes   ☒ No

If "Yes," please attach details.

SECTION V.   OUTSIDE ENTITY EXECUTIVE COVERAGE

1. If any director, officer, employee, or independent contractor of the  Applicant or any entity proposed for coverage serves as a director, officer, employee, board observer, or other advisor to an outside entity, please attach a list of such outside entities with the following information:   *See Notes*

☐ The respective ownership percentage of outstanding shares for each outside entity of the Applicant and any other  entity proposed for coverage (including affiliates, funds and subsidiaries);

☐ Whether such outside entity is publicly-held or is considering a public offering within the next year; and

☐ Schedule of management liability insurance in place for each outside entity, including limit of liability and name of insurer.

2. Does the Applicant and any other entity proposed for coverage have policies in place regarding "insider trading," trading "blackout periods," and "trading windows" with respect to portfolio companies?   ☒ Yes   ☐ No

3. Does the Applicant and any other entity proposed for coverage have policies in place to ensure that commingling of funds does not occur between portfolio companies and the Applicant?   ☒ Yes   ☐ No

4. Is any portfolio company in breach of any covenants under its lending agreements, and/or in bankruptcy or in the process of liquidation or dissolution (or contemplating any of the foregoing)?   ☐ Yes   ☒ No

If "Yes," please attach details.

SECTION VI.  - RELATED PRODUCTS AND SERVICES

The following products and services also are available:

EMPLOYMENT PRACTICES: Would you like us to provide a quote for employment practices liability coverage?   ☒ Yes   ☐ No

FIDUCIARY:  Would you like us to provide a quote for fiduciary liability coverage?   ☒ Yes   ☐ No

FIDELITY:  Would you like us to provide a quote for a fidelity bond?   ☒ Yes   ☐ No

SECURITY AND PRIVACY:  Are you interested in liability insurance for damages arising from a failure of computer security or the wrongful release of private information?   ☒ Yes   ☐ No

PASSPORT: A service is available to facilitate compliance with local insurance and premium tax requirements outside the U.S.  Would you like information on that service provided with your quote?   ☐ Yes   ☒ No

©  AIG Property Casualty Inc. All rights reserved.



Notes: This section may be used to provide additional information.

IMPORTANT: To complete the application, please remember to proceed to the next page in order to review the notices and to apply your signature.

Section V. Rich Baird is a dual employee of Yellowstone Partners and Riskx investments, IARD # 133232. Mr. Baird has 0% ownership in Riskx. Riskx is not publicly held.

108903 (6/11)          © AIG Property Casualty Inc. All rights reserved.



- The undersigned authorized officer of the Applicant declares that the statements set forth herein are true, and agrees that if the information supplied on this application changes between the date of this application and the effective date of the insurance, the applicant will, in order for the information to be accurate on the effective date of the insurance, immediately notify the Insurer of such changes, and the Insurer may withdraw or modify any outstanding quotations and/or authorizations or agreements to bind the insurance

- Signing of this application does not bind the Applicant or the Insurer to complete the insurance, but it is agreed that this application shall be the basis of the contract should a policy be issued, and it will be attached to and become part of the policy.

- All written statements and materials furnished to the Insurer by or on behalf of the Insured in conjunction with this application are incorporated by reference into this application and made a part of it.

NOTICE TO APPLICANTS:  ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR, CONCEALS, FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT ACT, WHICH IS A CRIME AND MAY SUBJECT SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES.

NOTICE TO ALABAMA APPLICANTS:   ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR WHO KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO RESTITUTION FINES OR CONFINEMENT IN PRISON, OR ANY COMBINATION THEREOF.

NOTICE TO ARKANSAS, NEW MEXICO AND WEST VIRGINIA APPLICANTS:   ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT, OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.

NOTICE TO COLORADO APPLICANTS: IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY.   PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OF INSURANCE, AND CIVIL DAMAGES.  ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICYHOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICYHOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AUTHORITIES.

NOTICE TO DISTRICT OF COLUMBIA APPLICANTS:  WARNING: IT IS A CRIME TO PROVIDE FALSE OR MISLEADING INFORMATION TO AN INSURER FOR THE PURPOSE OF DEFRAUDING THE INSURER OR ANY OTHER PERSON. PENALTIES INCLUDE IMPRISONMENT AND/OR FINES.  IN ADDITION, AN INSURER MAY DENY INSURANCE BENEFITS IF FALSE INFORMATION MATERIALLY RELATED TO A CLAIM WAS PROVIDED BY THE APPLICANT.

NOTICE TO FLORIDA APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY INSURER FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY OF THE THIRD DEGREE.

NOTICE TO KANSAS APPLICANTS:   ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD, PRESENTS, CAUSES TO BE PRESENTED OR PREPARED WITH KNOWLEDGE OR BELIEF THAT IT WILL BE PRESENTED TO OR BY AN INSURER, PURPORTED INSURER, BROKER OR ANY AGENT THEREOF, ANY WRITTEN STATEMENT AS PART OF, OR IN SUPPORT OF, AN APPLICATION FOR THE ISSUANCE OF, OR THE RATING OF AN INSURANCE POLICY FOR PERSONAL OR COMMERCIAL INSURANCE, OR A CLAIM FOR PAYMENT OR OTHER BENEFIT PURSUANT TO AN INSURANCE POLICY FOR COMMERCIAL OR PERSONAL INSURANCE WHICH SUCH PERSON KNOWS TO CONTAIN MATERIAL FALSE INFORMATION CONCERNING ANY FACT MATERIAL THERETO; OR CONCEALS, FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT.

      ©  AIG Property Casualty Inc. All rights reserved.



NOTICE TO KENTUCKY APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME.

NOTICE TO LOUISIANA APPLICANTS:  ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.

NOTICE TO MAINE APPLICANTS:  IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY.  PENALTIES MAY INCLUDE IMPRISONMENT, FINES OR A DENIAL OF INSURANCE BENEFITS.

NOTICE TO MARYLAND APPLICANTS:  ANY PERSON WHO KNOWINGLY OR WILLFULLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR WHO KNOWINGLY OR WILLFULLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.

NOTICE TO MINNESOTA APPLICANTS:  A PERSON WHO FILES A CLAIM WITH INTENT TO DEFRAUD OR HELPS COMMIT A FRAUD AGAINST AN INSURER IS GUILTY OF A CRIME.

NOTICE TO NEW JERSEY APPLICANTS: ANY PERSON WHO INCLUDES ANY FALSE OR MISLEADING INFORMATION ON AN APPLICATION FOR AN INSURANCE POLICY IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES.

