

April 24, 2017

<u>**VIA EMAIL** Rikke.Morice@FaegreBD.com</u>
<u>**AND CERTIFIED MAIL RETURN RECEIPT REQUESTED**</u>
<u>**9214 8901 8607 7611 1118 52**</u>
Rikke Dierssen-Morice, Esq.
Faegre Baker Daniels LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402

|        |            |                                                                                  |
|--------|------------|----------------------------------------------------------------------------------|
| **RE:** | **Insurer:** | **Wesco Insurance Company, Claims Management by AmTrust North America ("Wesco")** |
|        | **Insured:** | **Yellowstone Partners, LLC ("Yellowstone")**                                    |
|        | **Policy No.** | **WDO1429740 00 ("Policy")**                                                   |
|        | **Claim No.** | **2485773**                                                                     |
|        | **Matter:** | **Securities and Exchange Commission Investigation ("SEC Investigation")**       |

Dear Ms. Dierssen-Morice:

      We have completed our review of coverage for the SEC Investigation with respect to Yellowstone and six individuals: David Hansen, Rick Baird, Paul Weimer, Michael Dustin, KayLynn Dalebout, and Karen Steighner. [1]   We understand that you are coverage counsel for Yellowstone and all six of these individuals with respect to potential Policy coverage for the SEC Investigation.  Please let us know immediately if this is not the case, or if this coverage position letter should be sent to others.

      Our review has included the SEC's formal order of investigation, the SEC subpoenas, and accompanying documents.  We have also reviewed Yellowstone's self-report of potential violations, the additional information and documents provided by the insureds in response to our requests, and all terms and conditions of the Policy.

      The purpose of this letter is to provide Yellowstone and these six individuals with Wesco's determination regarding coverage for the SEC Investigation.[2]

---

[1] We were originally asked to also review Policy coverage for Cameron High.  However, your March 29, 2017 email to our coverage counsel states that Cameron High is no longer seeking insurance coverage from Wesco.

[2] In the course of reviewing potential Policy coverage for the SEC Investigation, it was brought to our attention that there also may be a criminal investigation involving Yellowstone and/or one or more of these individuals.  You have confirmed, however, that Yellowstone and these six individual insureds are not seeking Policy coverage for any criminal investigation.

Rikke Dierssen-Morice, Esq.
April 24, 2017
Page 2

Wesco has determined that there is no coverage for the SEC Investigation under the Policy. Without waiving this no-coverage determination – and subject to the specific and general reservations of rights stated in this coverage position letter – Wesco will, as an interim step, advance certain defense expenses subject to the retention and limits referred to in this coverage position letter.

Wesco's interim agreement to advance defense expenses does not include Karen Steighner because, unlike the other individuals seeking coverage, Ms. Steighner is not an "insured" under the Policy.

## CURRENT FACTUAL RECORD

This matter involves the SEC Investigation into the conduct of Yellowstone and related individuals, concerning the overbilling of fees to client accounts.  According to information reported by Yellowstone to the SEC, Yellowstone intentionally billed and collected more than one annual fee from a number of its clients during several 12-month periods between 2010 to 2016. Yellowstone states that it overbilled clients in order to meet its payroll and other operating expenses.  Yellowstone then failed to credit these "advance" payments when the annual fee later became due, and charged the fee again.  According to Yellowstone's calculations, the total amount of overbilled fees was in excess of $5 million.

Yellowstone states that it received inquiries about overbilling from three clients in 2015. In response, Yellowstone reversed the overcharges.  Yellowstone states that it also reviewed a sampling of other client accounts, but found no other fee discrepancies.  In April 2016, however, Yellowstone was made aware of the overbilling of several additional clients.  One instance of overbilling was discovered by Yellowstone's CEO, David Hansen, as he was reviewing the performance of a new account.  One instance of overbilling was discovered following an inquiry by a Yellowstone client.  Two additional instances were discovered and raised by Yellowstone's Chief Operating Officer, Paul Weimer.  In May 2016, Yellowstone hired an accounting firm and law firm to conduct an investigation and review of all of its accounts.  As a result of that review, Yellowstone identified the particular accounts that had been overbilled.  Yellowstone began to immediately reimburse affected clients for the amounts overbilled to their accounts.  Yellowstone also self-reported the issues to the SEC on July 29, 2016 (the "Self-Report").

The Self-Report states that it is written "to report possible violations of the Investment Advisers Act of 1940 and its related rules."  The Self-Report admits the overbilling of annual fees, described above.  The Self-Report identifies the improper calculation of annual fees, based on a client's total assets under management.  The Self-Report recites that the total amount of overbilled fees was $5,281,585.46, $4,495,782.62 of which Yellowstone represented it had already reimbursed to clients, and another $785,802.84 Yellowstone stated it would be repay to clients by October, 2016.

It is our understanding that the SEC audited Yellowstone in August 2016.  On November 21, 2016, the SEC then issued a formal order of investigation into Yellowstone's billing practices and overbilling of fees to client accounts (the "SEC Formal Order").  The SEC's "Formal Order" states that the Commission has information that tends to show that:

Rikke Dierssen-Morice, Esq.
April 24, 2017
Page 3

> In possible violation of Sections 206(1) and 206(2) of the Advisers Act, Yellowstone Partners, LLC its officers, directors, employees, partners, subsidiaries, and/or affiliates and/or other persons or entities, while acting as investment advisers, directly or indirectly, may have been or may be employing devices, schemes, or artifices to defraud any client or prospective client, or engaging in transactions, practices or courses of business which operated or operate as a fraud or deceit upon a client or prospective client.
>
> As part of these activities, such persons or entities, directly or indirectly, may have been or may be making false statements of material fact or omitting to state material facts concerning, among other things, billing practices. As part of these activities, such persons or entities, directly or indirectly, may have been or may be misappropriating or abusing client assets by, among other things, the overbilling of fees to client accounts.

The Formal Order directs that a private investigation be made to determine whether such violations were committed, and it designates certain officers to conduct that investigation. The Formal Order was subsequently amended on December 19, 2016 to designate additional officers to assist in the investigation of "possible violations of the provisions of the federal securities laws."

Pursuant to the Formal Order, the SEC began issuing subpoenas in December 2016. The Yellowstone entity received a subpoena on December 20, 2016. It is our understanding that the following individuals have also received subpoenas from the SEC:

- David Hansen, Yellowstone's majority member and former CEO;
- Rick Baird, Yellowstone's current CEO and prior Chief Investment Officer;
- Paul Weimer, Yellowstone's former Chief Operating Officer;
- Michael Dustin, Yellowstone's former municipal bond manager; and
- KayLynn Dalebout, Yellowstone's financial controller.

You have also forwarded an invoice for legal services provided by your firm to Karen A. Steighner, of Compliance Advisors, Inc. in relation to the SEC Investigation. In your correspondence, you identify Ms. Steighner as an "independent contractor" of Yellowstone. However, Wesco is not aware if Ms. Steighner has also received a subpoena from the SEC. Nor has Wesco received a copy of such a subpoena.

Each of the subpoenas provided to Wesco requires the recipient to testify and/or produce documents related to the SEC's investigation. The cover letter to each subpoena states that the SEC is "trying to determine whether there have been any violations of the federal securities laws." The subpoenas themselves also state the SEC "has issued a formal order authorizing this investigation under Section 20(a) of the Securities Act of 1933, Section 21(a) of the Securities Exchange Act of 1934, and Section 209(a) of the Investment Advisers Act of 1940."

Rikke Dierssen-Morice, Esq.
April 24, 2017
Page 4

A number of the individuals requested coverage from Wesco under the Policy. Specifically, Wesco has received notices and demands for coverage from the Yellowstone entity and individuals David Hansen, Rick Baird, Paul Weimer, Michael Dustin, KayLynn Dalebout and Karen Steighner.  In their notice letters, all of the reporting individuals state that it is their position the SEC Investigation "arises from certain alleged wrongful acts referenced in the Formal Order in connection with the possible violations of the Securities Act of 1933 and the Securities Exchange Act of 1934."  The notice submitted by the Yellowstone entity similarly states that the SEC Investigation arises from "alleged wrongful acts in connection with the possible violations of the Investment Adviser Act of 1940, the Securities Act of 1933 and the Securities Exchange Act of 1934."  Yellowstone and each of the reporting individuals have asked Wesco to advance defense expenses and indemnify them for any losses "relating to and resulting from the SEC's formal investigation."  In response to questions from Wesco's coverage counsel, you have confirmed that Yellowstone has agreed to indemnify each of the individuals for all losses and defense expenses related to the SEC Investigation.

## POTENTIALLY APPLICABLE POLICY PROVISIONS

The Policy was issued by Wesco for the policy period of January 1, 2016 to January 1, 2017.  The Policy contains multiple coverage parts, including the D&O Coverage Part, and the Professional Liability Coverage Part.  The Declarations identify Yellowstone Partners, LLC as the named insured.  The policy year aggregate limit of liability is $2 million.

The D&O Coverage Part includes coverage under Insuring Agreement B ("Company Indemnification") and Insuring Agreement C.1 (Company Liability), subject to a single limit of liability of $2 million and a retention of $25,000.  Subject to the other terms and conditions of the Policy, those two insuring agreements provide coverage as follows:

> **B.** **COMPANY INDEMNIFICATION COVERAGE** – The **Insurer** will pay on behalf of the **Company**, **Loss** resulting from any **Claim** first made during the **Policy Period** or Extended Reporting Period (if exercised) against the **Insured Persons** for which the **Company** has agreed to or is legally permitted or required by law to indemnify the **Insured Persons** for any **Wrongful Act**.

> **C.** **COMPANY LIABILITY COVERAGE** – The **Insurer** will pay on behalf of the **Company**:

> 1. **Loss** resulting from any **Claim** first made during the **Policy Period** or Extended Reporting Period (if exercised) against the **Company** for any **Wrongful Act** not covered in any other **Coverage Part** made part of this **Policy** . . . .

Section IV of the D&O Coverage Part contains definitions for certain terms that appear in bold font in the Policy.  The following may be relevant here:

**Claim** means:

Rikke Dierssen-Morice, Esq.
April 24, 2017
Page 5

1.  a written demand, other than a **Shareholder Derivative Demand**, for monetary damages or non-monetary relief;

2.  a civil proceeding commenced by the service of a complaint or similar pleading;

3.  a criminal proceeding commenced by a filing of charges or the return of an indictment;

4.  a formal administrative or regulatory proceeding commenced by a filing of a notice of charges, formal investigative order, service of summons, or similar document;

5.  an arbitration, mediation or similar alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the **Insurer's** written consent, such consent not to be unreasonably withheld;

6.  service of a subpoena on an **Insured Person** identified by name if served upon such person pursuant to a formal investigative order by the Securities and Exchange Commission;

7.  a **Shareholder Derivative Demand** solely with respect to Insuring Agreement C.2. only; or

8.  a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding,

against an **Insured** for a **Wrongful Act**. **Claim** does not include any labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement.