NOTICE TO NEW YORK APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME, AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION.

NOTICE TO OHIO APPLICANTS: ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD.

NOTICE TO OKLAHOMA APPLICANTS: WARNING: ANY PERSON WHO KNOWINGLY, AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE ANY INSURER, MAKES ANY CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY (365:15-1-10, 36 §3613.1).

NOTICE TO OREGON APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR, CONCEALS, FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, MAY BE GUILTY OF A FRAUDULENT ACT, WHICH MAY BE A CRIME AND MAY SUBJECT SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES.

NOTICE TO PENNSYLVANIA APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES.

NOTICE TO TENNESSEE, VIRGINIA AND WASHINGTON APPLICANTS: IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS.

            © AIG Property Casualty Inc. All rights reserved.



NOTICE TO VERMONT APPLICANTS:   ANY PERSON WHO KNOWINGLY PRESENTS A FALSE STATEMENT IN AN APPLICATION FOR INSURANCE MAY BE GUILTY OF A CRIMINAL OFFENSE AND SUBJECT TO PENALTIES UNDER STATE LAW.

Signed _____     Attest _____
                    *(Applicant)*

Title _____President_____     Broker _____
        (Must be signed by President, Chairman,
        Chief Executive Officer or Chief Financial Officer)     License # _____

Date _____11 - 20 - 2015_____     Address _____
                                                            _____

THE FOLLOWING APPLIES TO APPLICANTS LOCATED IN THE STATES OF AR, MO, NY, NM and RI:

Please read the following statement carefully and sign where indicated.  If a policy is issued, this signed statement will be attached to the policy.

The undersigned authorized officer of the Applicant hereby acknowledges that he/she is aware that the limit of liability contained in this policy shall be reduced, and may be completely exhausted, by the costs of legal defense and, in such event, the insurer shall not be liable for the costs of legal defense or for the amount of any judgment or settlement to the extent that such exceeds the limit of liability of this policy.

The undersigned authorized officer of the Applicant hereby acknowledges that he/she is aware that legal defense costs that are incurred shall be applied against the retention amount.

Signed _____
                    *(Applicant)*

Title _____President_____
        (Must be signed by President, Chairman,
        Chief Executive Officer or Chief Financial Officer)

Date _____11 - 20 - 2015_____

           ©  AIG Property Casualty Inc. All rights reserved.



PARTNER *with* YELLOWSTONE

INVESTMENT AGREEMENT

Prepared for:

The undersigned (the "Client") hereby retains Yellowstone Partners, LLC (hereinafter "Adviser") to act as investment adviser and to manage the assets of the Client's Account (the "Account") in accordance with the following terms and conditions:

## 1. Investment Management

Adviser is to invest and reinvest the securities, cash, mutual funds, and/or other investments held in the Account.  Investments may be made in, but not limited to, securities of any kind including mutual funds, common or preferred stocks, options, warrants, rights, corporate or government bonds or notes.  Client understands that a portion of the assets in the Account may be held in cash when it is consistent with the investment plan.

In connection with the advisory services being provided to Client, Adviser is entitled to rely on the financial and other information provided by Client.  Client agrees to inform Adviser in writing of any material change in Client's circumstances which might affect the manner in which the Client's assets should be invested and to provide Adviser with such information as Adviser shall reasonably request.

## 2. Reports to be Provided

Clients will receive confirmation of trades directly from the broker-dealer who effects the securities transactions for the Account.

## 3. Fees

Client will compensate Adviser at the end of each calendar quarter for its services in accordance with the Fee Schedule attached hereto as Exhibit A.  If this agreement is terminated prior to the end of the quarter, the fee will be prorated as to the number of days of the quarter that service was provided.

## 4. Trading Authorization

The Client hereby grants Adviser complete and unlimited discretionary trading authorization and appoints Adviser as agent and attorney-in-fact with respect to the Account.  Pursuant to such authorization, Adviser may, in its sole discretion and at the Client's risk, purchase, sell, exchange, convert and otherwise trade the funds, securities and other investments in the Account, as well as arrange for delivery and payment in connection with the above, and act on behalf of the Client in all other matters necessary or incidental to the handling of the Account.  Client grants Adviser full authorization to issue such instructions to, and engage in such transactions with the Client's custodian as may be appropriate in connection with the management of the Account.  Adviser will not be responsible for any loss or liability incurred by any reason as a result of any willful or negligent failure to act on the part of Client's custodian.

This trading authorization is a continuing one and shall remain in full force and effect until terminated by Client or Adviser pursuant to the provisions of paragraph 9 of this Agreement. The termination of this authorization will constitute the termination of this Agreement.

Client understands that Adviser performs investment advisory services for persons other than the Client, and that Adviser may give advice and take action in the performance of its duties to others which may differ from advice given, or the timing and nature of action taken, with respect to the Client. Nothing in this Agreement shall be deemed to impose upon Adviser any obligation to purchase or sell, or recommend for purchase or sale, for the Client any security or other investment which Adviser may recommend for purchase or sale for the account of any other client.

## 5. Execution of Transactions

In connection with transactions effected for the Account, Client authorizes Adviser to establish and trade in accounts in its name with members of national or regional securities exchanges and the Financial Industry Regulatory Authority (FINRA), including "omnibus" accounts established for the purpose of combining orders for more than one client.

In selecting broker-dealers for a particular transaction, Adviser may consider all relevant factors, including the execution capabilities required by the transaction, the importance of speed, efficiency or confidentiality, familiarity with sources from whom or to whom particular securities might be purchased or sold, brokerage and research service provided to Adviser as well as any other relevant matters.

Adviser may cause the Client to pay a broker-dealer which provides brokerage and research services to Adviser a commission for effecting a transaction in excess of the amount another broker-dealer would have charged for effecting such transaction, if Adviser determines in good faith that such amount of commission is reasonable in relation to the value of brokerage and research services provided by the executing broker-dealer viewed in terms of either that particular transaction or Adviser's overall responsibilities with respect to accounts as to which it exercises investment discretion.

In no event will Adviser be obligated to effect any transaction for Client which it believes would be in violation of any applicable state or federal law, rule or regulation, or of the regulations of any regulatory or self-regulatory body.

The Adviser does not accept orders and/or instructions regarding your account by e-mail, voicemail, fax or any alternate method. Transaction details do not supersede normal trade confirmations or statements. E-mail sent through the Internet is not secure or confidential.

## 6. Valuation

In computing the market value of any security, mutual fund, or other investment in the Account, each security listed on a national securities exchange shall be valued, as of the valuation date, at the closing price on the principal exchange on which it is traded. Mutual funds or other investments in the Account shall be valued in a manner determined in good faith to reflect fair market value.