**Employee** means any natural person whose labor or service was, is or shall be engaged and directed by the **Company** including all full-time, part-time, seasonal, leased and temporary employees as well as volunteers. **Employee** shall not include any **Independent Contractor**.

**Executive** means any natural person who was, is or shall be a duly elected or appointed:

1.  director, officer, or member of the board of managers or management committee of the **Company**;

2.  in-house general counsel or risk manager of the **Company**; or

3.  manager of a **Company** organized outside the United States of America, if such position is equivalent to those specified in 1. or 2. above.

**Insured Person** means any:

1.  **Executive**; or
2.  **Employee**.

**Loss** means **Defense Expenses** and any amount the **Insured** is legally obligated to pay resulting from a **Claim**, including damages, judgments, settlements, punitive or exemplary damages or the multiple portion of any multiplied damage award (if

Rikke Dierssen-Morice, Esq.
April 24, 2017
Page 6

insurable under the applicable law most favorable to the insurability of punitive, exemplary, or multiplied damages), prejudgment and post judgment interest, and legal fees and expenses awarded pursuant to a court order or judgment.  **Loss** shall not include:

1. payroll or other taxes;
2. criminal or civil fines or penalties imposed by law;
3. any unpaid, unrecoverable or outstanding amounts resulting from a loan, lease or extension of credit to any borrower, including unpaid, unrecoverable or outstanding amounts resulting from a loan, lease or extension of credit which has been sold as a participation to other financial institutions;
4. any increased amount in the price or consideration paid, or proposed to be paid, for any actual or attempted acquisition of all or substantially all of the ownership interest in, or assets of, an entity, or merger with any entity;
5. any restitution, disgorgement, or payment of similar payments including, but not limited to the return of fees, commissions or charges for the **Company's** services; or
6. costs to comply with any non-monetary or injunctive relief of any kind or any agreement to provide such relief, including but not limited to any damages, costs or expenses incurred in making an accommodation for any disabled person pursuant to the Americans with Disabilities Act or any similar federal, state or local laws, or in complying with any other federal, state or local laws of any kind;
7. any matters which are uninsurable under the law pursuant to which this **Policy** shall be construed.

Where the **Company** reasonably determines that punitive, exemplary or multiple damages are insurable under the applicable law, the **Insurer** shall not challenge that interpretation of insurability.

**Wrongful Act** as used in this **Coverage Part** means any actual or alleged:

1. error, omission, misstatement, misleading statement, neglect or breach of duty by **Insured Persons** in their capacity as such or, with respect to Insuring Agreement C., by the **Company**; or
2. matter claimed against the **Insured Persons** solely by reason of their serving in such capacity.

Section V of the D&O Coverage Part contains certain exclusions to coverage.  The following may be relevant to this matter:

**Fraud / Illegal Profit and Violation of Law** – The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to:

Rikke Dierssen-Morice, Esq.
April 24, 2017
Page 7

1.  the gaining, of any profit, remuneration or pecuniary advantage to which such **Insured** is not legally entitled; or

2.  any fraudulent or criminal **Wrongful Act** with actual knowledge of its wrongful nature or with intent to cause damage by such **Insured**,

as evidenced by a final adjudication by a judge, jury or arbitrator in any proceeding.

<u>**Prior Knowledge / Litigation**</u> – The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to:

1.  any fact, circumstance, situation, or event that is or reasonably would be regarded as the basis for a **Potential Claim** about which any **Executive** had knowledge prior to the date of the initial **Application** for coverage; or

2.  any prior or pending civil, criminal, administrative or regulatory proceeding initiated against any **Insured** prior to the applicable Prior and Pending Litigation Date(s) set forth in Item 5.(a) of the Declarations Page, or arising out of or in any way involving the same or substantially the same fact, circumstance, situation or **Wrongful Act** underlying or alleged in such prior or pending civil, criminal, administrative or regulatory proceeding.

<u>**Prior Notice**</u> – The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to any **Wrongful Act** or any **Wrongful Act** which is part of any **Interrelated Wrongful Acts**, or any fact, circumstance or situation, which has been the subject of any notice given to any carrier other than the **Insurer** under any similar insurance policy providing protection for any **Insured**.

<u>**Securities Offering**</u> – The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to:

a.  the public offer, sale, solicitation or distribution of securities issued by the **Company**; or

b.  the violation of any federal, state, local or provincial statute relating to securities, including the Securities Act of 1933 and the Securities and Exchange Act of 1934, or any rules or regulations promulgated thereunder;

provided, however, that this exclusion will not apply to:

1.  any offer, purchase or sale of securities, whether debt or equity, in a transaction that is exempt from registration under the Securities Act of 1933 (an "Exempt Transaction"); or

2.  to the extent that such **Claim** is made by a security holder of the **Company** for the failure of the **Company** to undertake or complete an initial public offering or sale of securities of the **Company**.

Rikke Dierssen-Morice, Esq.
April 24, 2017
Page 8

If at least thirty (30) days prior to any securities offering by the **Company**, other than pursuant to an Exempt Transaction, the **Insurer** receives notice of the proposed transaction and any additional information requested by the **Insurer**, the **Company** may request a proposal for coverage subject to any additional terms and conditions, and payment of any additional premium, described in such proposal.

Section VI of the D&O Coverage Part provides certain additional terms and conditions. Section VI.B provides as follows:

**OTHER INSURANCE** – This **Coverage Part** shall not be subject to the terms of any other insurance.  All **Loss**, including **Defense Expenses**, payable under this **Policy** shall be excess to:

1.  any other valid and collectible insurance available to any **Insured**, including any insurance under which there is a duty-to-defend, unless such insurance is written specifically excess of this **Coverage Part** by reference in such other policy to the Policy Number assigned to this **Policy**; or
2.  indemnification to which an **Insured Person** is entitled from any entity other than the **Company**.

*Professional Liability Coverage Part*

The Professional Liability Coverage Part includes coverage under Insuring Agreement B ("Professional Services Liability"), subject to a single limit of liability of $2 million and a retention of $25,000.  Subject to the other terms and conditions of the Policy, that insuring agreement provides coverage as follows:

B.  **PROFESSIONAL SERVICES LIABILITY** – The **Insurer** will pay on behalf of the **Insured**, **Loss** resulting from a **Claim** first made during the **Policy Period** or Extended Reporting Period (if exercised), by or on behalf of a customer of the **Company** for a **Wrongful Professional Services Act**.

Section II of the Professional Liability Coverage Part provides definitions for certain terms that appear in bold font in the Policy.  As amended by the Investment Advisor endorsement, the following definitions may be relevant to this matter:

**Claim** means:

1.  a written demand for monetary damages or non-monetary relief;
2.  a civil proceeding commenced by the service of a complaint or similar pleading;
3.  a criminal proceeding commenced by a filing of charges or return of an indictment;
4.  an arbitration, mediation or similar alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the **Insurer's** written consent, such consent not to be unreasonably withheld; or
5.  a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding,

Rikke Dierssen-Morice, Esq.
April 24, 2017
Page 9

against an **Insured** for a **Wrongful Act** including any appeal from such proceeding. **Claim** shall also mean a notice of investigation of violation(s) of law or regulation or disciplinary proceedings against an **Insured** by any governmental body or self-regulatory organization, but only if the investigation of violation(s) of law or regulation or disciplinary proceedings were initiated by a complaint by the Insured's customer or client or former customer or client, arising from the **Insured's** rendering or failure to render **Professional Services** for that customer or client or former customer or client.

**Loss** means **Defense Expenses** and any amount the **Insured** is legally obligated to pay resulting from a **Claim**, including damages, judgments, settlements, punitive or exemplary damages or the multiple portion of any multiplied damage award (if insurable under the applicable law most favorable to the insurability of punitive, exemplary, or multiplied damages), prejudgment and post judgment interest, and legal fees and expenses awarded pursuant to a court order or judgment. **Loss** shall not include:

1.   payroll or other taxes;
2.   criminal or civil fines or penalties imposed by law;
3.   any unpaid, unrecoverable or outstanding amounts resulting from a loan, lease or extension of credit to any **Borrower**, including unpaid, unrecoverable or outstanding amounts resulting from a loan, lease or extension of credit which has been sold as a participation to other financial institutions;
4.   costs to comply with any non-monetary or injunctive relief of any kind or any agreement to provide such relief, including but not limited to any damages, costs or expenses incurred in making an accommodation for any disabled person pursuant to the Americans with Disabilities Act or any similar federal, state or local laws, or in complying with any other federal, state or local laws of any kind;
5.   the depreciation (or failure to appreciate) in value of any investment product, including but not limited to securities, commodities, currencies, options or futures due to market fluctuation unrelated to any **Wrongful Act**;
6.   any restitution, disgorgement, or payment of similar payments including, but not limited to the return of fees, commissions or charges for the **Company's** services; or
7.   any matters which are uninsurable under the law pursuant to which this **Policy** shall be construed.

Where the **Company** reasonably determines that punitive, exemplary or multiple damages are insurable under the applicable law, the **Insurer** shall not challenge that interpretation of insurability.

**Wrongful Professional Services Act** means any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty or neglect by any Insured in the rendering of, or failure to render **Professional Services**. **Wrongful Professional Services Act** does not include a **Wrongful Lending Act** or a **Wrongful Trust Services Act**.

**Professional Services** means services rendered for or advice given to others by an **Insured** for a fee, remuneration, **Pro Bono** or other consideration in an **Insured's** practice as a

Rikke Dierssen-Morice, Esq.
April 24, 2017
Page 10

**Financial Advisor**.   **Professional Services** also includes services performed in the capacity of a fiduciary pursuant to **ERISA**.

**Professional Services** shall not include:

1.   any services rendered during the period of any suspension or revocation of an **Insured's** certification, licensure, accreditation, appointment or other right to practice as a **Financial Planner**, **Registered Representative**, **Registered Investment Advisor** or **Life Insurance Agent**; or
2.   activities as a partner, principal, officer, director, manager, member, employee, independent contractor or administrative staff of any organization or public office other than the **Company** or an organization specifically endorsed by name onto this insurance.

Section III of the Professional Liability Coverage Part contains a number of exclusions from coverage.  The following may be relevant here:

**<u>Fraud / Illegal Profit and Violation of Law</u>** – The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to:

1.   the gaining, of any profit, remuneration or pecuniary advantage to which such **Insured** is not legally entitled; or
2.   any fraudulent or criminal **Wrongful Act** with actual knowledge of its wrongful nature or with intent to cause damage by such **Insured**,

as evidenced by a final adjudication by a judge, jury or arbitrator in any proceeding.