### 7. Client Authority

If this Agreement is entered into by a trustee or other fiduciary, such trustee or other fiduciary represents that the Adviser investment program is within the scope of the investments authorized pursuant to the plan, trust and/or applicable law, and that he is duly authorized to enter into this Agreement. If Client is a corporation, the signatory on behalf of such Client represents that the execution of this Agreement has been duly authorized by appropriate corporate action. The Client undertakes to notify Adviser of any event which might affect the authority or the propriety of this Agreement.

### 8. Proxies and Other Legal Notices

Adviser will not be required to take any action or render any advice with respect to the voting of proxies for securities held in the Account, nor will it be obligated to render advice or take any action on behalf of the Client with respect to securities presently or formerly held in the Account, or the issuers thereof, which become the subject of any legal proceedings, including bankruptcies.

### 9. Termination of Agreement

This Agreement may be terminated at will upon written notice by either party to the other and termination will become effective 30 days from receipt of notice. Such termination will not, however, affect the liabilities or obligations of the parties under this Agreement arising from transactions initiated prior to such termination. Upon termination of this Agreement, Adviser shall be under no obligation whatsoever to recommend any action with regard to, or liquidate the securities or other investments in the Account.

### 10. Bonding

Client agrees to obtain and maintain for the period of this Agreement any bond required pursuant to the provision of ERISA or other applicable law and to include within the coverage of such bond, Adviser and any of its officers, directors and employees whose inclusion is required by law. Client agrees to promptly provide Adviser with appropriate documents evidencing such coverage upon request.

### 11. Governing Law

This Agreement is made and shall be construed under the laws of the State of Idaho, provided that nothing herein shall be construed in any manner inconsistent with the Advisers Act or any rule, regulation or order of the Securities and Exchange Commission promulgated thereunder.

### 12. Entire Agreement

This Agreement represents the entire Agreement between the parties and may not be modified or amended except by a writing signed by the party to be charged.

## 13. Severability

If any provision of this Agreement shall be held or made invalid by a statute, rule, regulation, decision of a tribunal or otherwise, the remainder of this Agreement shall not be affected thereby and, to this extent, the provisions of this Agreement shall be deemed to be severable.

## 14. Miscellaneous

Adviser represents that it is registered as an investment adviser under the Advisers Act.  If the Account is an employee benefit plan subject to the provisions of ERISA, Adviser represents that, with respect to the performance of its duties in connection with the Account, it is a "fiduciary" as that term is defined therein.

Adviser reserves the right to refuse to accept this Agreement in its sole discretion and for any reason.

Adviser may assign this Agreement only if the Client consents thereto in a manner permitted by the Advisers Act.  Client specific restrictions will be noted in a signed investment plan and become a permanent part of each Client's file.

For the purpose of referring to this Agreement, the date of this contract shall be the date of acceptance by Adviser.

Client acknowledges that Adviser manages mutual funds that carry their own investment expenses which are separate from and in addition to the advisory fees.  As a fiduciary, Adviser has discretion to invest in any such mutual funds that Adviser deems suitable and appropriate based on the Client's stated investment objectives.  It is a conflict of interest for Adviser to invest in any mutual fund for which Adviser receives fees separate from the advisory fees stated herein.  This conflict of interest is disclosed on Adviser's From ADV.  By signing this Agreement, Client acknowledges that the conflict of interest has been fully disclosed and hereby waives any such conflict thereby permitting Adviser to exercise discretionary investment authority consistent with its fiduciary duty to Client.  If Client does not wish Adviser to waive any such conflict of interest, Client shall so notify Adviser in writing.

In the event that we are unable to communicate with clients for an extended period of time, it shall be the practice and policy of Yellowstone Partners, LLC to continue to manage advisory accounts according to the guidance given in the most recent contact with the client, our knowledge of the client's financial situation, and our understanding of the financial markets.  In the event that a client provides information regarding a substantial change in their financial situation, and/or behaves irrationally prior to a period in which we are unable to establish communication, Yellowstone Partners, LLC reserves the right to act in what we believe to be in the best interest of the client, maintaining discretionary authority to manage investment accounts according to our knowledge of the client's financial situation and our understanding of the financial markets.

All paragraph headings are for convenience of reference only, and do not form part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.

Client acknowledges receipt of Adviser's Form ADV Part 1, Part 2A and Part 2B. Notwithstanding anything to the contrary herein, Client shall have the right to terminate this Agreement without penalty within five business days of the execution of this Agreement by written notice to Adviser.

AGREED                                                ACCEPTED:
to this _____ day of _____ 20__            Yellowstone Partners, LLC

_____            By:_____
Signature of the Client
_____            Title:_____
Capacity of Signatory
_____            Date:_____
Street
_____
City  State  Zip


If more than one, all principals to the account must sign.  If any signatory is a fiduciary, the capacity in which he is acting should be indicated.
SIGNATURE(S) OF THE OTHER PRINCIPALS
_____
_____
_____

**EXHIBIT A**

FEE SCHEDULE

The management fee of Yellowstone Partners, LLC ("Adviser") shall be calculated on the basis of the total market value of the Client's assets under Adviser's supervision. Valuation shall be determined on the basis of the total market value of such assets as determined as of the close of business on the last business day of such quarter. The computation of total market value will be made at the close of the New York Stock Exchange composite tape. For purposes of this computation, readily marketable portfolio securities dually listed on the New York Stock Exchange and other national securities exchanges are valued at the last sale price as reported on the New York Stock Exchange composite tape. Readily marketable securities not reported on the New York Stock Exchange composite tape, but listed on national securities exchanges, will be valued at the last sale price on the exchange representing the primary trading market for such securities. If there has been no sale on the valuation day, the security will be valued at the closing bid price on such day. If no bid price is quoted on such day, then the security will be valued by such method as Adviser shall determine in good faith to reflect its fair market value. National Market System securities are valued at the current mean bid price as reported by the National Association of Securities Dealers Automated Quotations Services (NASDAQ), or such other comparable sources as Adviser deems appropriate to reflect their fair market value. Non-convertible bonds and debentures, and other long-term debt securities normally are valued at prices obtained from a major dealer in bonds, when such prices are available; however, in circumstances where Adviser deems it appropriate to do so another bond pricing service or an over-the-counter or exchange quotations may be used. United States Government, its agencies or instrumentalities, certificates of deposit issued by banks, corporate short-term notes and other short-term investments with original or remaining maturities in excess of 60 days are valued at the mean of representative quoted bids for securities of comparable maturity, quality and type. Short-term maturities with 60 days or less to maturity are amortized to maturity based on their cost to the Account if acquired within 60 days of maturity or, if already held by the Account on the 60th day, based on the value determined on the 61st day. All other assets of the Account will be valued in such manner as Adviser deems appropriate to reflect their fair market value.