**<u>Prior Knowledge / Litigation</u>** – The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to:

1.   any fact, circumstance, situation, or event that is or reasonably would be regarded as the basis for a **Potential Claim** about which any **Executive Officer** had knowledge prior to the date of the initial **Application** for coverage; or
2.   any prior or pending civil, criminal, administrative or regulatory proceeding initiated against any **Insured** prior to the applicable Prior and Pending Litigation Date(s) set forth in Item 5.(a) of the Declarations Page, or arising out of or in any way involving the same or substantially the same fact, circumstance, situation or **Wrongful Act** underlying or alleged in such prior or pending civil, criminal, administrative or regulatory proceeding.

**<u>Prior Notice</u>** – The **Insurer** shall not be liable to pay any **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to any **Wrongful Act** or any **Wrongful Act** which is part of any **Interrelated Wrongful Acts**, or any fact, circumstance or situation, which has been the subject of any notice given to any

Rikke Dierssen-Morice, Esq.
April 24, 2017
Page 11

carrier other than the **Insurer** under any similar insurance policy providing protection for any **Insured**.

**Fee Dispute** – The **Insurer** shall not be liable under Insuring Agreements B. or C. for **Loss** in connection with any **Claim** made against any **Insured** arising from, based upon, or attributable to any disputes over fees, commissions, or charges for the **Company's** services.

Section IV of the Professional Liability Coverage provides certain additional terms and conditions applicable to that coverage part. Section IV.B provides as follows:

**OTHER INSURANCE** – This **Coverage Part** shall not be subject to the terms of any other insurance. All **Loss**, including **Defense Expenses**, payable under this **Policy** shall be excess to any other valid and collectible insurance available to any **Insured**, including any insurance under which there is a duty to defend, unless such insurance is written specifically excess of this **Coverage Part** by reference in such other policy to the Policy Number assigned to this **Policy**.

*General Terms and Conditions*

Coverage under the Policy is also subject to the General Terms and Conditions applicable to all Coverage Parts of the Policy. Section III of those General Terms and Conditions provide the following:

A.   **LIMIT OF LIABILITY**

1.   The amount set forth in Item 3. of the Declarations Page is the maximum **Policy Year** Aggregate Limit of Liability of the **Insurer** for all **Loss** from all **Claims** under all purchased **Coverage Parts**, regardless of the number of **Insureds**, **Claims** made, or persons or entities bringing such **Claims**. The Single Limit of Liability and the Separate Limit of Liability on the Declarations Page are sub-limits of the **Policy Year** Aggregate Limit of Liability which further limits and does not increase the **Insurer's** limit of liability.

2.   The **Coverage Parts** of this **Policy** are offered with either a Single Limit of Liability applicable in the aggregate to all Insuring Agreements or a Separate Limit of Liability for each Insuring Agreement as set forth in Item 4. of the Declarations Page.

     a.   Each Single Limit of Liability designate in Item 4.(c) of the Declarations Page shall be the maximum per **Policy Year** limit of liability of the **Insurer** for all **Loss** under the respective **Coverage Part** regardless of the number of **Insureds**, **Claims** made, or persons or entities bringing such **Claims**. Each such Single Limit of Liability is a sublimit of and erodes the **Policy Year** Aggregate Limit of Liability set forth in Item 3. of the Declarations Page.

     . . .

Rikke Dierssen-Morice, Esq.
April 24, 2017
Page 12

    B.      **RETENTION**

        1.    The applicable Retention(s) for each purchased **Coverage Part** are set forth in Item 4.(d) of the Declarations Page.  The **Insurer** has no obligation to pay **Loss**, including **Defense Expenses**, until the Retention has been paid by the **Insured**.  Except for the payment of **Defense Expenses**, the **Insurer** shall pay or reimburse one hundred percent (100%) of covered **Loss**, in excess of the applicable Retention, upon final disposition of the **Claim**.

        2.    Each Retention shall be borne by the **Insured** and shall remain uninsured.
           . . .

    C.      **SINGLE LIMIT / RETENTION** – **Claims** based upon or arising out of the same **Wrongful Act** or **Interrelated Wrongful Acts** committed by one or more **Insureds** shall be considered a single **Claim**, and only one Retention and Limit of Liability shall apply.  Each such single **Claim** shall be deemed to be first made on the date the earliest of such **Claims** was first made, regardless of whether such date is before or during the **Policy Period**.

Section V.A provides the following regarding the insureds' duty to provide timely notice of claims:

    **NOTICE OF CLAIMS** – The **Insured** shall, as a condition precedent to their rights under this **Policy**, give the **Insurer** written notice as soon as practicable, of any **Claim** made and brought to the attention of an **Executive**, but in no event later than ninety (90) days after the expiration of the **Policy Year** in which the **Claim** was first made or the expiration of the **Policy Period**.

Section VI.B provides following regarding the insureds' duties and responsibilities in the event of a claim:

    **INSURED'S DUTIES AND RESPONSIBILITIES** – It shall be the duty and responsibility of the **Insured**, as a condition precedent to any coverage under this **Policy**:
        . . .

        2.    not to, except at personal cost, make any payment, admit any liability, settle any **Claims**, assume any obligation, or incur any expense without the **Insurer's** written consent, which consent shall not be unreasonably withheld;
        . . .

Section VI of the "General Terms and Conditions Applicable to all Coverage Parts of the Policy" provides as follows:

    A.      **DEFENSE OF CLAIMS** – The **Insurer** does not assume any duty-to-defend and contest any **Claim** made against them, provided that:

        1.    the **Insurer** will have the right to participate with the **Insured** in the investigation, defense and settlement, including the negotiation of a settlement of any **Claim** that appears reasonably likely to be covered in whole or in part by **Coverage Part** and the selection of appropriate defense counsel;

Rikke Dierssen-Morice, Esq.
April 24, 2017
Page 13

2.     the **Insurer** may establish and provide to counsel for the **Insured** guidelines for the handling of **Claims** covered under this **Policy** as a condition of the **Insurer's** obligation to pay **Defense Expenses**, counsel for the **Insured** shall adhere to the guidelines provided by the **Insurer** in the defense of such **Claims**. The **Insurer** shall not be obligated to pay **Defense Expenses** that have been incurred without observance of the guidelines, or that otherwise are unreasonable; and

3.     upon written request, the **Insurer** will advance **Defense Expenses** with respect to such **Claim**. Such advance payments by the **Insurer** will be repaid to the **Insurer** by the **Insureds** severally according to their respective interests in the event and to the extent that the **Insureds** are not entitled to payment of such **Defense Expenses**. As a condition of any payment of **Defense Expenses** under this subsection, the **Insurer** may require a written undertaking on terms and conditions satisfactory to the **Insurer** guaranteeing the repayment of any **Defense Expenses** paid to or on behalf of any **Insured** if it is finally determined that any such **Claim** or portion of such **Claim** is not covered.

B.     **INSURED'S DUTIES AND RESPONSIBILITIES** – It shall be the duty and responsibility of the **Insured**, a condition precedent to any coverage under this **Policy**:

1.     to grant to the **Insurer** the right to associate itself in defense and settlement of any **Claim** that appears reasonably likely to involve the **Insurer**;

2.     not, except at personal cost, make any payment, admit any liability, settle any **Claims**, assume any obligation or incur any expense without the **Insurer's** written consent, which consent shall not be reasonably withheld;

3.     to assert all appropriate defenses and to take all steps in defense of any **Claim** made, including but not limited to, releasing to the **Insurer** all copies of reports, investigations, pleadings and other papers as soon as reasonably possible and to provide the **Insurer** with such information, assistance and cooperation as the **Insurer** may reasonably request to determine the existence or extent of the **Insurer's** obligation; and

4.     to conduct all matters relative to any **Claim** or **Potential Claim** as if coverage under this **Policy** were not otherwise afforded, including but not limited to not admitting any liability for, settling any **Claim**, or incurring any **Defense Expenses** without the prior written consent of the **Insurer**, which consent shall not be unreasonably withheld.

C.     **ALLOCATION** – If there is a **Claim** under any **Coverage Part** in which the **Insured** incurs an amount consisting of both covered **Loss** and uncovered loss because such **Claim** includes both covered and uncovered matters or covered and

Rikke Dierssen-Morice, Esq.
April 24, 2017
Page 14

uncovered parties, the **Insured** and the **Insurer** agree to use their best efforts to determine a fair and proper allocation of all such amounts.  In making such a determination, the parties will take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and settlement of the **Claim** by the **Insured Persons**, the **Company**, and others not insured under the applicable **Coverage Part**.  In the event that an allocation cannot be agreed to, then the **Insurer** will be obligated to make an interim payment of the amount of **Loss** which the parties agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of the applicable **Coverage Part** and applicable law.

D.    **ARBITRATION** – If the **Insured** and the **Insurer** cannot agree on an allocation of **Defense Expenses**, if requested by the **Insured**, the **Insurer** shall submit the allocation dispute to bind arbitration.  In such case:

1.    no presumption as to allocation shall exist in any arbitration, suite or other proceedings; and

2.    the **Insurer**  shall advance on a current basis **Defense Expenses** which the **Insurer** believes to be covered under this **Policy** until a different allocation is negotiated, arbitrated or judicially determined.

The rules of the American Arbitration Association shall apply except with respect to the selection of the arbitration panel.  The arbitration panel shall consist of one arbitrator selected by the **Insured**, one arbitrator selected by the **Insurer**, and a third arbitrator selected by the first two arbitrators.  In any such arbitration each party will bear its own legal fees and expenses.  Any negotiated, arbitrated or judicially determined allocation of **Defense Expenses** will be applied retroactively to all **Defense Expenses**, notwithstanding any prior advancement to the contrary.  Any allocation or advancement of **Defense Expenses** shall not apply to or create any presumption with respect to the allocation of other **Loss** arising from such **Claim** or any other **Claim**.

## COVERAGE DETERMINATION

Yellowstone seeks coverage under the Policy for the SEC Investigation.  It seeks this coverage both directly on its own behalf and based upon its indemnification for the expenses of the six individuals.

Wesco has determined that the Policy provides no coverage for Karen Steighner, because she is not an "insured person" under the Policy.

With respect to Yellowstone and the five individuals other than Ms. Steighner, Wesco has determined that they are insureds under the Policy, but the SEC Investigation does not implicate any Policy coverage for them.  Without waiving this no-coverage determination, and subject to the specific and general reservations of rights described below, Wesco will advance, on an interim

Rikke Dierssen-Morice, Esq.
April 24, 2017
Page 15

basis, certain qualifying defense expenses to Yellowstone and these five individuals.  This interim agreement to advance defense expenses does not apply to Karen Steighner.