Unless the client requests to pay the management fee by check, Adviser shall be authorized by this Agreement to deduct from client's account the management fee as set forth herein. Any management fee to be paid by check must be received by Adviser within 15-days of client's receipt of a fee invoice from Adviser.

       A.     The following quarterly management fee will be charged based upon the Client's assets under management by the Adviser.

    \_\_\_\_    $0 - $999,999

    \_\_\_\_    $1,000,000 - $4,999,999

    \_\_\_\_    Over $5,000,000

In addition to the quarterly fee, an annual Adviser fee will be assessed at the rate of \_\_\_\_% annually.

       B.     Fees payable under this Agreement are separate from the transaction fees charged by the Broker Dealer(s) that effect the securities transactions for the Account.

## Part 2A of Form ADV: Firm Brochure

## Item 1 Cover Page: Company Contact Information

A.  Company Name:          Yellowstone Partners, LLC

Business Address:        3340 Merlin Drive, Ste. 100
                         Idaho Falls, ID 83404

Toll free phone: 800-252-3693
Local phone: 208-612-1000
Fax Number: 208-612-1031
Website: www.yellowstonepartners.com
General e-mail: service@yellowstonepartners.com

B.  Date of brochure: 3/11/2015

C.  This brochure provides information about the qualifications and business practices of Yellowstone
    Partners, LLC. If you have any questions about the contents of this brochure, please contact us at 208-
    612-1000 or service@yellowstonepartners.com. The information in this brochure has not been
    approved or verified by the United States Securities and Exchange Commission (SEC) or by any state
    securities authority. Additional information about Yellowstone Partners is also available on the SEC's
    website at www.adviserinfo.sec.gov.

D.  Yellowstone Partners, LLC (hereafter referred to as "Yellowstone") is a Registered Investment
    Adviser with the United States Securities and Exchange Commission. Please be aware that this
    designation in no way implies any certain level of skill or training.

## Item 2 Material Changes

This item is a summary of changes to the Brochure and discusses only specific material changes that have
been made to the Brochure dated 6/19/2014.  Below describes the changes made within the Brochure by
item:

Item 4 E:       Assets under management ("AUM") have been updated.  AUM as of 12/31/2014 is
                approximately $732 million compared to $643 the previous period.
Item 5 A:       Included fee schedule, removed performance based fees
Item 6 A:       Removed performance based fees
Item 8 B:       Added additional detail with regards to mutual fund analysis

At any time, you may view the current Firm Brochure on-line at the SEC's Investment Adviser Public
Disclosure website at http://adviserinfo.sec.gov. You may also request a copy of this Firm Brochure at any
time, by contacting us at (208) 612-1000.

## Item 3 Table of Contents

Item 1: Cover Page: Company Contact Information…………………………………        Page 1
Item 2: Material Changes…………………………………………………………...        Page 1
Item 3: Table of Contents…………………………………………………………...        Page 1
Item 4: Advisory Business………………………………………………………….        Page 2
Item 5: Fees and compensation…………………………………………………….        Page 2
Item 6: Performance-Based Fees and Side-By-Side Management……………………        Page 4
Item 7: Types of clients…………………………………………………………….        Page 4
Item 8: Methods of Analysis, Investment Strategies and Risk of Loss……………….        Page 4
Item 9: Disciplinary Information…………………………………………………...        Page 4

Item 10: Other Financial Industry Activities and Affiliations..............................   Page 5
Item 11: Code of Ethics, Interest in Client Transactions and Personal Trading.........   Page 6
Item 12: Brokerage Practices.........................................................................   Page 8
Item 13: Review of Accounts........................................................................   Page 9
Item 14: Client Referrals and Other Compensation..........................................   Page 9
Item 15: Custody........................................................................................   Page 10
Item 16: Investment Discretion....................................................................   Page 10
Item 17: Voting Client Securities..................................................................   Page 10
Item 18: Financial Information......................................................................   Page 10

**Item 4 Advisory Business**

A.  Yellowstone Partners, LLC has been in business since October 2005. Prior to the formation of
    Yellowstone Partners, the company's predecessor, The Fred Dowd Company had been open since
    1972. The Ownership of Yellowstone Partners, LLC is as follows:

| Individual | Ownership Percentage |
|---|---|
| David Hansen, President and CEO | 90% |
| Cameron High, Chief Compliance Officer | 5% |
| Richard Baird, Portfolio Manager | 5% |

B.  Yellowstone asks clients to complete a Risk Tolerance Questionnaire which describes the level or risk in
    which they are comfortable in assuming.  From there, we will begin to manage the client accounts on a
    discretionary basis to adhere to the requirements spelled out on that Risk Tolerance Questionnaire.   No
    publications or reports are issued for which a fee is charged. The majority of income received is a result of
    advisory fees as a percentage of assets under management though some income is received from hourly
    charges and fixed fees.  Generally, the types of investments that Yellowstone typically invests in are United
    States and International Equity securities (both listed and over the counter), Mutual Funds, Corporate debt
    securities, Municipal Securities and United States Government securities. A very small percentage (less
    than 2%) of our overall investments is invested in certificates of deposit, variable annuities and options on
    securities. Clients may terminate services at any time by informing the office in writing.

C.  Yellowstone tailors its advisory services to the individual needs of its clients. The way that we achieve this
    is to have clients complete a Risk Tolerance Questionnaire or sometimes referred to as an Investment
    Policy Statement, to assist us in determining their requested risk tolerance. We sometimes will assist clients
    in answering this questionnaire; however, the main purpose in completing it is to provide us with further
    detail with respect to the client's needs and wishes. After the Questionnaire has been completed, we will
    use this document to begin to construct the clients tailored portfolio. Clients may impose restrictions on
    investing in certain securities or types of securities at their discretion. These requests will be required by
    the client in writing.

D.  Yellowstone does not participate in a wrap fee program.

E.  As year-end 12/31/2014 Yellowstone Partners' assets under management totals $732,300,000. This
    represents $701,900,000 of Discretionary Assets under management totaling approximately 2,400
    accounts and $30,400,000 of Non-Discretionary Assets under management totaling approximately 110
    accounts.

**Item 5 Fees and Compensation**

A.  The following is a representation of a standardized investment management fee schedule.  Due to the fact
    that fees are negotiable, actual fees charged may differ from what is described below.