## I.     There is no Policy coverage for Karen Steighner

An "insured person" is defined under the Policy to mean any "Executive or Employee."  An "employee" is defined, in turn, to expressly exclude independent contractors.  ("Employee means any natural person whose labor or service was, is or shall be engaged and directed by the Company including full-time, part-time, seasonal, leased and temporary employees as well as volunteers.  Employee shall not include any Independent Contractor.").

You have represented to Wesco that Ms. Steighner was as an "independent contractor" of Yellowstone.  As a result, Ms. Steighner does not qualify as an "insured person" under the Policy, and Wesco has determined that Policy coverage is not implicated with respect to any claim made against her, including but not limited to the SEC Investigation.

You provided a copy of an Independent Contractor Endorsement, which redefines the term "employee" to include an "independent contractor" under certain circumstances.  The effective date of this endorsement, however, is January 5, 2017.  This endorsement is therefore effective for the policy commencing January 1, 2017, but not the Policy at issue in this matter, which has a policy period of January 1, 2016 to January 1, 2017.  You also provided an email string with Yellowstone's insurance agent, stating that the Independent Contractor Endorsement was "effective as of inception."  The Endorsement is effective as of the "inception" of the January 1, 2017 Policy.  It is not effective as of the inception of any prior policy, including the January 1, 2016 Policy at issue in this matter.  As a result, Wesco's determination that Ms. Steigner is not an "employee" and "insured person" under the Policy is not affected by this endorsement.

Wesco denies coverage under the Policy for Karen Steighner and does not agree to advance defense expenses, either on an interim basis or on any other basis.[3]

## II.     There is No Policy coverage for amounts Yellowstone or the insured persons refunded to clients, and there is no Policy coverage for attorneys' fees and other expenses incurred by them that are related to those refunds

The Self-Report states that Yellowstone had refunded or was about to refund $5,281,585.46 to customers.  Yellowstone has also stated that it incurred counsel fees and other expenses in investigating this overbilling, preparing the Self-Report, and administering the reimbursements.

Neither Yellowstone nor any of the individual insureds have requested Policy coverage for any portion of these customer refunds or any related expenses.  In order to confirm that no such coverage was sought, you represented to Wesco in writing, on behalf of Yellowstone and all individual insureds, that neither Yellowstone nor any of the individual insureds are seeking Policy coverage for (1) the $5,281,585.46 referenced in the Self-Report; (2) any other amounts that may

---

[3] In addition to not being an insured under the Policy, Wesco has determined that all no-coverage determinations in Sections II, III, IV and V apply as a basis to deny coverage under the Policy for Karen Steighner, and the reservations of rights contained in Section VI of the Policy likewise apply to Karen Steighner.

Rikke Dierssen-Morice, Esq.
April 24, 2017
Page 16

have in the past or may in the future be refunded to clients; and (3) attorney fees or other costs related to investigation costs of customer billing, costs related to the Self-Report, costs related to making the refunds, or other related costs.

### III.    The Improper Financial Gain Exclusion

Both the D&O Coverage Part and the Professional Liability Coverage Part contain the following exclusion:

> The **Insurer** shall not be liable to pay any **Loss** in connection with **Claim** made against any **Insured** arising from, based upon, or attributable to:
>
> 1.    The gaining of any profit, remuneration or pecuniary advantage to which such Insured is not legally entitled….
>    ….
>    as evidenced by a final adjudication by a judge, jury or arbitrator in any proceeding.

This exclusion applies where a claim arises out of or is based upon the insured obtaining an actual monetary or financial gain to which it was not entitled.  In the event the court in a declaratory judgment action determines that the SEC Investigation constitutes a "claim" (and Wesco reserves all of its rights in this regard) application of the exclusion is clear.  Yellowstone's Self Report admits that it obtained in excess of $5,000,000.00 in fees from customers to which it was not entitled, it refunded those fees to the customers, and the SEC Investigation arises out of the improper taking of customer fees.

Despite the clear application of this Policy exclusion to the facts presented, the exclusion requires a "final adjudication by a judge, jury or arbitrator in any proceeding" before the exclusion can be invoked.  Wesco therefore reserves all of its rights under this exclusion.

### IV.    The D&O Coverage Part

*A.    Initial Elements of Coverage*

The Policy's D&O Coverage Part includes three separate insuring agreements.  Because Yellowstone confirmed that it has agreed to indemnify each of the affected individuals, coverage (if any) for these individuals would fall under Insuring Agreement B, rather than Insuring Agreement A.  Coverage (if any) for the entity would be under Insuring Agreement C.1.  Although these two agreements include certain elements that are separate and distinct to their respective coverages, they both require that there be a "Claim" against the insured for a "Wrongful Act" in order for coverage to apply.  A "Claim" is defined under the D&O Coverage Part to include "service of a subpoena on an Insured Person identified by name if served upon such person pursuant to a formal investigative order by the Securities and Exchange Commission . . . against an Insured for a Wrongful Act."  A "Wrongful Act" is defined to mean any actual or alleged: (1) "error, omission, misstatement, misleading statement, neglect or breach of duty by Insured Persons in their capacity as such or, with respect to Insuring Agreement C., by the Company" or (2) "matter claimed against the Insured Person solely by reason of their serving in such capacity."

Rikke Dierssen-Morice, Esq.
April 24, 2017
Page 17

Wesco has determined that no "claim" for a "wrongful act" has been asserted against the Yellowstone entity.  The definition of "claim" discussed above provides coverage only for the "services of a subpoena *on an insured person*."  The Policy does not extend coverage to a subpoena served on the insured *entity*.  You state that the Yellowstone entity may be covered by subsection 4 of the definition of "claim," which includes "a formal administrative or regulatory proceeding commenced by a filing of a notice of charges, formal investigative order, service of summons, or similar document."  At this point in time, however, there is no "formal administrative or regulatory proceeding" that has been commenced, only an investigation that either will or will not result in a formal proceeding.  Wesco has determined that coverage is not triggered under the D&O Coverage Part with respect to Yellowstone.

A.     *Securities Exclusion*

Although Wesco has determined that coverage for five of the six individual employees may be initially triggered under the D&O Coverage Part, any such coverage for the individual employees remains subject to the exclusions stated in Section V.  One of the exclusions contained in Section V.A., which is applicable to all insuring agreements, is the D&O Coverage Part's securities exclusion.  The securities exclusion generally precludes coverage for any claim arising from, based upon, or attributable to "the violation of any . . . statute relating to securities."  Unlike other exclusions contained in the D&O Coverage Part, the securities exclusion does not require that a violation of statute be proven "in fact" or be "evidenced by a final adjudication" prior to applying. The provision's introductory phrase, "arising from," gives the exclusion a broad reach.

It is undisputed that the SEC Investigation in this matter arises from, is based upon, or is attributable to violations of federal statutes relating to securities.  In tendering this matter for coverage, all five reporting individuals expressly stated that the SEC's investigation "arises from certain alleged wrongful acts referenced in the Formal Order in connection with the possible violations of the Securities Act of 1933 and the Securities Exchange Act of 1934."  Yellowstone similarly stated that the SEC's investigation arises from "alleged wrongful acts in connection with the possible violations of the Investment Adviser Act of 1940, the Securities Act of 1933 and the Securities Exchange Act of 1934."  Wesco has therefore determined that the Securities exclusion is applicable to this matter, and that accordingly there is no coverage under the D&O Coverage Part.

The SEC's Formal Order and description of its investigation provides further support for Wesco's determination.  In its cover letter accompanying the subpoenas, the SEC states that it is "trying to determine whether there have been any violations of the federal *securities laws*."  More specifically, the Formal Order authorizing the SEC's investigation states that the SEC has information that tends to show possible violations of Sections 206(1) and 206(2) of the Investment Advisers Act of 1940.  This Act is a federal statute that applies to and regulates the conduct of persons who engage in the business of advising others about securities.  *See* 15 U.S.C. § 80b-2(11) (defining "investment advisers" subject to Act).  The authority to enforce and interpret the Act is vested in the Securities and Exchange Commission.  *See* 15 U.S.C. § 80b-9, § 80b-11.  It is also clear that the SEC treats the Investment Advisors Act as a "statute relating to securities."  In fact, the SEC's December 19, 2016 amendment of the Formal Order describes its investigation in this matter as being "based upon possible violations of the provisions of the federal securities laws." Wesco has therefore determined that coverage for the SEC Investigation in this matter is barred

Rikke Dierssen-Morice, Esq.
April 24, 2017
Page 18

by the D&O Coverage Part's Securities exclusion, and it respectfully denies coverage on this basis.[4]

## V.      The Professional Liability Coverage Part

### B.      *Initial Elements of Coverage*

Under the Professional Liability Coverage Part, Yellowstone purchased only the insuring agreement for Professional Services Liability.  Subject to the other terms and conditions of the Policy, that agreement provides coverage for "Loss resulting from a Claim . . . by or on behalf of a customer of the Company for a Wrongful Professional Services Act."  As modified by the Investment Advisor endorsement, the term "Claim" is defined to include "a notice of investigation of violation(s) of law or regulation . . . against an Insured by any governmental body . . ., but only if the investigation of violation(s) of law or regulation . . . were initiated by a complaint by the Insured's customer or client or former customer or client, arising from the Insured's rendering or failure to render Professional Services for that customer or client or former customer or client."  The term "Professional Services" is modified to mean "services rendered for or advice given to others by an Insured for a fee, remuneration, Pro Bono or other consideration in an Insured's practice as a Financial Advisor" or "services performed in the capacity of a fiduciary pursuant to ERISA."

These modifications by the Investment Advisor endorsement allow coverage for certain regulatory investigations into potential violations of law.  But they do not provide coverage for the SEC Investigation at issue here, because of the failure to satisfy several of the insuring agreement's requirements for coverage:

- First, although this matter involves an "investigation of violations of law . . . by [a] governmental body," the investigation is not one that was "initiated by a complaint by the Insured's customer or client."  The SEC has an established process by which customers can submit complaints online, and the SEC can then decide to open an investigation or inquiry into such complaints.  But there is no indication that a complaint was submitted to the SEC in this case, or that the SEC commenced its investigation on the basis of such a

---

[4] In a prior email, Yellowstone argued that this securities exclusion does not apply here.  Yellowstone pointed out that the exclusion is titled "Securities Offering," and that no "offering" of securities occurred here.  But the title is irrelevant and does not override the exclusion's plain language.  *See, General Conditions, Section XI.M* ("Descriptions in the headings and sub-headings of this Policy are inserted solely for convenience or reference and form no part of the terms and conditions of coverage").  The plain language of the exclusion excludes coverage for securities "offerings" in sub-section (a), but then goes on to *also* exclude violations of any securities laws in sub-section (b).  If the exclusion were read as applicable only to security offerings, this would either render sub-section (b) completely meaningless or effectively replaces the "or" with an "and" between (a) and (b).  The fact that the exclusion goes on to allow for the re-purchase of coverage for securities offerings under some circumstances is also not persuasive.  There is nothing unusual about an insurer offering the opportunity to remove part of an exclusion for an additional premium, but continuing to maintain another part of the exclusion.  Yellowstone also argues that the exclusion does not apply because the SEC Investigation not only concerns "securities" but also includes "all client assets under management."  But the exclusion does not require that an investigation be based on or limited to securities.  It excludes any claim arising from, based upon or attributable to the violation of any "statute relating to securities."  The only statutes referred to in the SEC Investigation documents are potential violations of securities laws.  Indeed, the SEC's jurisdiction is limited to enforcement of securities laws.