For equity accounts

| Assets Under Management | Annual Fee |
| --- | --- |
| Under $1,000,000 | 2.00% |
| $1,000,000 - $5,000,000 | 1.88% |
| Over $5,000,000 | 1.80% |

For fixed income accounts

| Assets Under Management | Annual Fee |
| --- | --- |
| Under $1,000,000 | 1.00% |
| $1,000,000 - $5,000,000 | 0.88% |
| Over $5,000,000 | 0.80% |

For smaller accounts, Yellowstone may asses an annual advisor fee in addition to the fees described above of up to 2%.  Fees are negotiable and may be lower than what is described above.

Effective January 1, 2015 Yellowstone no longer charges performance based fees.

Some clients who have assets invested in mutual funds and variable annuities also indirectly incur management fees and other expenses in the portfolios they invest..

Although the standard fee is what Yellowstone typically charges advisory fees may be negotiable.

B.   For most clients, advisory fees are deducted from their account. This is the standard method for how fees are paid. At the client's request however, Yellowstone allows for management fees to be paid with a check. This must be requested from the client in writing.

C.   In addition to the management fees described above in Item 5, Section A, clients may also be charged additional fees such as custodian fees and mutual fund expenses. Clients will also be charged transaction costs for any trades placed at the individual custodians.

D.   Quarterly management fees are billed in advance at the beginning of each quarter. When the firm switched from billing in arrears to advance in July of 2009, some clients chose to remain being billed in arrears. In the event a client is charged for advisory fees in advance and then terminates the investment contract with the firm, a pro-rata refund will be deposited into the clients account for the number of days charged without management.  In cases where a client is charged an annual advisor fee, that fee is charged in arrears.

E.   Certain of our employees are Registered Representatives with Crown Capital Securities, L.P. ("CCS") based out of Orange California. They receive compensation in the form of commission from CCS for selling securities products including but not limited to Mutual Funds, Variable Annuities and Variable Life Insurance Policies. These Registered Representatives additionally occasionally sell fixed Life Insurance products. Due to this fact, we recognize that this practice presents a conflict of interest and gives some of the firm's employees an incentive to recommend investment products based on the compensation received rather than on a client's need. How we address this conflict is to retain and review all orders for such securities and verify that there is an economic benefit for the client through the transaction. In addition to this practice, the firm closely corresponds with CCS so that two separate entities are able to view and verify the economic benefit for the client in such a transaction. Clients of Yellowstone have the option to purchase investment products that we recommend through other brokers or agents that are not affiliated with the CCS. Commissions are disclosed on transaction confirmations which clients receive from CCS. In addition, a few representatives of Yellowstone Partners are also licensed Life Insurance Producers which may or may not sell life insurance to Yellowstone clients. The total amount of time used in selling life insurance products is less than 1%.

**Item 6 Performance-Based Fees and Side-By-Side Management**

    A.  As noted in Item 5 Section A, Yellowstone does not charge performance based fees.

**Item 7 Types of Clients**

    B.  Yellowstone generally provides investment advice to High Net Worth Individuals as well as non High Net Worth individuals, Banks or thrift institutions, Pension and profit sharing plans, trusts, estates, charitable organizations, corporations or other business entities other than those listed above. In circumstances where one of Yellowstone's specialized investment strategies is advised, it is recommended that clients meet the minimum initial investment assigned to the respective strategies.  Each strategy is unique and therefore will be assigned a different minimum based on holdings and turnover.   Accounts that don't meet the recommended minimum can be evaluated on a case-by-case basis.

**Item 8 Methods of Analysis, Investment Strategies and Risk of Loss**

    A.  Yellowstone Partners security analysis method includes charting, fundamental, technical and cyclical methods.  Please be aware that investing involves risk of loss and you can lose money.

    B.  All investments including individual stocks, individual bonds, mutual funds, exchange traded funds (ETFs) and the specialized strategies that Yellowstone invests in contain material risks. The specialized equity strategies include the following equity strategies.  Yellowstone Opportunity, Focused Opportunity, Disciplined Value and Laffer Dividend Growth.  These strategies involve frequent trading of securities which can affect investment performance due to increased transaction costs and potential tax implications. This may include short-term gains which are taxed at a higher rate. Yellowstone also offers a Municipal Bond strategy in which it invests directly into individual bonds for its clients. Although these securities are less frequently traded than our equity strategies, it should be noted that transaction costs for this security can affect performance and potential tax implications. Yellowstone is not a tax advisor nor does it offer tax advice to its clients. Clients are strongly encouraged to seek their own advice from an outside professional tax advisor.

         Yellowstone Partners mutual fund analysis method includes Performance analysis; Upside versus downside capture, bear market versus bull market performance and performance versus benchmark and category. Yellowstone Partners also review mutual funds for their corporate culture including the compensation of the portfolio management team, compensation of the fund board of trustees and the review of the total amount of personal investment in the fund of the portfolio management team and board of trustees.  Other items of review include portfolio turnover analysis, tax efficiency analysis, assets under management analysis, ownership structure of the fund, portfolio management team analysis with regards to education and business experience, review of independent research reports and reviewing conference calls and interviews provided by the fund company.

    C.  Yellowstone primarily recommends individual securities (i.e,. Individual Stocks and Individual Bonds), Mutual Funds, ETFs and with all of these investments there is a risk that they may lose value.

**Item 9 Disciplinary Information**

    A.  No member of Yellowstone or its Management has been involved in a criminal or civil action in a domestic, foreign or military court of competent jurisdiction.

        1.  No member of Yellowstone or its Management has convicted of, or pled guilty or nolo contendere ("no contest") to (a) any felony; (b) a misdemeanor that involved investments or an investment-related business, fraud, false statements or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, or extortion; or (c) a conspiracy to commit any of these offenses;

4

2. No member of Yellowstone or its Management is the named subject of a pending criminal proceeding that involves an investment-related business, fraud, false statements or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, extortion, or a conspiracy to commit any of these offenses;

3. No member of Yellowstone or its management was found to have been involved in a violation of an investment-related statute or regulation; or

4. No member of Yellowstone or its management was the subject of any *order*, judgment, or decree permanently or temporarily enjoining, or otherwise limiting, your firm or a *management person* from engaging in any *investment-related* activity, or from violating any *investment-related* statute, rule, or *order*.