Rikke Dierssen-Morice, Esq.
April 24, 2017
Page 19

complaint.  All of the information provided by the insureds indicates that the investigation was initiated instead as a result of Yellowstone's Self-Report or employee whistleblowing. As such, the SEC's investigation does not satisfy the definition of "claim" under the Professional Liability Coverage Part.

- Second, even if the SEC's investigation could be said to have been initiated by a customer complaint, it still would not have been initiated by a complaint "arising from the Insured's rendering or failure to render Professional Services for that customer or client."  All of the potential violations described in the SEC's Formal Order of investigation relate to Yellowstone's billing practices and the overbilling of client fees.  There is no indication that the SEC is inquiring into the services or advice provided by Yellowstone's financial advisors.  The SEC's investigation therefore fails to satisfy the definition of "claim" for this reason as well.

- The SEC Investigation also fails to satisfy another essential requirement of the Professional Services Liability insuring agreement: that there be a claim "by or on behalf of a customer of the Company."  Here, the SEC Investigation is clearly not a claim "by" a customer.  Nor is there any indication that the SEC Investigation is being conducted "on behalf of" a customer.

- Finally, the SEC Investigation also fails to satisfy the requirement of a claim "for a Wrongful Professional Services Act."  The investigation appears to be focused on the overbilling of client fees, not on any erroneous advice or improperly performed services. There are also no facts indicating that the affected accounts were subject to ERISA or that Yellowstone was performing services in its capacity as an ERISA fiduciary when calculating and collecting the fees in question.

Wesco has therefore determined that the requirements for coverage under the insuring agreement for Professional Services Liability have not been met, and that Yellowstone and the individuals are not entitled to coverage under the Professional Liability Coverage Part.

B.      *Fee Dispute Exclusion*

Wesco has further determined that coverage under the Professional Liability Coverage Part is excluded by that part's "Fee Dispute" exclusion.  Pursuant to Section III.C of the Professional Liability Coverage Part, Wesco shall not be liable under the insuring agreement for Professional Services Liability for "Loss in connection with any Claim . . . arising from, based upon, or attributable to any disputes over fees, commissions, or charges for the Company's services."  The phrase "arising from," used in this exclusion, is a broad-reaching concept, and is not limited to claims directly based upon the object of that phrase.

This matter arises from, is based upon, or is attributable to disputes over fees, commissions, or charges for the Company's services.  The SEC's Formal Order of investigation states that it is investigating possible statutory violations relating to the overbilling of fees to client accounts. Yellowstone's earlier Self-Report to the SEC also describes potential violations relating to the early billing and overbilling of Yellowstone's annual advisor fee.  The SEC's investigation is

Rikke Dierssen-Morice, Esq.
April 24, 2017
Page 20

therefore based upon or at least arises from a dispute over fees or charges for the Company's services, and the Fee Dispute exclusion is applicable to this matter. Accordingly, Wesco respectfully denies coverage for the SEC Investigation under the Professional Liability Coverage Part.

## VI.    The Reservations Applicable to Both Coverage Parts

There are several other provisions of the Policy that may exclude or limit coverage for this matter under both the D&O Coverage Part and the Professional Liability Coverage Part. Wesco reserves its rights with respect to the following issues:

(a) **Exceptions to "Loss":** The definition of covered "loss" does not include any of the following: civil fines or penalties; the costs to comply with any non-monetary or injunctive relief; and any restitution, disgorgement, or payment of similar payments. In the event the SEC issues an order imposing civil monetary penalties, restitution, or an order of prohibition in this matter, such relief would not be covered under the Policy. Wesco therefore reserves its rights under this provision.

(b) **Admission of Liability:** Section VI.B of the Policy provides that "It shall be the duty and responsibility of the Insured, as a condition precedent to any coverage under this Policy . . . not to, except at personal cost, make any payment, admit any liability, settle any Claims, assume any obligation, or incur any expense without the Insurer's written consent, which shall not be unreasonably withheld." Here, Yellowstone's Self-Report may constitute an admission of liability within the meaning of this provision. Wesco therefore reserves its rights in this regard.

(c) **Prior Knowledge Exclusion:** The Policy excludes coverage for any claim arising from, based upon, or attributable to any fact, circumstance, situation, or event that is or reasonably would be regarded as the basis for a Potential Claim about which any Executive had knowledge prior to the date of the initial application for coverage. A Potential Claim is defined to mean any wrongful act that may subsequently give rise to a Claim. Here, Mr. Hansen and other executives knew in 2015 of at least three client accounts that had been overbilled. These facts might be reasonably regarded as the basis for a potential claim against the insured, and were known prior to Yellowstone's initial application for insurance. Wesco therefore reserves its rights under this exclusion.

(d) **Prior Notice Exclusion:** The Policy excludes coverage for any claim arising from, based upon, or attributable to any wrongful act or any fact, circumstance, or situation that has been the subject of notice to another insurer. Here, Yellowstone may have provided notice of a claim or a notice of circumstances to its prior insurer, AIG, when it discovered issues with several client accounts in 2015. Wesco therefore reserves its rights under this exclusion.

(e) **Fraud Exclusion:** The Policy excludes coverage for any claim arising from, based upon, or attributable to any fraudulent or criminal wrongful act with actual knowledge of its wrongful nature or with intent to cause damage by the insured. The SEC Formal

Rikke Dierssen-Morice, Esq.
April 24, 2017
Page 21

Order recites that Yellowstone, as well as certain of its officers, directors, employees or others may have defrauded clients or engaged in transactions or practices which operated as a fraud or deceit upon clients. The fraud exclusion requires that the fraudulent conduct is "evidenced by a final adjudication by a judge, jury or arbitrator in any proceeding." Wesco reserves its rights under this exclusion.

(f)   **Other Insurance:**  The Policy provides that its coverage is generally excess to any other valid and collectible insurance available to the insured. The D&O Coverage Part also provides that its coverage is excess to any indemnification to which an insured person is entitled to from any entity other than the company. As described above, Yellowstone may have provided notice of a claim or a notice of circumstances to its prior insurer, AIG, when it discovered issues with several client accounts in 2015. Several of the individuals may also be employed by, and entitled to indemnification from, the LLCs that hold membership units in the Yellowstone entity. Wesco therefore reserves its rights under these provisions.

## VII.    DEFENSE EXPENSES

Subject to the specific reservations of rights stated above and subject to a general reservation of rights, Wesco will reimburse certain defense expenses with respect to the SEC Investigation on an interim basis. That reimbursement will be subject to the applicable $25,000.00 retention and $2,000,000.00 limit of liability, and subject to Wesco's right to obtain a refund of all such advanced defense expenses in a declaratory judgment action. By agreeing to reimburse defense expenses under this reservation of rights, Wesco is not admitting that any legal duty to reimburse defense expenses exists or ever existed with respect to this matter.

Pursuant to Section VI.A.3 of the General Terms, Yellowstone and the insureds are severally responsible to Wesco for the refund of any defense expenses advanced, and Wesco is requiring, as a condition of any payment of any defense expenses, a "written undertaking on terms and conditions satisfactory to [Wesco] guarantying the repayment of any defense expenses" when it is "finally determined that any such Claim or portion of such Claim is not covered." The required form of guaranty accompanies this coverage position letter.

Please provide to us information regarding the lawyers that the insureds have selected to defend them in this matter, including their experience in matters of this kind, the specific individuals who would be responsible for defense of this matter, and those lawyers' per-hour rates. Wesco will then evaluate whether to consent to the representation. The lawyers will also be required to abide by Wesco's defense counsel guidelines, which are referenced in Section VI.A.2 of the Policy's General Terms, and are enclosed herewith.

Wesco's reimbursement of defense expenses does not require Wesco to make any settlement offers or satisfy any judgments on the insureds' behalf. Wesco reserves the right to deny coverage for defense or indemnity at any time and to withdraw from reimbursing defense expenses. Wesco's position is that it is under no contractual or legal obligation to reimburse defense expenses or provide any indemnity for this matter under the Policy.

Rikke Dierssen-Morice, Esq.
April 24, 2017
Page 22

### SUMMARY OF COVERAGE POSITION AND RESERVATION OF RIGHTS

As described more fully above, Wesco has determined that Karen Steighner is not an "insured person" under the Policy and denies all Policy coverage for her.

With respect to Yellowstone, and the other five individuals who do qualify as "insured persons" under the Policy, Wesco has determined that there is no Policy coverage for the SEC Investigation.  Without waiving this no-coverage position, Wesco agrees to reimburse defense expenses, on an interim basis, under the specific and general reservations of rights stated herein. Wesco reserves the right to commence a declaratory judgment action in order to confirm its no coverage position and in order to obtain a refund of any defense expenses advanced to any of the insureds.

Wesco reserves the right to reconsider and amend any coverage position described in this letter if it becomes aware of new or different facts, or if warranted by ongoing developments in this matter.  Please let us know if you believe any facts or conclusions reached in this coverage position letter are inaccurate, of if there are additional facts and circumstances you wish to bring to Wesco's attention for purposes of evaluating coverage of this matter.

Wesco reserves all rights and defenses pursuant to Policy, and at law or equity, and does not waive any of them.  Wesco has not made all coverage position arguments available to it within this correspondence.  Wesco expressly reserves all rights to make additional arguments and take additional coverage positions as it deems appropriate.  No statements made herein constitute an admission by Wesco of liability or other admission against interest regarding the underlying matters or relating to coverage.

Very truly yours,

Joanne Snow
Senior Claims Analyst
Amtrust North America
233 North Michigan Ave. Suite 1200
Chicago, IL 60601
312.577.5351 office
Joanne.Snow@amtrustgroup.com

cc:    Loren Washburn, Esq.
       Richard Van Wagoner, Esq.
       Brennan H. Moss, Esq.

April 24, 2017

Yellowstone Partners, LLC; David H. Hansen, Richard K. Baird, Paul Wiemer, Michael G. Dustin, KayLynn Dalebout; and Karen A. Steighner (each, a "Signatory," and collectively, the "Signatories") hereby confirm and agree as follows:

That Wesco Insurance Company, ("Wesco") issued to Yellowstone Partners, LLC Policy No. WDO1429740 00 (the "Wesco Policy);

That the Signatories purport to be Insureds under the Wesco Policy;

That the Signatories have provided notice to Wesco under the Wesco Policy of a Securities and Exchange Commission investigation, pursuant to the SEC's order of investigation dated November 21, 2016 (the "SEC Investigation");

That Wesco has denied Policy coverage for the SEC Investigation, but has agreed, on an interim basis, to reimburse certain defense expenses pursuant to specific and full reservations of rights and pursuant to a right to seek reimbursement of all defense expenses advanced.