B. No member of Yellowstone or its management is or has been involved in an administrative proceeding before the SEC, any other federal regulatory agency, any state regulatory agency, or any foreign financial regulatory authority in which your firm or a management person

1. No member of Yellowstone or its management were found to have caused an investment-related business to lose its authorization to do business; or

2. No member of Yellowstone or its management were found to have been involved in a violation of an investment-related statute or regulation and was the subject of an order by the agency or authority
   (a) denying, suspending, or revoking the authorization of your firm or a management person to act in an investment-related business;

   (b) barring or suspending your firm's or a management person's association with an investment-related business;

   (c) otherwise significantly limiting your firm's or a management person's investment related activities; or

   (d) imposing a civil money penalty of more than $2,500 on your firm or a management person.

C. A self-regulatory organization (SRO) proceeding in which your firm or a management person

1. No member of Yellowstone or its management was found to have caused an investment-related business to lose its authorization to do business; or

2. No member of Yellowstone or its management was found to have been involved in a violation of the SRO's rules and was: (i) barred or suspended from membership or from association with other members, or was expelled from membership; (ii) otherwise significantly limited from investment related activities; or (iii) fined more than $2,500.

**Item 10 Other Financial Industry Activities and Affiliations**

A. As discussed in Item 5 Section E of this brochure, certain of our employees are registered representatives of CCS which is a FINRA member broker dealer. The individuals currently registered are Cameron High, Don Wiscomb, Brock Bowden, Mark Johnson and Patrick Jenkins. It should be noted that Mr. High is a member of the firm's management team as Chief Compliance Officer.

B. None of Yellowstone Partners management team is registered, or has an application pending to register, as a futures commission merchant, commodity pool operator, a commodity trading advisor, or an associated person of the foregoing entities.

5

C.  As discussed in Item 10 Section A above, certain individuals of Yellowstone are registered representatives of CCS.  Yellowstone does not have an associated person who is one of the following:

1. futures commission merchant, commodity pool operator, or commodity trading advisor
2. banking or thrift institution
3. accountant or one who provides accounting services
4. pension consultant
5. real estate broker or dealer
6. sponsor or syndicator of limited partnerships.

Dave Hansen and Richard Baird are dual employees of Yellowstone Partners and American Independence Financial Services, LLC (American Independence), an SEC-registered investment adviser; therefore, Yellowstone Partners does have an associated person who is associated with another investment adviser or financial planner and an investment company or other pooled investment vehicle.  Their duties for American Independence are similar in nature to those being performed at Yellowstone Partners. The investment strategy used for American Independence clients, for one of American Independence's proprietary mutual funds and certain of their separately managed accounts, are similar to those used for Yellowstone clients. The management of investments for clients is done at the same time for both firms.  A conflict of interest may exist in managing the accounts of American Independence clients and Yellowstone clients based on different fee rate schedules. Currently, American Independence does not receive performance fees from any client account. Policies and procedures are in place to limit the potential conflicts of interest, including trade aggregation and oversight of such trading by compliance personnel. One of these policies for example randomizes trading executions across separately managed account platforms.

Those individuals who are Registered Representatives of CCS also have producer licenses with insurance companies.  Some of these companies include but are not limited to Beneficial Financial Group, ING, AXA Equitable, Nationwide, Principal and John Hancock.

Yellowstone does have an associate who is a lawyer.  Michael Dustin is a lawyer and currently is working in Idaho Falls, Idaho as an employee of the firm.

D.  Yellowstone does not recommend or select other investment advisers for its clients and or receive compensation directly or indirectly from those advisers that creates a material conflict of interest.  Please refer to Item 11 Section B for compensation received by certain employees who manage a mutual fund, which Yellowstone may recommend to its clients.

**Item 11 Code of Ethics, Participation or Interest in Client Transactions and Personal Trading**

A.  Pursuant to SEC rule 204A-1, Yellowstone has adopted a Code of Ethics. This statement has been distributed to all associated persons and other employees. It is signed, dated, and filed with the insider trading compliance materials. There are provisions adopted for restricting access to files, providing continuing education, restricting and /or monitoring trading on those securities of which our employees may have material nonpublic information, requiring all of the our employees to conduct their trading through a specified broker or reporting all transactions promptly to us, and monitoring the securities trading of the firm, our employees and associated persons.

The Code works in conjunction with our written Statement of Policy and Procedures (the "Statement") designed to detect and prevent insider trading and to govern personal securities trading. Such statement, among other things, forbids any associated person or employee from trading, either personally or on behalf of others on material non-public information or communicating material non-public information to others in violation of the law (i.e., insider trading). It also sets forth our policy that clients' interests are always placed ahead of any personal interest. Our policy requires our associated persons and other employees to

either place trades within the block trade placed for clients or at substantially different days and times from client purchases. It also requires them to report their personal securities transactions to management on a periodic basis. We believe that the Code and Statement designed to detect and prevent insider trading and to govern personal securities trading are appropriate to prevent or eliminate potential conflicts of interest situations between us, our employees and our clients. However, clients should be aware that no set of rules can possibly anticipate or relieve all potential conflicts.

As a professional organization serving the public in the area of asset management, we are guided in its actions by the highest ethical and professional standards and subscribes to the Code of Ethics and Standards of Professional Conduct adopted by the CFA Institute as stated below:

1. The general conduct of our associated persons and other employees must at all times reflect the professional nature of the business we are in. Our personnel are judicious, accurate, objective and reasonable in dealing with both clients and other parties. The personal integrity of all our associated persons and other employees must be beyond the slightest shadow of a doubt.

2. All our associated persons and other employees must act within the spirit and the letter of all relevant federal, state and local laws and regulations pertaining to a registered investment adviser and to the general conduct of business.

3. At all times, the interest of our clients has precedence over personal interests. This applies particularly in the case of purchases and sales of stocks and other securities that are owned, purchased or sold in the advisory and fiduciary accounts that we service.

4. We have adopted Insider Trading Policies which set parameters for the establishment, maintenance and enforcement of policies and procedures to detect and prevent the misuse of material non-public information by our personnel. The Insider Trading Policies are in addition to and do not supersede this Code of Ethics and Professional Standards.

5. All our associated persons and other employees shall notify us as required by the Adviser's Statement of Policy and Procedures Designed to Detect and Prevent Insider Trading and to Govern Personal Securities Trading, of any securities transactions in which he or she may have any beneficial interest and any such transaction effected by, for, or on behalf of, any member of their household. All our associated persons and other employees will file a complete report of all securities transactions effected during a calendar quarter for his or her own account, or for the account of his or her immediate family, not later than 10 days after the end of the calendar quarter in which the transaction was effected. These reports will be kept on file in accordance with applicable regulatory requirements.

6. When an associated person or employee finds that his or her personal interests conflict with our clients or our interests, he or she will report the conflict promptly to us for resolution.