That Section VI of the "General Terms and Conditions Applicable to all Coverage Parts of the Policy," at Section VI.A.3 provides:

> As a condition of any payment of **Defense Expenses** under this subsection, the **Insurer** may require a written undertaking on terms and conditions satisfactory to the **Insurer** guarantying the repayment of any **Defense Expenses** paid to or on behalf of any **Insured** if it is finally determined that any such **Claim** or portion of such **Claim** is not covered.

That each Signatory hereto hereby guarantees the repayment of any Defense Expenses paid to or on behalf of any Insured if it is finally determined that any such claim or portion of such claim is not covered.  This repayment obligation by each Insured shall be effective severally, accordingly to their respective interests.

That this Undertaking may be executed in any number of counterparts each of which, when executed and delivered, shall be deemed an original and all of which together shall constitute but one and the same agreement. Signatures obtained by facsimile or e-mail shall be deemed to be an original signature.

Date:_____

**YELLOWSTONE PARTNERS, LLC**

By_____

Its_____

Date:_____                    _____
                                      David H. Hansen


Date:_____                    _____
                                      Richard K. Baird


Date:_____                    _____
                                      Paul Wiemer


Date:_____                    _____
                                      Michael G. Dustin


Date:_____                    _____
                                      KayLynn Dalebout

**AmTrust Counsel**
**Litigation Management Guidelines**

# Table of Contents

Introduction ………………………………………… 3

Assignment ………………………………………… 4

General Case Handling ………………………………………… 6

Reporting ………………………………………… 10

Trials ………………………………………… 12

Billing ………………………………………… 13

Administrative Matters ………………………………………… 14

Authorized Vendors and Experts ………………………………………… 15

# AMTRUST COUNSEL
# LITIGATION MANAGEMENT GUIDELINES

In the event that a lawsuit is commenced against a policyholder, AmTrust is committed to providing professional, responsive legal services to our insureds. Establishing and maintaining effective relationships with defense counsel and a strong, collaborative relationship with our insureds will lead to the best possible outcome in an efficient and cost conscious manner, consistent with counsel's legal and ethical obligations. Ultimately, these guidelines are intended to strengthen the relationship between our insureds, claims adjusters and defense counsel, which translates into a higher level of service for our customers. This strong relationship leads to the best possible outcome of each litigated matter. We designed these Guidelines to provide a framework for this relationship.

The primary obligation of defense counsel is to provide its client with a fully competent legal defense. Counsel is to keep us apprised of all developments and we require consultation on all critical decisions, as detailed in these Guidelines.

Counsel enters into this agreement and accepts these Guidelines subject to all of the prevailing ethical obligations that exist under applicable laws and rules of professional conduct. In the event of a conflict between these Guidelines and counsel's ethical obligations, the existence of which is to be determined by the attorney, then the attorney's duties under applicable laws, ethical obligations and/or rules of professional conduct, as determined by the attorney, supersede these Guidelines. Subject to such laws, obligations and/or rules, we expect that counsel will timely advise us of any such issues. Indeed, nothing herein shall restrict counsel's exercise of professional judgment in the rendering of legal services to its client.

The execution of an effective and strategically sound legal defense is the responsibility of counsel in consultation with us, and it should be developed in a timely manner. The goal is to engage in all activities necessary to advance the litigation and achieve an appropriate conclusion.

Both Counsel and AmTrust are charged to identify cases for which there is liability against the insured in order to discuss any opportunity for prompt and proper resolution. Alternate avenues of resolution are to be considered during the course of representation.

If fraud is suspected from any source whatsoever, you are expected to report your concerns to us and, if applicable, to the relevant governing authority.

It is expected that you will act to protect the information that you receive against cyber-attack or breach and will implement all means necessary to protect the information received in the course of your representation of your client. We expect that you will take appropriate acts to protect the privacy rights of anyone in need of protection against cyber fraud and/or identity theft.

In the event of a data breach, it is required that you will immediately notify the Claims Manager of the referring branch.

Please note that to the extent your firm has not followed these Guidelines with respect to the cases you are presently assigned, please bring your practices and procedures into compliance.  A copy of these Guidelines must be circulated to all attorneys who work on AmTrust matters.  It is also essential that you use AmTrust-approved report formats to the extent they apply.  Templates for the reports are included in the e-mail communication.

## Assignment and Initial Handling

1.     Counsel is required to complete a conflict of interest review immediately upon receipt of any assignment.  Counsel is to affirmatively confirm, in writing, that no conflicts exist and that the firm is able to handle the assigned matter.  Counsel must continue to review for conflicts throughout the pendency of the matter.  Any identified conflict must be immediately reported to the claims adjuster.  Any waiver of a conflict must be approved by the Claims Manager or a Vice President of Claims.

2.     The law firm must designate one attorney to have primary responsibility for each case for which your services are retained. AmTrust expects that the staffing of each case will follow a model of one partner, one associate and one paralegal.  Duplication of effort on any task or activity on a given assignment within the firm should be avoided. If a specific matter calls for resource needs outside of this model, any deviation should be pre-approved by the claims adjuster and confirmed in writing.

It is understood that most cases involve less demanding tasks that can be handled more economically by others (i.e., paralegals or associates) without compromising quality.   AmTrust supports Counsel's responsible delegation of these tasks to subordinates whenever possible to achieve efficiency and cost-effectiveness.   We believe that non-legal activities and tasks should be appropriately delegated to secretaries, clerks and other support staff in your office.

All attorneys working on AmTrust cases must be previously approved of by us, and if not, a request must be made to do so.  We require that any attorney working on AmTrust cases must have his or her *curriculum vitae* (or similar document conveying qualifications and background material) on file with us.

3.     At the onset of the attorney-client relationship, Counsel must advise your client to preserve all potential, relevant evidence, which includes, but is not limited to, any tangible property, documents (paper and electronic), and electronic data.   Where relevant, Counsel must advise the client to suspend any normal document destruction policy that may cause paper or electronic documents to be discarded or deleted.

Counsel must be familiar with the governing rules pertaining to electronic data discovery, which includes the preservation, discovery and disclosure of, *inter alia*: relevant e-mails; voice mails; databases; electronic documents; financial applications; calendars; and, all other data sources containing information including any and all back-up tapes and mirror sources.  If any electronic data discovery issues arise in

litigation, counsel must immediately notify the claims adjuster, Claims Manager and Vice President, Claims at cac@amtrustgroup.com

4.      Within three (3) days of receipt of the assignment, the assignment partner is to send an acknowledgment of representation, which is to be copied to your client.  This letter should provide, *inter alia*, the name and contact information of the assignment partner, and if relevant, the primary handling attorney.

5.      If upon assignment, you recommend immediate action, such as the filing of a pre-answer motion, removal to a different venue, or other time sensitive strategy, it is incumbent upon you to contact the claims adjuster to discuss the issue(s) immediately to avoid procedural bars.

6.      Within ten (10) days of receipt of the initial file, regardless of the information available, the handling attorney is to conference the matter with the claims adjuster.

7.      Within thirty (30) days of receipt of the case, the handling attorney is to submit a litigation action plan, *i.e.*, an initial evaluation, analysis and strategy concerning the case. The recommended action plan should be submitted only after conferencing the matter with the claims adjuster.  Thereafter, the litigation action plan and defense strategy should be updated as the case proceeds.[1]

The action plan should include, *inter alia*, a recommendation as to whether any dispositive motions should be considered, a list of the investigation and discovery required to fully analyze liability and damages, whether any non-medical experts should be retained, whether a medical records and/or diagnostic film review should be performed, exit strategy and the estimated fees and costs of handling the case up to, but not including, trial.

Counsel should also include your impressions of the client from an in-person meeting or telephone interview, any site inspection of the accident scene, and an evaluation of the information, contracts, records and/or documents provided by your client.  We strongly recommend that for all premises liability cases and certain others, the handling attorney visit the accident location within ten (10) days of receipt of the assignment. A face-to-face meeting with your client is strongly preferred but not mandated. Concerning the client interview and site inspection, this should occur as soon as possible after the assignment so as to capture the most current information.

A litigation budget, which includes all recommended actions, should accompany the Litigation Action Plan.

Please note that if the assignment is narrow in scope (*e.g.*, a limited research project, legal opinion, minor's settlement hearing, defense of a small claims hearing), a simple acknowledgement is more appropriate than a detailed initial report.

---

[1]      For construction defect cases, the handling attorney is to submit the initial claim evaluation, which includes a litigation action plan, within forty-five (45) days of receipt of the case.

8.      Counsel should provide us copies of their client's answer and discovery and copies of all other parties' pleadings.  When other parties cross- or counter-claim against your client, you should immediately advise us and provide us with copies of those pleadings. Likewise, any written demands for defense, indemnification and/or insurance coverage from your client (and/or AmTrust) must be immediately forwarded to us.

9.      As soon as counsel receives any discovery responses, (*e.g.*, response to interrogatories and/or production of documents, the bill of particulars, *etc.)* from any party, please provide us with copies along with your brief summary impression of how it impacts the case.

## General Case Handling

1.      Please provide electronic (and only electronic) copies of documents to the AmTrust claims adjuster, preferably as attachments to an e-mail.  This expedites delivery time, increases our mutual efficiency, and allows the recipient to perform "word searches" within the electronic document.  Attachments should be in Microsoft Word, Excel, or PDF formats, or in formats that are readable by these programs, without requiring the recipient to perform conversions of the attachments.

All communications from counsel must reference our full claim number (xxxxxx-x or xxxxxxx-x), and the claims adjuster, plaintiff's name, client's name, venue, date of loss and your file number.  All e-mail correspondence must include our claim number and your client's name in the subject line.

Based upon the assigned adjuster's location, please use the corresponding contact information to send correspondence and documents to us:

| Office | E-mail Address |
| --- | --- |
| Boca Raton, FL | flmail@amtrustgroup.com |
| Buffalo, NY | albmail@amtrustgroup.com |
| Concord, CA | conclaims@amtrustgroup.com |
| Chicago, IL (PL) | chiamtrustspecialty@amtrustgroup.com |
| Chicago, IL | dallasclaimsmail@amtrustgroup.com |
| Dallas, TX | dallasclaimsmail@amtrustgroup.com |
| Ft. Lauderdale, FL | flmail@amtrustgroup.com |
| Irvine, CA | conclaims@amtrustgroup.com |
| Jersey City, NJ | albmail@amtrustgroup.com |
| Maitland, FL | flmail@amtrustgroup.com |
| Melville, NY | albmail@amtrustgroup.com |
| Monterrey, CA | conclaims@amtrustgroup.com |
| Newtown, PA | albmail@amtrustgroup.com |
| Southington, CT | albmail@amtrustgroup.com |

2.      During the course of litigation, Counsel must provide copies of all substantive documents that affect the case, including but not limited to contracts, medical,

employment, tax, educational/school, workers' compensation, benefits and social security records; deposition reports and transcripts; witness statements; and, demonstrative evidence.  Also, we require duplicate originals or color reproductions of all photographs produced by all parties.