7. Our recommendations and actions are confidential and private matters between ourselves and our clients. Accordingly, it is our policy to prohibit, prior to general public release, the transmission, distribution or communication of any information regarding securities transactions of client accounts except to broker/dealers or other custodians of client assets in the ordinary course of business. In addition, no information obtained during the course of employment regarding particular securities (including reports and recommendations by us) may be transmitted, distributed, or communicated to anyone who is not affiliated with us, without our prior written approval.

8. The policies and guidelines set forth in this Code of Ethics must be strictly adhered to by all our associated persons and employees. Severe disciplinary actions, including dismissal, may be imposed for violations of this Code of Ethics and Professional Standards.

Yellowstone Partners will provide a copy of its code of ethics to any client or prospective client upon request.

7

B.  Dave Hansen and Richard Baird are registered jointly with Yellowstone Partners as well as American Independence Financial Services, LLC based out of New York, NY.  These individuals manage the American Independence Stock Fund (IFCSX, ISFSX and ISISX) and will receive compensation in the form of a salary for its management. We recognize that this poses a potential conflict of interest in that clients may invest in the mutual fund within their advisory account and pay advisory fees to Yellowstone in addition to the underlying management expense of the mutual fund itself. Generally, Yellowstone will use the mutual fund in accounts which we manage with less than $100,000 in assets.

C.  Yellowstone Partners does allow associated persons to invest in the same securities (or related securities, *e.g.*, warrants, options or futures) that we or a related person recommends to clients.  As mentioned above, our Code of Ethics require associated persons to either place trades within the block trade placed for clients or at substantially different days and times from client purchases.

D.  Yellowstone Partners places its associated under the mandate that Client Priority is to remain in connection with all personal securities transactions. Employees must first give priority on all purchases and sales of securities to Yellowstone Partner's clients. Prior to the execution of transactions for their proprietary accounts and personal trading must be conducted so as not to conflict with the interests of a client. Clients must always receive the best price, in relation to employees, on same day transactions. The firm buys and sells the same securities for its 401(k) Retirement plan account that it holds within client portfolios. To ensure there is no front running within the 401(k) all trades are executed in a block trade or are executed at significantly different days and times.

## Item 12 Brokerage Practices

A.  Our overriding objective in effecting transactions for client accounts is to obtain the best combination of price and execution. The best net price is an important factor, but we also consider the full range and quality of a broker's services, including the value of research provided, execution, clearance and settlement capabilities, commission rates, financial responsibility, and responsiveness to us.

1. Yellowstone Partners receives Research and Other Soft Dollar Benefits. The United States Securities and Exchange Commission has defined soft dollar practices as arrangements under which products or services other than execution of securities transactions are obtained by an adviser from or through a broker-dealer in exchange for the direction of client brokerage transactions to the broker-dealer. An individual or firm must exercise "investment discretion" over an account in order to use client commission to obtain research under Section 28(e) of the Exchange Act. Some of the soft dollar benefits that the firm receives are research, both proprietary research (created or developed by the broker-dealer) and research created or developed by a third party. The soft dollars that the firm receives are used to receive research, pay for research costs (I.E Bloomberg Terminal, Thompson One, Holt) or attend research conferences offered by the broker-dealer.

   a.  When Yellowstone uses client brokerage commissions (or markups or markdowns) to obtain research of other products or services, we receive a benefit because we do not have to produce or pay for the research, products or services.

   b.  Yellowstone may have an incentive to select or recommend a broker-dealer based on our interest in receiving the research or other products or services, rather than on our clients interest in receiving most favorable execution.

   c.  Yellowstone does not cause clients to pay commissions (or markups or markdowns) higher than those charged by other broker-dealers in return for soft dollar benefits (known as paying up).

   d.  Yellowstone uses soft dollar benefits to service all of its clients' accounts including those clients who may not have paid commissions relating to the soft dollars.

   e.  The types of products and services that Yellowstone has acquired with client brokerage

      commissions within the last fiscal year are: Research software such as Bloomberg, Holt, S&P Fair Value and Morningstar. In addition to this research technology, Yellowstone also receives research conference credits in which certain of Yellowstone employees attend research conferences offered by the brokers used to place trades.

    f.    The procedure that Yellowstone uses to direct client transactions to a particular broker-dealer in return for soft dollar benefits is based on an as needed basis. An example of this is that Yellowstone will place trades with a broker who provides software research credits if the license to the software is about to expire. This helps Yellowstone to maintain robust research services to in turn benefit its clients.

2. Brokerage for Client Referrals. Yellowstone Partners does not consider, in selecting or recommending Broker-dealers, whether we or a related person receives client referrals from a broker-dealer or third party.

    a.    Yellowstone does not recommend a broker-dealer based on our interest in receiving client referrals. None of the brokers that Yellowstone has chosen to utilize offers a program which sends referrals to Yellowstone in exchange for brokerage transactions.

    b.    There is no procedure that Yellowstone follows to direct trades to brokers in return for referrals due to the fact described in Item 12 A,2,a above.

3. Directed Brokerage.

    a.    Yellowstone Partners does not permit clients to direct brokerage. If a client requests or requires the firm to use a specified broker-dealer of their choice and Yellowstone does not place client accounts at that broker dealer, Yellowstone will not accept the clients account.

B.    Excluding individual transactional request, Yellowstone Partners uses block trades to aggregate the purchase or sale of securities for various client accounts. The description of a block trade is where Yellowstone will aggregate client trades into a single transaction through a broker to try to achieve even execution for all clients.

## Item 13 Review of Accounts

A.    Portfolios are summarized by several computer systems on a monthly basis. The accounts are reviewed as to holdings, gain/loss, as well as average annual gain/loss from date of purchase. Yellowstone's Investment Adviser Representatives, review accounts on a periodic basis.  Daily monitoring of the portfolios and their corresponding positions are monitored by Yellowstone's Portfolio Management Team and each accounts respective Investment Adviser Representative.

B.    Yellowstone Partners reviews accounts on a periodic basis.

C.    The clients receive monthly reports/statements directly from the custodian of the securities. These are delivered independently to the client's requested address from the firm's custodians including but not limited to; Raymond James, Fidelity, Charles Schwab and TD Ameritrade.

## Item 14 Client Referrals and Other Compensation

A.    Yellowstone does not have someone who is not a client and benefits by providing Yellowstone investment advice therefore item 14A is not applicable.