3.      If the initial discovery responses (*e.g.*, response to interrogatories or demand for documents, bill of particulars, *etc.*) are not received within the shortest time allowed under the applicable procedural rules, a letter demanding same should be sent.  If relevant, and unless agreed otherwise with the claims adjuster, the appropriate discovery motion should be made within the shortest time pursuant to the applicable court rule.  As with all other motions, Counsel must provide us with a copy.

In the event a demand for e-discovery is made, or demand for preservation electronic data, or other electronic data discovery issue arises in litigation, Counsel must immediately notify the claims adjuster and the Claims Manager, as well as send notification to CAC@amtrustgroup.com).

4.      We require a copy of the court's initial discovery or case management order, and all other court orders, decisions and stipulations entered into.

5.      Counsel should not proceed with depositions, unless they have received and reviewed all relevant disclosure and complete records (especially, medical, employment, tax, educational/school, worker's compensation, social security records, reports and diagnostic films) through discovery and investigation requested.  Counsel is expected to verify in advance of depositions the availability of their client for deposition.  In the event there is an issue producing your client for deposition, we must be timely notified of the reason.

6.      Generally, all witnesses, including but not limited to those identified by any party in discovery and importantly, plaintiff's spouse or domestic partner, are to be deposed.  Preferably, prior to deposing any person, and subject to the governing rules and regulations, as well as prevailing ethical obligations, a statement of the deponent should be obtained as soon as practicable.

7.      We must be advised timely of the need or recommendation for a video deposition along with an estimation of cost.  Similarly, we must be advised promptly of any recommendation to forego deposing a particular witness along with the supportive rationale.  These decisions are to be made in consultation with us.

8.      In any case where summary judgment or a dispositive motion is a possibility, we generally seek judicial redress as soon as possible.  Keep in mind that the decision to seek substantive relief (or not to do so) must be made in consultation with us.[2]  For motions for summary judgment: 1) where there is no liability against the insured; or,

---

Please note that for all cases in New York, we require all dispositive motions to be made no later than thirty (30) days after the placement of a case on the trial calendar or docket, regardless of a later Court deadline, and subject to the rules of the governing jurisdiction.

2) for contractual defense and indemnification, counsel must seek judicial redress as soon as practical, preferably prior to depositions or significant discovery.

If the court denies a dispositive motion, we require counsel to notify us immediately and provide us with a copy of the decision.  If permissible, the attorney should file a timely notice of appeal and provide us with an indication of the allowable time frame. If an immediate or interlocutory appeal is not permitted, counsel must promptly notify the claims adjuster.  Please keep in mind that the decision to finalize an appeal (or to forego it) must be made in consultation with us.[3]

9.     Upon receipt of a motion seeking judgment against your client, a motion seeking to strike the insured's answer or affirmative defense(s), or requests to admit, you must immediately notify and consult with the claims adjuster to formulate a plan of action, which might include settlement discussions.

10.    The claims adjuster must authorize research in excess of three (3) hours.  Counsel's request must indicate the issue(s) to be researched, who will conduct the research, and the established amount of time.  The request should be made in writing.  All research and legal memos must be sent, electronically, to the claims adjuster.  Please note that approval regarding research is separate from approval for a motion.

11.    Counsel should refrain from performing any jury verdict searches, unless we consent to it, and in which case, we will agree to specific search parameters.

12.    Prior to the scheduling of an independent medical examination or the assignment of an expert, please advise the claims adjuster of the doctor or expert you wish to schedule or request the name of an AmTrust-approved physician or expert.  To the extent the physician or expert has not been previously approved by us, please provide a copy of his or her *curriculum vitae*, fee schedule, and we will review it.  In the event the expert is retained, we require an IRS form W-9.

Additionally, prior to the retention of an expert, counsel must review the *curriculum vitae*, perform a background check regarding the professional standing of the expert to ensure their qualifications, and review similar testimony previously provided by this expert to ensure there is no conflict.

We expect that the cost for experts will be shared with other parties, where appropriate, and that the cost will be borne equally.

The decision to forego any independent medical examination must be made in consultation with us.

---

For all New York cases, drafts of all documents pertaining to appeals must be sent, by e-mail, to the claims adjuster, Peter Gannon, Esq. (peter.gannon@amtrustgroup.com) and Lisa Gokhulsingh, Esq. (lisa.gokhulsingh@amtrustgroup.com), unless a conflict of interest exists with the latter.  When transmitting the draft, please indicate the service deadline.  Please send the draft at least ten (10) days before the service deadline to allow ample time for review.

13. Counsel must comply with discovery demands so as to keep motions to compel or preclude against your client to a minimum.  Immediately advise us of any issues or difficulties encountered in conducting any portion of the defense of a case, before motion practice or the expiration of any court ordered deadline.

14. At all critical junctures during the litigation, Counsel should discuss with the claims adjuster the most probable settlement value of the case.  Our standard reports request that information.  Settlement value takes into account, *inter alia*, your client's liability percentage given the relevant case law and statutes, plaintiff's comparative/contributory negligence, liability percentage of other parties, joint and several liability, ability to achieve risk transfer, economic and non-economic damages and venue.  The settlement value is not the potential jury verdict (or the possible range of jury verdicts), but your best estimate as to the amount the client will be responsible to pay to resolve the matter given all facts involved.

   Requests for settlement authority must be timely made in advance of any mediation, ADR session, settlement conference or court proceeding (at which settlement discussions are expected to occur).  If attendance of an AmTrust claims adjuster is mandated at any such proceeding, then you must advise us immediately upon receipt of the appearance request.

15. Identify and implead all other potentially responsible parties.

16. It is your duty to verify the existence of any other insurance coverage for the client in the shortest time possible. Please place on notice any such carrier having a potential interest in the outcome of the litigated matter.  We must be copied on all such correspondence.

17. Counsel must actively seek defense and indemnification and additional insurance coverage on behalf of your client from any identified or potential parties and their carriers.   To that extent, if it is determined that your client is entitled to indemnification, counsel must immediately tender your client's defense and indemnification to the appropriate entity and its insurance carrier and demand their acknowledgment in writing.  Additionally, counsel must immediately demand a copy of that entity's insurance policy.  We must be copied on all such tenders and demands and sent all responses, especially other insurance policies.

18. Prior to depositions, counsel should attempt to resolve all indemnification and additional insured issues.  If a dispositive motion is not feasible, then at the very least, prior to depositions, all other entities from which the client could arguably receive indemnification and/or insurance coverage should be involved in the litigation.  If necessary, counsel should subpoena the insurance policies from other entities, such as the relevant brokers and/or carriers.

19. Significant, case-altering events should be reported orally as soon as practicable to the claims adjuster or, if unavailable, the supervisor or Claims Manager, followed by written notice.  Such communications should not await the actual written report.

20.    Whenever possible, the terms of any settlement should be kept confidential. If possible, this should be addressed with your adversaries before agreeing to a final resolution.  The settlement terms should include non-publication. Counsel is not permitted to discuss or disclose the terms and conditions of any settlement or outcome of any case with any media without the written approval of a Vice President, Claims.

To the extent that extrajudicial statements to the media are permitted by state or federal rules of professional conduct, all media inquiries must be discussed with and all responses approved in advance by AmTrust Corporate Legal.

21.    Prior to any settlement where plaintiff has been identified as a Medicare beneficiary, counsel must communicate with the claims adjuster to obtain required information and identify documents needed to ensure compliance with all Medicare Secondary Payer Act requirements.  This includes ensuring that plaintiff exchanges a completed Final Settlement Detail document, determination of the Medicare lien amount, determination of any future Medicare allocation and utilization of an approved release. Moreover, if a settlement is placed on a court record, the Medicare Secondary Payer Act requirements must be included as part of the settlement record.

## Reporting

1.    The goal of all reporting is to ensure that we are kept informed of any significant development as soon as possible.  These reports should not be a restatement of information contained in prior reports, but rather, they should report on any newly acquired information and how this information affects the case - both factually and legally.  Good reporting anticipates questions and answers them or suggests what may be required to develop the answers.

2.    Within ten (10) days of receipt of the initial file, regardless of the amount of information available, counsel is to conference the matter with the adjuster.

Within thirty (30) days of receipt of the case, regardless of the amount of information available, the handling attorney is to submit a Litigation Action Plan, *i.e.*, an initial case evaluation, providing a recommendation as to whether any dispositive motions should be considered, a list of the investigation and discovery required to fully analyze liability and damages, whether any non-medical experts should be retained, whether a medical records and/or diagnostic film review should be performed, exit strategy and the estimated fees and costs of handling the case up to, but not including, trial.[4]

3.    The litigation action plan should identify the attorney(s) and paralegal(s) assigned to the case along with their previously-agreed upon billing rate.

---

[4]    For construction defect cases, the handling attorney is to submit the initial claim evaluation, which includes a litigation action plan, within forty-five (45) days of receipt of the case.  Every ninety (90) days thereafter, until the final trial report is completed, defense counsel on construction defect cases is to submit the Supplemental Report for CD cases.

4.   Within fifteen (15) days of receipt of plaintiff's initial discovery responses, the handling attorney is to submit a summary report discussing the alleged theories of liability and damages. Suggested items of investigation, strategy and settlement evaluation must be included. As previously indicated, copies of the responses must be included.[5]

5.   Within seven (7) days following a deposition, the attending counsel must submit a report in the attached format. A copy of the "slim script" or "miniscript" of the transcript must be provided electronically as soon as received by you. Copies of all exhibits must be provided (including color copies or duplicate originals of all photographs). Copies of exhibits should include exhibit tabs/markers.[6]

6.   AmTrust must be advised of any trial, mediation or arbitration in advance of the event.

     AmTrust should be advised of the proposed mediation or arbitration dates, whether the mediation is court-ordered, and whether the adjuster needs to attend in person. In addition, counsel should advise on possible mediator selections, counsel's recommendation for the selection of a mediator, advise of all potential costs including how the mediation costs will be shared, and send copies of the mediation statements or briefs from all parties. Within thirty (30) days prior to the mediation or arbitration, counsel should provide an evaluation of the case and resolution strategy.[7]

     At the time that a court places a case on the trial calendar or docket, counsel must submit a report in the attached format within thirty (30) days. If the jurisdiction you practice in provides a trial date at the outset of litigation, the trigger date for this criterion would be when the case is considered "ready" for trial. The report must specify the deadline for filing dispositive motions, if applicable. If possible, the report should also indicate a time frame for the probable trial date.[8]

     Critically, forty-five (45) days prior to trial, counsel must submit a final, formal Trial report.