B.    Yellowstone provides compensation to certain individuals who refer clients to Yellowstone for advisory services. These individuals are not investment professionals, are not allowed to provide investment advice and are not employees of Yellowstone. When a client is referred to Yellowstone, we have agreed to compensate the solicitor for these activities by paying the solicitor a referral fee. Yellowstone will not

charge a client referred to it by a solicitor an amount for the cost of obtaining the client.  In these scenarios, clients will acknowledge full disclosure and consent to such a relationship by signing an Exhibit titled, "Arrangement between Yellowstone Partners, LLC and Solicitor".

## Item 15 Custody

A.  Yellowstone does not have custody of client's funds or securities. A broker-dealer or other qualified custodian will send quarterly or more frequent account statements directly to clients of Yellowstone. Clients should carefully review these statements.

## Item 16 Investment Discretion

A.  Yellowstone accepts discretionary authority to manage securities accounts on behalf of its clients. This means that Yellowstone has the ability to buy/sell securities according to its own discretion and judgment for the behalf of its clients and at the risk of the client . This also provides Yellowstone the authority to, in its sole discretion and at the client's risk, purchase, sell, exchange, convert and otherwise trade the funds, securities and other investments in the account. Clients enter into an Investment Agreement acknowledging the full extent of this discretionary authority and appoint Yellowstone as agent and attorney-in-fact with respect to the account.

## Item 17 Voting Client Securities

A.  Yellowstone does not accept authority to vote client securities.

B.  Yellowstone Partners does not vote client proxies. Clients will receive proxy material directly from the custodian holding the client's account. Under circumstances where Yellowstone receives proxy material on behalf of a client involving any security held in the client's account, Yellowstone will promptly forward such material to the client's attention. It is the client's responsibility to vote his/her proxy(ies). Upon client request, Yellowstone will provide advice regarding proxy voting. Yellowstone will keep a record of: any advice given to a client regarding proxy voting, and any proxy material on behalf of a client and the steps taken to forward such material to the client.

## Item 18 Financial Information

A.  Since Yellowstone does not require nor solicits prepayments of more than $1,200 in fees per client, six months or more in advance, no balance sheet is required to be included in this brochure.

B.  Currently there are no financial conditions that are reasonably likely to impair Yellowstone's ability to meet contractual commitments to clients.

C.  Yellowstone has not been the subject of a bankruptcy petition at any time during the past ten years.

9:27 AM

11/18/15

Accrual Basis

# Yellowstone Partners, LLC
# Balance Sheet
### As of September 30, 2015

|  | Sep 30, 15 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| SSB - Advisor Fees Account 8687 | 93.00 |
| SSB - Yellowstone (Operating) | -85,428.04 |
| **Total Checking/Savings** | -85,335.04 |
| **Accounts Receivable** | |
| Accounts Receivable | 25,277.19 |
| **Total Accounts Receivable** | 25,277.19 |
| **Other Current Assets** | |
| N/R - Richards Financial Group | 35,000.00 |
| **Total Other Current Assets** | 35,000.00 |
| **Total Current Assets** | -25,057.85 |
| **Fixed Assets** | |
| Accumulated Amortization | -1,827,723.92 |
| Accumulated Depreciation | -221,066.85 |
| Andy Goodman Purchase | 1,353,432.44 |
| Furniture and Equipment | 18,869.27 |
| Furniture and Fixtures | 2,138.96 |
| Gordon Carpenter Purchase | 470,000.00 |
| Investment - Jim Turcotte | 363,000.00 |
| Investment in Wind River | 462,500.00 |
| Leasehold Improvements | 177,446.81 |
| Loan Fees | 4,701.00 |
| Office Equipment | 112,085.22 |
| Office Remodel | 93,475.05 |
| Pilatus (Classic) | 1,678,929.88 |
| Vehicles | 199.56 |
| YP Purchase | 1,779,250.00 |
| **Total Fixed Assets** | 4,467,237.42 |
| **Other Assets** | |
| Investment in White Orchid Spa | 99,566.32 |
| **Total Other Assets** | 99,566.32 |
| **TOTAL ASSETS** | **4,541,745.89** |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| Accounts Payable | 88,357.07 |
| **Total Accounts Payable** | 88,357.07 |
| **Credit Cards** | |
| American Express | 119,504.95 |
| **Total Credit Cards** | 119,504.95 |
| **Other Current Liabilities** | |
| CCB - LOC | 70,447.16 |
| SSB Operating Line of Credit | 450,500.00 |
| SSB Ready Reserve LOC | 35,000.00 |
| **Total Other Current Liabilities** | 555,947.16 |
| **Total Current Liabilities** | 763,809.18 |
| **Long Term Liabilities** | |
| Loan - Pilatus (Classic) | 1,602,892.13 |
| N/P - Gordon Carpenter | 282,000.00 |
| N/P - Raymond James | 171,328.57 |
| Note Payable - Jim Turcotte | 235,597.74 |
| SSB LOAN - 9812 | 285,825.27 |

9:27 AM

11/18/15

Accrual Basis

## Yellowstone Partners, LLC
## Balance Sheet
### As of September 30, 2015

|  | Sep 30, 15 |
|---|---|
| SSB Loan 72339712 | 1,084,319.43 |
| SSB Loan 9702 (Pilatus) | 562,028.97 |
| **Total Long Term Liabilities** | 4,223,992.11 |
| **Total Liabilities** | 4,987,801.29 |
| Equity |  |
| Cameron Draws | -123,846.59 |
| Dave Hansen Draws |  |
| Boise Office | -110,465.77 |
| Falcon (AirFleet) | -1,400,000.00 |
| Ferrari | -131,372.43 |
| George Klopfer (Lear Jet) | -550,000.00 |
| Interest - Personal | -524,999.78 |
| Investment in C4Hundred LLC | -332,500.00 |
| Misc Other Draws | 58,952.69 |
| N/P - Falcon (AirFleet Corp) | 1,176,251.79 |
| N/P - IF Home (WellsFargo) | 712,331.43 |
| N/P - Landrover | 55,904.92 |
| N/P - SG Home (Wells Fargo) | 400,229.34 |
| N/P - TD Range Rover | 50,191.43 |
| N/P - YH (Colston) | 374,573.50 |
| N/P - YH (Pinnacle) | 429,526.99 |
| Dave Hansen Draws - Other | -4,798,185.31 |
| **Total Dave Hansen Draws** | -4,589,561.20 |
| Lukla | -15,890.78 |
| Members Equity | 3,686,525.08 |
| Rick Draws | -169,081.49 |
| Net Income | 765,799.58 |
| **Total Equity** | -446,055.40 |
| **TOTAL LIABILITIES & EQUITY** | 4,541,745.89 |