7.   Upon your receipt of any statement of damages or written settlement demands, immediately provide us with a copy.

8.   Upon your receipt of any proposals for settlement, offers of judgment or other statutory settlement demands, including but not limited to time limit demands and policy limit demands, counsel is to immediately submit same to the claims adjuster by

---

[5]     For construction defect cases, the handling attorney need not submit this Discovery Report, for it is incorporated within the Supplement Report for CD Cases.

[6]     For construction defect cases, the handling counsel should submit the Deposition Report for CD Cases.

[7]     For construction defect cases, the handling counsel should submit the Pre-Trial/Pre-Mediation Report for CD Cases.

[8]     For construction defect cases, the handling counsel should submit the final Trial Report for CD Cases.

e-mail.  A conference with the claims adjuster concerning same must be held as soon as possible and no less than fourteen (14) days prior to the deadline date.

Counsel must immediately report any allegation of bad faith handling and demands for extra-contractual obligations to the Claims Manager and the Vice President, Claims and Litigation Management at CAC@amtrustgroup.com.

9.     Many cases assigned to outside counsel involve claims of excess damages and/or serious injuries and are reportable to excess/umbrella carriers.  Please be sure to request in writing from your client, multiple times if necessary, the identity of their excess/umbrella carriers and, if applicable, secure an affidavit that no excess, umbrella or other coverage exists for the date(s) of loss.  Once such insurers are identified, we must be notified, and copies of your reports must be sent to those other carriers, unless they instruct you in writing not to do so.  In the event that your client may not possess sufficient coverage to satisfy a possible settlement or verdict, the client and their personal counsel, if applicable, must be copied on all relevant reports.

10.    Counsel should report all significant case activity and/or developments as soon as practical.

11.    Additionally, many cases assigned to outside counsel involve claims that are reportable to reinsurers, consultants, brokers, *etc.*  If appropriate, we will provide the necessary information so that you may copy them on all relevant correspondence.

12.    Each report must be signed by the attorney(s) who drafted the report and is responsible for its contents and opinions.

## Trials

1.     Counsel must immediately advise us of all pre-trial/settlement conference (and adjourn/continuation) dates.

2.     Counsel must immediately advise of any trial or arbitration (and adjourn/continuation) dates.

3.     In the event that the presence of an AmTrust representative is required at trial or arbitration (or any court proceeding), counsel must immediately notify the claims adjuster and branch manager of the details concerning the nature of the proceeding, location, date, time and anticipated duration of the appearance.

4.     Sufficiently prior to jury selection, and ideally at the time the case is placed on the trial docket, counsel must contact and advise us of the identity of the attorney designated to try the case so that we may approve of the assignment, if not done so previously. Our working assumption is that the handling partner will try the matter, and in no case can an attorney try a case who we have not approved.

5.  If any fees need to be advanced to ensure the appearance of expert and non-party witnesses, a fully completed IRS W9 form, fee schedule, demand for payment and other documentation needs to be provided to us in a timely manner and not on the eve of trial or a rush basis.

6.  A sufficiently detailed jury profile is to be provided upon completion of the selection process.  The proposed order of witnesses, trial schedule, and anticipated date for the jury to be charged or the conclusion of the bench trial should be provided to us and updated as circumstances change during the trial.

7.  If during the course of trial or arbitration critical issues develop, including appellate issues, evidentiary problems, or other developments, you must notify us immediately. It is essential that the court record be protected to preserve your client's rights.  If motions need to be made post-trial, please secure an adequate extension of time so that these issues can be optimally addressed.

8.  As soon as possible, trial counsel must advise the claims adjuster of the events of a trial conference, jury selection and the actual trial during each significant break and before and after each day of jury selection and trial.  Trial counsel must carry a charged iPad, tablet, cell phone or similar electronic means of communication.  It is expected that trial counsel report to us as much as practical; to wit, before and after the day's testimony, as well as at lunch and all other significant breaks.

    If a claims adjuster is present and monitoring the trial, then prior to the trial, counsel and the claims adjuster must consult and agree to a reporting protocol.  Such protocol must be approved by the Claims Manager and/or Vice President, Claims.

    Your client must be present for the entire length of the trial or, if relevant, arbitration. Any exception to this must be conferenced in advance with the Claims Manager and/or Vice President, Claims to waive this rule.

9.  Post-trial motions and appeals are always expected whether the outcome of a trial is favorable or adverse. Trial counsel is expected to request extensions of deadlines as needed to promote a favorable outcome.

10. At the end of a case, on any case subject to appeal or where we received a non-expected result, trial counsel should submit a brief closing report.


## Billing

Please review most current version of the document entitled AmTrust's Information for Attorneys Providing Legal Services (presently, version 1.3, dated May 1, 2013).

## Administrative Matters

1.  Each year, counsel must provide us with evidence that your firm possesses errors and omissions (malpractice) coverage in an amount no less than $2,000,000 per occurrence. Upon the renewal of the applicable insurance policies, please provide us with the relevant certificate of insurance and/or the declarations pages. All such document should be sent via e-mail to legalbillaudit@amtrustgroup.com.

2.  Counsel must ensure that all attorneys assigned to a file have active licenses in the state where the litigation is venued. If an attorney needs to be admitted *pro hac vice*, the claims adjuster must be advised of the need for such admission and approval must be obtained by the claims adjuster.

3.  We require that any approved attorney working on AmTrust matters maintain current *curriculum vitae* (or similar document conveying qualifications and background material) on file with us.

4.  Counsel must maintain a current IRS form W-9 and Error and Omissions Certificate on file with us for our records.

5.  Counsel must ensure that its computer system, network, servers and data storage system provide for adequate security and protection of personal privacy information. This includes:

    a.  Secure user authentication protocols
    b.  Secure access control measures
    c.  Encryption of all transmitted records and files containing personal information that will travel across public networks, and encryption of all data containing personal information to be transmitted wirelessly.
    d.  Reasonable monitoring of systems for unauthorized use of or access to personal information.
    e.  Encryption of all personal information stored on laptops or other portable devices.
    f.  Up–to-date firewall protection and system security patches designed to maintain the integrity of personal information.
    g.  Up–to-date system security agent software which must include malware protection and reasonably up to date patches and virus definitions, and is set to receive the most current updates on a regular basis.
    h.  Education and training of employees on the proper use of the computer security system and the importance of personal information security.

    Proven, standard algorithms such as AES, DES, Blowfish, RSA, RC5 and IDEA (or similar, modern technologies) should be used as the basis for encryption technologies. These algorithms represent the actual cipher used for an approved application. For example, Symantec's Pretty Good Privacy (PGP) uses a combination of IDEA and RSA or Diffie-Hellman, while Secure Socket Layer (SSL) uses RSA encryption. Symmetric cryptosystem key lengths must be at least 128 bits. Asymmetric crypto-

system keys must be of a length that yields equivalent strength. AmTrust's key length requirements will be reviewed annually and upgraded as technology allows.

## Authorized Vendors and Experts

1.    The use of any vendor service exceeding $1,000.00 must be pre-approved by the claims adjuster.

2.    The claims adjuster must approve the retention of all experts, consultants, investigators or trial preparation specialists.  Prior to the assignment of an independent medical examination or other expert, we require a copy of the physician's/expert's *curriculum vitae* and fee schedule.

3.    If counsel has experts, consultants or investigators you would like to use, please submit their *curriculum vitae* and pricing list to the adjuster for our approval and addition to our vendor panel.  Charges you incur without our approval will be borne by you.

4.    In all cases, please make sure to identify that you are engaging the services on behalf of AmTrust.  In doing so, you will get the advantage of preferred billing rates, as well the invoices being sent directly to us for payment and processing.

In the event that local law governing attorney conduct prohibits use of preferred vendors, we submit the following as a resource rather than a mandate and ask that you contact our office before proceeding any further.

Court Reporters:

For litigation in all states east of the Mississippi River, please use:
    U.S. Legal Support                              832.971.6753

All inquiries pertaining to U.S. Legal Support should be directed to Heather Hughes at 832.971.6753 or hhughes@uslegalsupport.com.

For litigation in the New York-metropolitan area, please use one of the following court reporting agencies:

|  |  |
|---|---|
| U.S. Legal Support | 832.971.6753 |
| American Steno | 718.291.6600 |
| Deitz Court Reporting | 800.678.0166 |

All inquiries pertaining to U.S. Legal Support should be directed to Heather Hughes at 832.971.6753 or hhughes@uslegalsupport.com.  For inquiries to American Steno, please direct them to Lloyd Savel at 718.291.6600 or lloyd@americansteno.com.  For inquiries to Deitz, please direct them to Mark Hoorwitz at 800.678.0166 or mark@deitzreporting.com.

For litigation in all states west of the Mississippi River, please use: Esquire Court Reporting, whose contact information is below:

| | |
|---|---|
| Online: | www.esquireconnect.net (the preferred scheduling method) |
| E-mail: | ECSscheduling@esquiresolutions.com |
| Phone: | 888.486.4044 |
| Fax: | 888.486.6007 |

Contacts at Esquire are: Jeff Anthony, Esquire National Account Manager (janthony@esquiresolutions.com or 860-895-3853); Matt Leary, National Director (mleary@esquiresolutions.com); or, Janna Read, Esquire Corporate Solutions Vice President (jread@esquiresolutions.com).

Interpreters:  For litigation in east of the Mississippi River, please use U.S. Legal, and for litigation west of the Mississippi River, please use Esquire.  Additionally, in the New York-metropolitan area, the following entities are approved, authorized interpreters:

| | |
|---|---|
| Ventura Translations | 718.349.3374 |
| International Interpreters, Inc. | 718.597.5930 |

Medical Records Retrieval:  AmTrust's preferred national vendor for medical records retrieval is U.S. Legal (see above for contact information).

Structured Settlement Broker:  Ringler Associates is the only vendor authorized by AmTrust to broker a structured settlement.  Any assignment is to be made after consultation with the claims adjuster.

Medicare Secondary Payer Services:  Our primary vendor for Medicare Secondary Payer services, including lien research, allocation and set aside agreements is:

Jamie Benson
ISO/Crowe Paradis
400 Riverpark Drive
Suite 400
North Reading, Massachusetts 01864

E-mail: jbenson@iso.com

Phone: (978) 979-5244
Fax:     (978) 825-8119

Counsel should not make any assignment to a Medicare Secondary Service provider without our consultation and written approval.